# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ILLINOIS
### BENTON DIVISION

| | | |
|---|---|---|
| MICHAEL BOYD, PAUL LEE, KENDRICK PEARSON and J.B. WASHUP, on behalf of themselves and all others similarly situated, | ) ) ) ) | Civil Action No. 3:12-cv-00704-JPG |
| Plaintiffs, | ) ) | CJRA TRACK:  D |
| v. | ) ) | PRESUMPTIVE TRIAL MONTH: |
| S. A. GODINEZ, Director of the Illinois Department of Corrections, and RANDY DAVIS, Warden of Vienna Correctional Center, in their official capacities, | ) ) ) ) ) ) | July 14, 2014

Judge J. Phil Gilbert

Magistrate Judge Philip M. Frazier |
| Defendants. | ) | |

## FIRST AMENDED COMPLAINT

Plaintiffs Michael Boyd, Paul Lee, Kendrick Pearson and J.B. Washup by and through

their attorneys, Latham & Watkins LLP and Uptown People's Law Center, allege for their First

Amended Complaint against Defendants S. A. Godinez, Director of the Illinois Department of

Corrections, and Randy Davis, Warden of Vienna Correctional Center (collectively,

"Defendants"), in their official capacities as follows:

### NATURE OF THE ACTION

1.      Vienna Correctional Center ("Vienna") is a minimum-security facility located

in southern Illinois that houses male offenders convicted of low-level and largely non-violent

crimes.  When it opened in 1965, Vienna was intended to hold approximately 925 prisoners

and to focus on education and community development as part of its rehabilitative mission.

2.      Nearly 50 years later, Vienna is unconscionably overcrowded (housing nearly

1,900 prisoners), is dilapidated from years of neglect and has long since abandoned any

meaningful educational or community development programs.  Today, the prisoners at Vienna

are forced to live in squalid conditions, where they are exposed to overflowing sewage,

pervasive mold and mildew and infestations of insects and rodents.  They lack access to basic necessities, like properly functioning heat and ventilation, properly functioning toilets, sinks and showers and fresh, uncontaminated food.  In short, the conditions at Vienna are inhumane and deprive the prisoners housed there of their basic human needs.

3.      Despite having actual knowledge of these conditions and the serious risks they pose, Defendants have been deliberately indifferent to the inhumane conditions to which the prisoners at Vienna are exposed and have failed to make reasonable efforts to remedy those conditions, leaving the prisoners to suffer an inhumane, degrading, uncivilized and unhealthy existence.

4.      As a result, this suit seeks injunctive and declaratory relief pursuant to 42 U.S.C. § 1983 and 28 U.S.C. § 2201 and § 2202 for violations of the Eighth Amendment to the United States Constitution, as applied to the states by the Fourteenth Amendment, on behalf of all prisoners at Vienna.

**THE PARTIES**

**A.      Plaintiffs**

5.      Plaintiff Michael Boyd ("Mr. Boyd") is 28 years old.  Mr. Boyd was incarcerated in Vienna approximately from January 2011 until January 2013 and was serving time for a non-violent crime.  During the time that he was incarcerated at Vienna, Mr. Boyd was housed in Building 19, two of Vienna's other housing units and Vienna's segregation unit and was exposed to the conditions described in this Complaint.

6.      Plaintiff Paul Lee ("Mr. Lee") is 58 years old.  Mr. Lee was incarcerated in Vienna approximately from August 2010 to February 2013 and was serving time for a non-violent crime.  During the time that he was incarcerated at Vienna, Mr.  Lee was housed in

2

Building 19 as well as three of Vienna's other housing units and was exposed to the conditions described in this Complaint.

7. Plaintiff Kendrick Pearson ("Mr. Pearson") is 44 years old. Mr. Pearson was incarcerated in Vienna approximately from May 2011 until March 2013 and was serving time for a non-violent crime. During the time that he was incarcerated at Vienna, Mr. Pearson was housed in Building 19 as well as one of Vienna's other housing units and was exposed to the conditions described in this Complaint.

8. Plaintiff J.B. Washup ("Mr. Washup") is 56 years old. Mr. Washup has been incarcerated at Vienna since June of 2011. Upon arriving at Vienna, Mr. Washup was initially housed in Building 19 and has since lived in three of Vienna's other housing units. He is serving time for a non-violent crime. While detained at Vienna, Mr. Washup has been exposed to the conditions described in this Complaint.

### B. Defendants

9. Defendant S. A. Godinez ("Director Godinez") has been the Director of the Illinois Department of Corrections since May 5, 2011. In all of his actions, Director Godinez was acting under color of state law and in the course of his employment. The claims being made against Director Godinez are brought against him in his official capacity.

10. Defendant Randy Davis ("Warden Davis") is the Warden of Vienna Correctional Center. In all of his actions, Warden Davis was acting under color of state law and in the course of his employment. The claims being made against Warden Davis are brought against him in his official capacity.

### JURISDICTION AND VENUE

11. Plaintiffs bring this action on behalf of themselves and all others similarly situated pursuant to 42 U.S.C. § 1983 to secure equitable relief from Defendants' actions,

which themselves were initiated under color of state law and which violate the rights, privileges and immunities guaranteed to Plaintiffs by the Eighth Amendment to the United States Constitution, as made applicable to the states through the Fourteenth Amendment.

12. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1343.

13. This Court is authorized to render declaratory relief pursuant to 28 U.S.C. § 2201 and § 2202.

14. Venue is proper in this district pursuant to 28 U.S.C. § 1391, because all of the relevant events occurred at Vienna, located in Johnson County, which is within the Southern District of Illinois.

**FACTS COMMON TO ALL COUNTS**

**A. Severe Overcrowding At Vienna**

15. Located in Johnson County and adjacent to the Shawnee National Forest, Vienna is a minimum-security, adult, male-only correctional facility that primarily houses low-level, non-violent offenders incarcerated for relatively short lengths of time. See Sept. 27, 2011 Monitoring Visit to Vienna Correctional Center by the John Howard Association of Illinois ("John Howard Report"), Ex. A, at 2.

16. In its early years, Vienna was hailed as one of the most successful prisons in Illinois. See John Howard Report, Ex. A, at 2. At that time, the facility was intended to function as a small town in which the prisoners could be rehabilitated and learn to re-enter society as responsible citizens. See id. In order to further its rehabilitative mission, Vienna focused on education and vocational training and its programs were so well-regarded that members of the surrounding community often took classes at the prison alongside the men who were incarcerated there. See id. In addition, since the majority of the prisoners at Vienna

4

were non-violent offenders, they also were permitted to volunteer in the community. See id. In fact, Vienna operated an emergency technician program, which allowed qualified prisoners to staff a 24-hour ambulance service for the surrounding community. See id.

17. Despite its auspicious beginnings, the conditions at Vienna have degraded significantly over time. A surge in the prison population throughout Illinois has caused severe and pervasive overcrowding at Vienna. According to the Illinois Department of Corrections, Vienna was originally designed to house 925 prisoners, but as of July 1, 2013, 1,898 prisoners were packed into the facility. See Limited Scope Compliance Examination For the Two Years Ended June 30, 2008, Vienna Correctional Center, State of Illinois Department of Corrections ("2008 Compliance Examination"), Ex. B, at 61; July 1, 2013 Illinois Department of Corrections Quarterly Report ("Quarterly Report"), Ex. C, at Table 4. At 205% capacity, Vienna is one of the most over-crowded prisons in Illinois. See id.

18. The roughly 1,900 prisoners detained at Vienna are housed in six single-story housing units and one three-story housing unit. The three-story unit is referred to as "Building 19." In order to accommodate the nearly 1,000 additional prisoners in excess of its designed capacity, Vienna has converted storage units and other spaces that were never meant to house prisoners into living quarters.

19. For example, Building 19 was, upon information and belief, an administrative building that was converted into housing. The first floor of Building 19 contains the segregation unit, and the second and third floors of Building 19 house prisoners in open-style dormitories containing double bunk beds. See John Howard Report, Ex. A, at 9. These bunk beds are placed so close to one another that the men can reach across the narrow aisles and touch the person sleeping in the bed next to them. Approximately 200 prisoners live on the

5

second floor in one open dormitory, and approximately 400 prisoners live on the third floor in four separate quadrants. See id. As discussed in more detail below, since these converted areas were not designed to function as housing, they lack basic facilities, such as sufficient toilets and showers. See disc. infra at ¶¶ 47-59.

20. Moreover, although Illinois' Unified Code of Corrections requires that "[a]ll new, remodeled and newly designed institutions or facilities shall provide at least 50 square feet of cell, room or dormitory floor space" per prisoner (see 730 ILCS 5/3-7-3 (emphasis supplied)), the Illinois Department of Corrections admits that the prisoners at Vienna are on average confined to 33 square feet, two-thirds the minimum space the Illinois General Assembly has determined necessary for safe and sanitary living conditions. See Quarterly Report, Ex. C, at Table 6. In reality, many prisoners are restricted to even less space.

21. The overcrowding at Vienna "stretches vital . . . resources, from programming to healthcare." John Howard Report, Ex. A, at 7. Indeed, Vienna's once robust educational programming is now practically nonexistent. For a population of almost 1,900, Vienna has only four Adult Basic Education classes and two GED classes, which have extremely long waiting lists. See id. at 15. Vienna also has only limited vocational training opportunities and limited possibilities for prisoners to obtain jobs. See id.

22. Vienna's general population receives at most three hours of recreation/exercise time per week. See John Howard Report, Ex. A, at 9. Many men report receiving only two hours per week or less. The living areas, especially in Building 19, have very limited common area space where the prisoners can play cards or watch television. As a result, many of the prisoners at Vienna have nothing to do all day but sit idle in their bunks.

6

23.     The severe overcrowding and the fact that the prisoners do not have any productive way to spend their time and energy fosters an environment of tension, unrest and violence.  Fights routinely break out over theft as well as petty issues, such as seats near the television, time on the phone or the placement of fans.

24.     Inadequate staffing exacerbates this situation.  Simply put, Vienna has insufficient staffing to monitor and control the growing population of prisoners.

25.     For example, only two correctional officers monitor the 200 prisoners on Building 19's second floor, and only two to three officers oversee the 400 prisoners on Building 19's third floor.  See John Howard Report, Ex. A, at 11.  Because there are so many prisoners and so few officers, the officers are frequently unaware of the fights that occur in the dormitories and when the officers are aware, they often let the prisoners fight it out, intervening only after the fight is finished in order to issue disciplinary citations.

26.     The severe overcrowding has also limited Vienna's ability to provide the prisoners with adequate clothing, linens or blankets.  The clothing and bedding materials provided to prisoners are often stained, soiled and tattered.  The prisoners are not provided state-issued boots or stocking hats to protect them from the winter weather, and the shoes that are provided to prisoners often fall apart in a matter of weeks.

**B.     The Inhumane Living Conditions At Vienna**

27.     Compounding the problems caused by severe overcrowding is a lack of maintenance and upkeep.  Critical maintenance projects have been ignored for nearly a decade, causing widespread disrepair.  See John Howard Report, Ex. A, at 5.  As a result, conditions at Vienna are deplorable and can only be considered inhumane.

**1.      Vienna Is Infested With Insects And Vermin**

28.      Cockroaches, spiders, ants, millipedes, mice, rats and other insects and vermin infest all the housing units as well as the kitchen and dining hall at Vienna.  These insects and vermin expose the prisoners at Vienna to a multitude of diseases, including some diseases that can be fatal.  In fact, many prisoners have reported experiencing spider bites that later became infected.

29.      Cockroaches, in particular, are a common problem at Vienna.  They infest the walls and take residence in the prisoners' clothing, shoes, bunks, property boxes, sinks and bathrooms.  Prisoners find cockroaches in their coffee cups, drinking glasses and toothbrushes and feel cockroaches crawl across them while they lie in their bunks.  The men often have to physically sweep cockroaches off of their mattresses and remove cockroach feces from their pillows and clothing.

30.      Mice and rats are also a constant problem at Vienna.  They crawl into the prisoners' property boxes and eat the food that the men have purchased from the commissary.  Both officers and prisoners have reported finding mice nesting in closets and mouse feces on the floors of the housing units.  Mice also "frequently [run] across the floors" in the dining hall during meals.  See John Howard Report, Ex. A, at 10.

31.      The infestations in the kitchen and dining hall are particularly disturbing.  Mice, cockroaches and other insects run rampant across the floors of the dietary unit, where Vienna prepares meals for its prisoners.  Cockroaches dart across "clean" pans, utensils, countertops and serving stations and climb into the food trays as they are being passed down the serving line.  Much of the food, including bread, rice, grains, cereals and oatmeal, contains rodent feces and mold.  Mice nest in the cabbage, rice, potatoes, bread and other food.

32. Nonetheless, prison staff instruct the prisoners working in the kitchen to cook with and serve this food, which is often otherwise outdated, expired or spoiled. Unsurprisingly, therefore, prisoners find dead bugs, rodent droppings, insect antennae, hair, rocks, rubber bands, cardboard and other objects in their food. Some men have stated that the problem has become so bad that they simply do not eat in the dining hall at all. Instead, if they can afford it, they live only off of whatever they can buy in the commissary.

33. The dining hall, like the food that is served there, is filthy. Rodents, cockroaches, flies, spiders and other bugs run across the floor during meals. Cockroaches crawl across the serving boards and sneeze guards where food is prepared and served. Spider webs cover the walls, and birds nest in available crevices.

### 2. Vienna Lacks Adequate Ventilation, Exposing The Prisoners To Extreme Temperatures And Other Weather

34. Ventilation in the housing units throughout Vienna is severely inadequate and causes extreme fluctuations in temperature.

35. The windows in the majority of the housing units are broken and lack screens, which causes the dormitories to become frigid in the winter.

36. In addition, in at least some of the housing units, "air constantly blew through the air vents, making the cells very cold" in the winter. See John Howard Report, Ex. A, at 9. The prisoners in these units "stuff[] toilet paper into the vents to block the airflow" in order to try to warm up but are threatened with "being issued a disciplinary ticket" if they are caught. See id. It is often so cold that the men must sleep in all of their clothing, yet they still feel as if they are sleeping outside.

37. Some air vents in Building 19 are caked with dust, which is then constantly circulated throughout the building. The lack of proper ventilation keeps dust, mold and

9

mildew in the air, causing prisoners breathing problems.  Some prisoners have complained of waking up with nose bleeds as a result of the poor ventilation.

38.     In Building 19, Vienna's "solution" to the problem of broken windows has been to board over the windows entirely, totally blocking out sunlight and fresh air.  When the windows in Building 19 are boarded up, it is so dark that the prisoners feel as if they are living in an abandoned building.

39.     Moreover, the housing units can become unbearably hot in the summer, particularly in Building 19, which houses hundreds of prisoners in spaces that were never intended to be living quarters.

40.     Broken windows not only let in cold air and extreme heat but also water and other elements.  During storms, rain leaks into the dormitories through broken windows and visible cracks in the ceiling, damaging light fixtures, staining the ceiling, dripping directly onto prisoners' beds and property, fostering the growth of mold and creating a smell of mildew that pervades the living spaces.  See John Howard Report, Ex. A, at 10; disc. infra at ¶¶ 41-46.  Staff members place buckets and trash cans throughout the facility as makeshift measures to attempt to collect the rain water.  Because no other measures are taken, however, the floors nevertheless become dirty, wet and dangerous.

### 3.     Vienna Is Also Infested With Mold

41.     The improper ventilation at Vienna contributes to its severe mold problem.

42.     Mold is everywhere in Vienna: in the housing units, the bathrooms and even the dining hall.  It grows along the walls and ceilings, in the light fixtures, around the sinks and drinking fountains, in the showers and behind the toilets.

43.     The mold on the ceiling and in the showers sometimes grows so thick that it breaks off and falls on the prisoners while they are sleeping in their bunks or showering.

44.     The Centers for Disease Control has noted that exposure to mold indoors can lead to "upper respiratory tract symptoms, cough, and wheeze in otherwise healthy people; with asthma symptoms in people with asthma; and with hypersensitivity pneumonitis in individuals susceptible to that immune-mediated condition." <u>See</u> http://www.cdc.gov/mold/stachy.htm#Q6 (last visited October 7, 2013).

45.     Despite the fact that mold presents a health hazard, Vienna has made no meaningful attempt to stem the growth of mold.  Maintenance workers periodically paint over the mold, which does nothing to actually stop its growth.  Inevitably, because the underlying mold is not addressed, this paint eventually chips and flakes, only further contributing to the appalling living conditions.

46.     Moreover, prison officials often reject or fail to respond to grievances about mold and mildew, claiming that the prisoners have access to cleaning supplies and should clean the mold themselves.  Vienna's general population, however, does not have access to even the watered-down cleaning supplies normally used, let alone access to the more powerful bleaches and disinfectants that would be needed to begin to actually clean the mold.

### 4.     Building 19

47.     While the living conditions at Vienna are generally deplorable, Building 19 is widely recognized as the worst of the worst.  As noted by John Howard during their visit, Building 19 is "<u>unfit</u> for the 600 [] men who lived there." <u>See</u> John Howard Report, Ex. A, at 10 (emphasis supplied).  Indeed, prison officials use Building 19 as a punishment, threatening prisoners with transfer to Building 19 as a way to get them to behave, knowing that Building 19 represents the very worst of the poor living conditions at Vienna.

48.     Upon arrival at Vienna, all prisoners are initially housed in Building 19 before they are transferred to one of the other housing units.  In addition, prisoners may be transferred back to Building 19 at any time and for a variety of reasons.

49.     Upon information and belief, Building 19 was never intended to be used as housing and is unsuitable for habitation.  There is exposed insulation, pipes with chipping and flaking paint and exposed electrical wiring throughout.  As discussed above, the prisoners in Building 19 are exposed to pervasive mold and mildew (see disc. supra at ¶¶41-46), infestations of mice, cockroaches and other insects (see id. at ¶¶28-33) and extreme temperature fluctuations due to broken windows and inadequate clothing and bedding (see id. at ¶¶34-40).

50.     Moreover, Building 19 lacks basic necessities.  The prisoners are crammed together in bunks placed less than 18 inches apart from each other.  See disc. supra ¶¶19-20. These bunks are rusting and are not properly bolted to the floor.  Often, the top bunk lacks support so that the mattress sags, endangering the prisoner on the top bed and encroaching upon the prisoners sleeping below.

51.     In addition, Building 19's third floor, which houses approximately 400 prisoners, has only one functioning phone.  So many prisoners competing for one phone has led to "repeated fights."  See John Howard Report, Ex. A, at 11.

52.     But it is Building 19's bathroom facilities that epitomize the deprivation of basic human needs occurring at Vienna.

53.     The second floor bathroom, which serves 200 prisoners, contains only three toilets and three sinks.  The third floor bathroom, which serves 400 prisoners, has only four toilets, four sinks and two urinals.

12

54.     To make matters worse, some of these toilets and sinks often do not function or drain properly due to leaking or clogged pipes.  See John Howard Report, Ex. A, at 10-11. Rust-colored water comes out of these few sinks, which the prisoners use to brush their teeth, wash their faces and "clean" their dishes.  Broken toilets are left filled with feces, sometimes for weeks.  These toilets often overflow, flooding the bathroom with raw human waste and leaving stagnant water pooling on the floor.  A "strong smell of fecal matter and sewage" constantly saturates the air.  See id. at 10.

55.     Dirty water falls from exposed, rusting pipes in the ceiling, creating a dangerously slippery floor and spawning additional mold and mildew.  See John Howard Report, Ex. A, at 10-11.  This water falls on the prisoners while they are exposed and attempting to use whatever working toilets are available.  To keep dry while using the facilities, the prisoners bring towels to cover their heads when using the toilets.

56.     The second floor bathroom has no working showers.  The only working showers in Building 19 are on the third floor.  See John Howard Report, Ex. A, at 11.  The men housed on the second floor of Building 19 are shuttled to the third floor showers on a rotating basis, as the third floor bathrooms obviously cannot accommodate all 600 prisoners each day.  See id.

57.     When the prisoners are able to access the showers, the water is sometimes so ice cold, boiling hot or lacking in water pressure that the showers cannot actually be used.  In addition, raw sewage and dirty water back up through the shower drain, causing flooding in the showers.  The prisoners in Building 19 tie bags over their feet and ankles to try to avoid developing infections or fungus while showering.

13

58.     Moreover, the shower area lacks adequate ventilation, creating a "stuffy, humid, and fetid" environment totally unsuitable for human use. <u>See</u> John Howard Report, Ex. A, at 11.

59.     Notably, although the bathrooms in Building 19 are considered the worst, the bathrooms in the other housing units are also disgusting and in serious disrepair. The walls are covered with mold, rust, dirt and grime. In one of the units, for example, a "rusty-colored liquid dripped from the ceilings, which prisoners had to artfully dodge as they brushed their teeth or used the restroom." <u>See</u> John Howard Report, Ex. A, at 9.

**5.       Vienna's Administration Ignores These Deplorable Living Conditions**

60.     The Illinois Department of Corrections and Vienna's prison administration, correctional officers and other staff are aware of the living conditions described above. In fact, on January 5, 2012, the Warden for Vienna issued a memorandum acknowledging the high number of grievances relating to Building 19. In his memorandum, the Warden admitted that these inhumane living conditions "are not new and have been present since reopening this area for housing" but argued that, while Building 19 may need some "improvements," it is "livable." <u>See</u> Ex. D hereto. Since issuing that memorandum, the Warden has not been amenable to hearing the inmates' concerns about the living conditions and instead has simply referred them to the memorandum.

61.     Additionally, Vienna's administration has affirmatively taken steps to cover up these inhuman conditions. Before John Howard arrived to inspect Vienna in September of 2011, prison officials instructed prisoners to paint over rust and mold without actually cleaning or improving prison conditions.

62.     Despite the fact that Defendants knew or should have known of the deplorable conditions at Vienna, Defendants have chosen to disregard these conditions and the risks they pose to the prisoners.

## CLASS ALLEGATIONS

63.     Plaintiffs bring this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of themselves and all prisoners residing at Vienna, seeking prospective declaratory and injunctive relief.

64.     Class action status is proper for this litigation, because the class of persons described in Paragraph 63 above is so numerous that the individual joinder of all absent class members is impracticable. While Vienna's population fluctuates, Plaintiffs believe that the proposed class consists of approximately 1,900 persons. See Quarterly Report, Ex. C, at Tables 1-2, 4-5. The exact number of absent class members is unknown to Plaintiffs at this time but will be ascertainable upon appropriate discovery from Defendants.

65.     The claims set forth in this Complaint are common to each member of the class. Common questions of law or fact exist as to each of the proposed class members, including but not limited to:

   a.     Whether Defendants are violating the prisoners' Eighth Amendment rights by forcing them to live in a vastly overcrowded and dilapidated facility;

   b.     Whether Defendants are violating the prisoners' Eighth Amendment rights by exposing them to rats, mice, cockroaches, birds, spiders, other insects and vermin and rodent feces, which infest the housing units, kitchen and dining hall;

c.      Whether Defendants are violating the prisoners' Eighth Amendment rights by exposing them to inadequate ventilation and extremes in temperatures;

d.      Whether Defendants are violating the prisoners' Eighth Amendment rights by depriving them of basic sanitation, including adequate bathroom facilities, showers and toilets;

e.      Whether Defendants are violating the prisoners' Eighth Amendment rights by exposing them to mold, which covers the walls, ceilings and/or floors of the housing units; and

f.      Whether Defendants are violating the prisoners' Eighth Amendment rights by exposing them to an unnecessary threat of violence, due to the overcrowding, unsanitary living conditions and insufficient staff.

66.     Plaintiffs are proper representatives of the proposed class, because they are members of the class described in Paragraph 63 above. The claims of Plaintiffs are typical of the claims of the class. Each Plaintiff has suffered the living conditions at Vienna in violation of the federal Constitution, federal law and all other applicable laws.

67.     Plaintiffs will fairly and adequately represent the interests of the members of the proposed class and have no interests in conflict with those of the proposed class. Plaintiffs have retained competent attorneys who are experienced in class action and complex litigation.

68.     The proposed class may properly be certified under Federal Rule of Civil Procedure 23(b)(2), because Defendants have acted in a manner generally applicable to the class as a whole, making final injunctive relief appropriate with respect to the class as a whole.

16

## CAUSES OF ACTION

## COUNT I – INJUNCTIVE RELIEF

### Unconstitutional Conditions Of Confinement Under The
### Eighth Amendment In Violation Of 42 U.S.C. § 1983

69.     Plaintiffs reallege and incorporate herein by reference the foregoing Paragraphs 1 to 68 of their Complaint as if stated fully herein.

70.     The Eighth Amendment to the United States Constitution protects individuals from cruel and unusual punishment.

71.     The protections of the Eighth Amendment apply equally to the states and all divisions and entities thereof, including departments of corrections, prison facilities and officers acting in their official capacities.

72.     Plaintiffs and the members of the proposed class have a right not to be subjected to cruel and unusual punishment.

73.     By the facts and actions described above regarding the conditions of confinement at Vienna, Defendants are subjecting Plaintiffs and the members of the proposed class to a serious deprivation of basic human needs, including through exposure to, infliction of and failure to address the following conditions:

      a.     vastly overcrowded living conditions;

      b.     rats, mice, cockroaches, spiders, rodent feces and other insects and vermin;

      c.     inadequate ventilation;

      d.     excessive heat;

      e.     excessive cold;

f.     inadequate sanitation, including malfunctioning toilets, sinks and showers;

g.     defective plumbing;

h.     raw sewage, rust, mold, mildew, rain water and flooding and pooling water;

i.     inadequate, soiled and tattered clothing and bedding materials;

j.     insufficient recreational, educational and vocational training opportunities;

k.     unclean drinking water;

l.     unsanitary dining facilities filled with rats, cockroaches spiders and other vermin; and

m.     the threat of violence among prisoners due to the deplorable living conditions and insufficient correctional staff.

74.     These deprivations and the risks they pose violate contemporary standards of decency and deny prisoners minimal civilized measures of life's necessities.

75.     These deprivations of basic human needs are serious and excessive, given that they pose serious harm or serious risk of harm to the prisoners' health and safety.

76.     Despite having actual knowledge of the serious risks posed to the prisoners' health and safety, Defendants have disregarded those risks, taking little if any action to try to address the deprivations of the prisoners' basic human needs brought about by the conditions of confinement.

77.     As such, Defendants have acted with deliberate indifference toward serious deprivations of the prisoners' basic human needs.

78.     At all relevant times, Defendants acted in their official capacity under color of state law.

79.     Defendants' actions have deprived the prisoners of their right to be free from cruel and unusual punishment and demonstrate a reckless and callous disregard of their rights.

80.     By the acts described above, Defendants have violated and continue to violate the rights of Plaintiffs and the members of the proposed class protected by the Eighth Amendment to the United States Constitution and 42 U.S.C. § 1983.

81.     Defendants' actions have caused and will continue to cause Plaintiffs great, immediate and irreparable harm if such actions are permitted to continue.

82.     Given Defendants' past actions, combined with their repeated refusal to acknowledge or address the deplorable conditions at Vienna, it is not only probable but likely that Defendants will continue to act in a similar manner toward Plaintiffs and the members of the proposed class in the future.

83.     Plaintiffs and the members of the class have no adequate remedy at law for Defendants' failure to provide conditions of confinement that comply with the United States Constitution, federal law and other applicable laws as a result of the conduct complained of herein.  As such, Plaintiffs and the members of the proposed class are entitled to an order compelling Defendants to comply with the Constitution, federal law and all other applicable laws.

WHEREFORE, Plaintiffs pray for judgment as follows:

a.     For an order that this action be maintained as a class action pursuant to the Court's powers under Federal Rule of Civil Procedure 23 and defining the class as described above in Paragraph 63;

19

b.　　For an order of permanent injunctive relief, compelling Defendants to comply with the Constitution, federal law and other applicable laws;

c.　　For costs, including attorneys' fees pursuant to 42 U.S.C. § 1988; and

d.　　For such other and further legal, equitable and other relief as this Court deems just and proper.

## COUNT II – DECLARATORY RELIEF

### Unconstitutional Conditions Of Confinement Under The Eighth Amendment In Violation Of 42 U.S.C. § 1983

84. Plaintiffs reallege and incorporate herein by reference the foregoing Paragraphs 1 to 83 of their Complaint as if stated fully herein.

85. The Eighth Amendment to the United States Constitution protects individuals from cruel and unusual punishment.

86. The protections of the Eighth Amendment apply equally to the states and all divisions and entities thereof, including departments of corrections, prison facilities and officers acting in their official capacities.

87. Plaintiffs and members of the proposed class have a right not to be subjected to cruel and unusual punishment.

88. By the facts and actions described above regarding the conditions of confinement at Vienna, Defendants are subjecting and have subjected Plaintiffs and the members of the proposed class to a serious deprivation of basic human needs, including through exposure to, infliction of and failure to address the following conditions:

a.　　vastly overcrowded living conditions;

20

b.  rats, mice, cockroaches, spiders, rodent feces and other insects and vermin;

c.  inadequate ventilation;

d.  excessive heat;

e.  excessive cold;

f.  inadequate sanitation, including malfunctioning toilets, sinks and showers;

g.  defective plumbing;

h.  raw sewage, rust, mold, mildew, rain water and flooding and pooling water;

i.  inadequate, soiled and tattered clothing and bedding materials;

j.  insufficient recreational, educational and vocational training opportunities;

k.  unclean drinking water;

l.  unsanitary dining facilities filled with rats, cockroaches, spiders and other vermin; and/or

m.  the threat of violence among prisoners due to the deplorable living conditions and insufficient correctional staff.

89.  These deprivations and the risks they pose violate contemporary standards of decency and deny prisoners minimal civilized measures of life's necessities.

90.  These deprivations of basic human needs are serious and excessive, given that they pose serious harm or serious risk of harm to the prisoners' health and safety.

91. Despite having actual knowledge of the serious risks posed to the prisoners' health and safety, Defendants have disregarded those risks, taking little if any action to try to address the deprivations of the prisoners' basic human needs brought about by the conditions of confinement.

92. As such, Defendants have acted with deliberate indifference toward serious deprivations of the prisoners' basic human needs.

93. At all relevant times, Defendants acted in their official capacity under color of state law.

94. Defendants' actions have deprived the prisoners of their right to be free from cruel and unusual punishment and demonstrate a reckless and callous disregard of their rights.

95. By the acts described above, a ripe and justiciable controversy exists between the parties regarding the rights of Plaintiffs and the members of the proposed class under the Eighth Amendment to the United States Constitution and 42 U.S.C. § 1983.

96. Given Defendants' past actions combined with their repeated refusal to acknowledge or address the deplorable conditions at Vienna, it is not only probable but likely that Defendants will continue to act in a similar manner toward Plaintiffs and the members of the proposed class in the future.

WHEREFORE, Plaintiffs pray for judgment as follows:

a. For an order that this action be maintained as a class action pursuant to the Court's powers under Federal Rule of Civil Procedure 23 and defining the class as described above in Paragraph 63;

b. For an order declaring that Defendants, individually and collectively, have subjected Plaintiffs and the members of the proposed class to

22

conditions of confinement, both individual and in aggregate, that deprive

Plaintiffs and the members of the proposed class of their rights under the Eighth

Amendment to the United States Constitution, federal law and other applicable

law;

      c.      For costs, including attorneys' fees pursuant to 42 U.S.C. § 1988;

and

      d.      For such other and further legal, equitable and other relief as this

Court deems just and proper.


Dated: October 29, 2013                 Respectfully submitted,

                                 s/ Kathleen P. Lally

                                 One of the Attorneys for Plaintiffs
Michael Boyd, Paul Lee, Kendrick Pearson and
J.B. Washup, on behalf of themselves and all
others similarly situated

Mark S. Mester
    mark.mester@lw.com
Kathleen P. Lally
    kathleen.lally@lw.com
Robert C. Collins III
    robert.collins@lw.com
Malorie Medellin
    Malorie.medellin@lw.com
LATHAM & WATKINS, LLP
233 South Wacker Drive, Suite 5800
Chicago, Illinois 60606
Telephone:  (312) 876-7700
Facsimile:  (312) 993-9767

Alan Mills
    alanmills@comcast.net
UPTOWN PEOPLE'S LAW CENTER
4413 North Sheridan
Chicago, Illinois 60640
Telephone: (773) 769-1411
Facsimile: (773) 769-2224

## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ILLINOIS
## BENTON DIVISION

| | | |
|---|---|---|
| MICHAEL BOYD, PAUL LEE and KENDRICK PEARSON, on behalf of themselves and all others similarly situated, | ) ) ) | Civil Action No. 3:12-cv-00704-JPG |
| | ) | |
| Plaintiffs, | ) | CJRA TRACK:  D |
| v. | ) | |
| | ) | PRESUMPTIVE TRIAL MONTH: |
| S. A. GODINEZ, Director of the Illinois | ) | July 14, 2014 |
| Department of Corrections and RANDY | ) | |
| DAVIS, Warden of Vienna Correctional | ) | Judge J. Phil Gilbert |
| Center, in their official capacities, | ) | |
| | ) | Magistrate Judge Philip M. Frazier |
| Defendants. | ) | |

## EXHIBITS TO FIRST AMENDED COMPLAINT

| Exhibit | Description |
|---|---|
| A | Sept. 27, 2011 Monitoring Visit to Vienna Correctional Center by the John Howard Association of Illinois |
| B | Limited Scope Compliance Examination for the Two Years Ended June 30, 2008, Vienna Correctional Center, State of Illinois, Department of Corrections (excerpt) |
| C | July 1, 2013 Illinois Department of Corrections, Quarterly Report |
| D | Jan. 5, 2012 Memorandum of Warden Randy Davis |

# EXHIBIT
# A



# John Howard Association of Illinois

375 East Chicago Avenue, Suite 529  Chicago, IL 60611
Tel. 312-503-6300 Fax. 312-503-6306 www.thejha.org

# Monitoring Visit to Vienna Correctional Center
# 9/27/2011

The John Howard Association (JHA) visited Vienna Correctional Center (Vienna) on September 27, 2011.  It is a male minimum-security prison located in Vienna, Illinois about six hours south of Chicago.



**Vital Statistics:**

Population: 1,616
Rated Capacity: 685
Average Annual Cost Per Inmate: $20,714
Average Age: 35
Source: DOC, 12/19/2011

**Key Observations**

- As of December 19, 2011, Vienna is Illinois' most overcrowded prison. It is designed to hold 685 inmates, but houses more than 1,600, which makes it about 240 percent over its design capacity.

- Most of Vienna's inmates serve less than one year at the facility.

- If Governor Quinn restored Meritorious Good Time, the early-release program he suspended in late 2009, Vienna could potentially empty its most overcrowded, dilapidated housing areas.

- At the time of JHA's visit in September 2011, Vienna had only one mental health professional to meet the needs of more than 1,600 inmates.

- Approximately 12 percent of Vienna's population is 50 or older.  The racial-ethnic makeup of Vienna's population is roughly 67 percent African American, 21 percent White, 11 percent Hispanic, and approximately 1 percent Native American and Asian combined.

# Monitoring Visit to Vienna Correctional Center
# 9/27/2011

## Executive Summary

On September 27, 2011, JHA visited Vienna Correctional Center (Vienna). Vienna is a Level Six minimum-security adult male facility that houses mostly low-level offenders. It also operates Dixon Springs-Impact Incarceration Program (IIP), a co-ed boot camp. Located on the fringes of Shawnee National Forest and adjacent to Shawnee Correctional Center, a male minimum-security prison, Vienna is about 350 miles south of Chicago and 170 miles west of Nashville, Tennessee.

Vienna represents the best of what Illinois Department of Corrections (DOC) can be and the worst of what it has become through a lack of vital resources and severe overcrowding.

For most of its more than 40-year history, Vienna was widely regarded as Illinois' most successful and innovative prison. It was designed to function as a small town where inmates could learn how to become responsible citizens. Until a little over 10 years ago, the facility did not have a fence, and inmates did not wear uniforms.

Education was critical to Vienna's rehabilitative mission. The prison's education and vocational program rivaled—and in some cases surpassed—the area's best technical high schools and post-secondary institutions. In fact, Vienna's programming was so good that local area residents took classes in the prison with inmates.

During this period, Vienna embodied a mutually beneficial relationship between prison and community that went far beyond the typical economic support prisons provide to their local economies. Up until the mid 1990s, Vienna inmates volunteered in the local community, umpired baseball games on weekends, and even ran an Emergency Technician Program, which supplied the surrounding area with a 24-hour ambulance service staffed by specially trained inmates.

Today Vienna has gone from being Illinois' most innovative and successful prison to its most overcrowded. Although the facility was designed to hold 685 inmates, it now houses more than 1,600 people. Years of neglect and lack of essential maintenance and upkeep have made these conditions worse, as mostly low-level offenders are crammed into dilapidated buildings infested with mice and cockroaches.

While Vienna's staff and administration are acutely aware of the problems they face, they believe if given the appropriate resources they could turn the facility around. They point to current renovations, which include a desperately needed re-roofing project. They also note how last spring, when the region faced some of the worst flooding it has ever seen,

inmates and staff volunteered and helped prepare more than 400,000 sandbags, which saved countless homes and buildings from serious damage.

At JHA's meeting with Vienna's administration, a senior member aptly described the current state of the facility: "Vienna is a good place with a proud history in need of help." Most urgently, Vienna needs the help of the governor and the legislature to enact legislation and support programs that will safely reduce the state's prison population, which has reached almost 50,000 inmates, a record high. In particular, Illinois needs to find more cost-effective alternatives to incarceration for low-level, non-violent offenders who have swelled minimum-security prisons like Vienna at great cost and little benefit to taxpayers.

With a reduction in population, DOC could return Vienna to a model, re-entry prison that inmates could earn their way into through good behavior. This proposal is based not on liberal or conservative approaches to crime, but on cost-effective use of tax dollars and state resources. Ultimately, the choice for elected officials is not whether to spend money on its prison system. It is whether to put money into smart re-entry programming or an endless cycle of re-incarceration.

## *Recommendations:*

(1) The Illinois Governor and General Assembly must reduce the prison population through sentencing reform, enact a safe replacement for Meritorious Good Time, and provide Vienna and other DOC facilities with the funding and staffing needed to meet the population's basic medical and mental health needs. If such action is not taken, it is all but inevitable that this issue will end up being litigated in the courts.

(2) Assuming elected officials find ways to safely reduce the state's prison population, DOC should consider investing in Vienna and making it into a premiere re-entry prison which inmates must earn their way into.

(3) As soon as it can feasibly do so, Vienna's administration should remove inmates from the second and third floor of Building 19, the prison's most decrepit, overcrowded living quarters.

(4) Vienna should consider using the segregation bullpen to house inmates only for short periods of time due to the fact that it is unfit for long-term living.

(5) To address the needs of its population, Vienna needs more mental health staff.

(6) DOC and Vienna should continue its efforts to rehab the facility.

(7) As recent studies have shown that prison visits reduce inmates' likelihood of recidivating, Vienna should improve its visiting area, making it more child and family friendly.

## Introduction

This report examines the following issues: Vienna: Past and Present; Housing and Living Conditions; Segregation; Physical and Mental Health; Staffing & Inmate Programming; Visiting Area; and Population Demographics.

## Vienna: Past & Present

It is impossible to understand Vienna today and its unrealized future potential without appreciating its unique past. Opened in 1965, Vienna was once widely regarded as the "most successful state prison in Illinois."[1] The facility was designed as if it were a small town, complete with a fishing pond, athletic fields, and dorms for which inmates had their own keys. For the first three decades of its existence, the facility did not have a fence, and for a short period, the prison was co-ed. As one study from the 1970s put it, Vienna "approaches the quality of [a] non-penal institution. Buildings resembling garden apartments are built around a 'town square' complete with churches, schools, shops, and library. Paths lead off to 'neighborhoods' where 'homes' provide private rooms in small clusters."[2]

The idea behind this design was to provide a rehabilitative environment for inmates to learn how to become responsible citizens. Education was key to this mission. The prison was known for its programs, which "equal[ed] or surpass[ed] those of many technical high schools."[3] Until the mid 1990s, the prison offered classes not only to its inmates, but also to citizens of the surrounding communities, who would come to the facility to take evening college classes and participate in daytime vocational programs.

Vienna blurred the boundaries between prison and the surrounding community. Of course, like most prisons, the facility employed a significant number of local residents and helped support the local economy. More surprisingly, inmates would umpire local baseball games and volunteer for community projects. The prison even ran a program called the Emergency Technician Program, which was an "ambulance service manned by eighteen trained inmates working twenty-four-hour shifts."[4]

In Vienna's early days, Illinois' prison system was a different place than it is now. For most of the 1970s, Illinois prisons held less than 10,000 people. Through multiple factors—including the war on drugs, the war on crime, and the de-institutionalization of

---

[1] James B. Jacobs, Notes on Policy and Practice, Social Service Review (December 1976) 623.

[2] Jacobs, Notes on Policy and Practice, 623.

[3] National Advisory Commission on Criminal Justice Standards and Goals: Report on Corrections (Washington, D.C.: 1973), 345.

[4] Jacobs, 628.

mental health— that number began to steadily increase. [5]  Today, Illinois has almost 50,000 people in its prisons, which is almost a 400 percent increase in four decades.

During this period of unprecedented growth in the prison population, the prison system



**Number of Inmates in Illinois Department of Corrections 1970-2011**

became not only more crowded, but also more violent.  As veteran DOC staff and inmates from the 1980s and early 1990s recall, gangs had almost complete control of prison operations. Assaults on inmates and staff were commonplace, and in some prisons, gang leaders were so powerful that they assigned new inmates to cells based on their gang affiliation.

Ultimately Illinois' prison violence spilled into Vienna's model correctional community.  In 1993, inmates staged what the local state attorney called a "mini riot." Shortly after that incident, an inmate sexually assaulted a correction officer and left her for dead.  DOC officials soon erected a fence around the facility, citizens stopped going into the prison for classes, and the prison's inmate-run Emergency Technician Program was shuttered. [6]

These events effectively ended what the <u>Chicago Tribune</u> called Vienna's "experiment with trust."  Around the same time, as the facility struggled to retain its programming focus, funding for prison education diminished.  In 1994, President Bill Clinton signed the Violent Crime Control and Law Enforcement Act, which, among other things, banned prisoners from using Pell Grants to pay for classes.  As Illinois' finances began to fail, governors and legislators found funding for prison education an attractive item to cut from the state's budget.

Then, in 2002, Governor George Ryan proposed closing Vienna to cut the state's budget. Although Governor Ryan eventually dropped the plan, state government seemed to abandon the prison and treat it as if it were a closed facility.  Several critical administrative positions were left vacant for years.  Essential upkeep and maintenance ceased, as requests for repairs were either ignored or never submitted.

When JHA visited Vienna in September of 2011, we found staff and a new administration trying to dig the facility out from years of neglect and disrepair.  A couple

---

[5] On the rise of prison population, see Heather Ann Thompson, Why Mass Incarceration Matters, Journal of American History, (December 2010), 703-734; and Mark Mauer, Race to Incarcerate (New Press, 2006).

[6] "Model prison can no longer escape violence," Chicago Tribune, October 22, 1996.

of months earlier, a housing unit had to be closed due to mold infestation.  At the time of our visit, administration was trying to make the building inhabitable by tearing out the dry wall and fixing windows and shower areas.  The administration noted that when they first arrived in April 2011, nearly every building had serious leak and rusting problems. During JHA's visit, Vienna's staff and administration described several on-going renovation projects, including a desperately needed re-roofing effort.  They also noted how staff and inmates helped prepare more than 400,000 sandbags, a reminder of the partnership between prison and community that Vienna used to represent.

Despite the facility's disrepair, JHA believes that the staff and surrounding community are ready to restore Vienna to what it once was.  For this to happen though, Illinois' elected officials first must stop wasting precious resources on imprisoning low-level, non-violent offenders who currently fill prisons like Vienna and instead continue to invest in safe and cost-effective alternatives to incarceration, like Adult Redeploy.[7]  This would not only help decrease Illinois' overcrowded prison system, but allow DOC to increase programming for inmates in all of its prisons.  In so doing, DOC could learn from the lessons of Vienna's past and turn the facility into the state's premiere re-entry prison, an institution which inmates must earn their way into and which offers innovative educational and vocational programs to facilitate their successful return to free society. This proposal is based not on liberal or conservative approaches to crime, but on cost-effective use of tax dollars and state resources.  Ultimately, the choice for elected officials is not whether to spend money on its prison system.  It is whether to put money into smart re-entry programming or an endless cycle of re-incarceration.

## Crowding

Vienna is Illinois' most crowded prison.  It is designed to hold 685 inmates, but as of December 19, 2011, housed more than 1,600 people, making it almost 240 percent over its design capacity.

As of the publication of this report, Illinois has almost 50,000 people in its prison system, which is designed to hold about 33,000. Although Illinois' prison population has exceeded its design capacity for decades, the number of prisoners has increased by almost 10 percent since 2010.  This sudden surge in the state's population is largely due Governor Pat Quinn's suspension of Meritorious Good Time (MGT), a 30-year-old, statute-based program that allowed inmates to earn as many as 180 days off their sentences.[8]

---

[7] From Adult Redeploy's website: "Adult Redeploy Illinois was established by the Crime Reduction Act (Public Act 96-0761) to provide financial incentives to local jurisdictions for programs that allow diversion of non-violent offenders from state prisons by providing community-based services. Grants are provided to counties, groups of counties, and judicial circuits to increase programming in their areas, in exchange for reducing the number of people they send to the Illinois Department of Corrections." To learn more, go to http://www.icjia.state.il.us/public/redeploy/.

[8] Malcolm Young, "Setting the Record Straight: The Truth About 'Early Release,'" October 28, 2010.

As most inmates sentenced for violent offenses were ineligible for MGT, low-level offenders have been the most affected by its suspension. Consequently, while every prison struggles with the state's exploding inmate population, medium and minimum-security prisons, like Vienna, which overwhelmingly incarcerate low-level offenders serving short sentences, face the most severe overcrowding. For instance, one administrator JHA interviewed at Vienna noted that if the governor restored MGT, they could empty the most decrepit and overcrowded parts of the prison.

The overcrowding of Illinois' medium and minimum-security prisons can undermine security and proper functioning on multiple levels. As JHA noted in its 2011 report on the Northern Reception and Classification Center,

| Average length of stay at Vienna (Reported 9/25/11) |
| --- |
| 12 months or less 53% |
| 1-2 years 26% |
| 3-4 years 21% |

"administrators at several medium and minimum-security facilities independently have reported to JHA that, with the increased population, they have received a substantial influx of inmates poorly suited to be housed at their facilities because they present too great a security risk or have too severe mental health problems and treatment needs that the facilities are not designed to handle."[9]

On JHA's visit to Vienna, we heard several examples of such classification problems. For instance, the administration noted they recently sent back an inmate to NRC on discovering that he had an outstanding warrant for murder. This is a problem because, as a minimum-security prison, Vienna allows a degree of freedom that an inmate facing a murder charge might use to escape. Another example: administration recently returned an inmate that had been sent to Vienna's boot camp, because boot camp requires participants to engage in strenuous exercise and activity and the inmate was so physically impaired that he could hardly walk. As described by one administrator, the inmate barely had the physical strength and capacity to get off the bus at Vienna, let alone participate in a boot camp.

On top of the classification problems, administration has no choice but to pack its living quarters and house prisoners in unsuitable living areas because Vienna has significantly more prisoners than it was designed to hold. This kind of crowding also stretches vital but limited resources, from programming to healthcare. These conditions frustrate rehabilitation efforts and create a dangerous environment for inmates to live and staff to work.

At JHA, we often hear in response to our work that prisoners deserve to live in these kinds of harsh conditions, and that doing so will teach them not to break the law. These assertions fail to appreciate two vital points. First, housing prisoners in overly harsh conditions hurts not only prisoners, but also public safety as it ends up costing taxpayers more money with increased crime and high recidivism rates. More than 90 percent of people who are sent to prison eventually are released, most after serving a short sentence.

---

[9] *See* JHA Monitoring Report of Stateville Northern Reception & Classification Center, July 12, 2011, found at http://www.thejha.org/NRC.

For instance, most prisoners at Vienna serve less than one year before they are released. While there is no evidence to suggest that exposure to harsh and overcrowded conditions makes prisoners less likely to commit new crimes, there is strong evidence that it makes prisoners worse and more likely to re-offend when they are released.[10]

Second, harsh prison conditions can severely undermine prison security. Studies confirm that poor prison conditions correspond to significantly higher rates of violence and staff assaults.[11] In addition, such conditions have a profoundly damaging impact on the physical and mental well-being of staff, by increasing the potential for violence, escalating workload pressures and making it much more difficult for staff to monitor inmates and safely and effectively perform their jobs.[12] A long time Vienna correctional officer that JHA spoke with expressed the same opinion, and said that most correctional officers see overcrowding and lack of inmate programming to be serious security problems because they lead to more fights and staff assaults.

In short, packing prisons beyond their capacity and allowing prison conditions to deteriorate serves no one's interests—not inmates, not staff, and not the public.

## Housing & Living Conditions

The layout of Vienna is organized around a town square concept, with a centrally located dining facility, library, chapel, commissary, barbershop and gymnasium. Six double-celled housing units are situated around the square and connected to each other by paths. From the outside, the units look extremely non-institutional, and resemble small apartment complexes more than prison housing. The presence of flowers and landscaping on the prison grounds adds to the residential feeling.

On our visit, JHA toured Building 1, a typical general population-housing unit. When we arrived, dozens of inmates crowded the building's dayroom, which consisted of a table on one side which inmates used to play cards and board games and a small television set mounted on the wall on the other side. JHA interviewed several inmates in Building 1, all of whom had similar complaints and observations about their living conditions. They

---

[10] *See* M. Keith Chang, Yale University and Cowles Foundation, Jesse M. Sapiro, University of Chicago and NBER, *Do Harsh Prison Conditions Reduce Recidivism? A Discontinuity Based Approach, available at http: //faculty.som.yale.edu/keithchen/papers/Final_ALER07.pdf.*

[11] *See* David M. Bierie, *Is Tougher Better? The Impact of Physical Prison Conditions On Inmate Violence*, International Journal of Offender Therapy and Comparative Criminology (April 13, 2011), *available at* http: // ijo.sagepub.com/ content/early/2011/04 /09/ 0306624X11405157.full.pdf

[12] *See* David M. Bierie, *The Impact of Prison Conditions on Staff Well-Being*, International Journal of Offender Therapy and Comparative Criminology (November 30, 2010) available at http://ijo. sagepub.com/ content/ early/2010/ 11/29/ 0306624X10388383.full.pdf+html; Commission on Safety and Abuse in America's Prisons, Executive Directives and Prison Violence (2005) available at http ://www. prisoncommission.org/ statements/ thompkins_douglas.pdf.

noted the building had a significant cockroach problem. During JHA's interview with administration, the administration acknowledged that there were bugs, mice, and other "varmints" throughout the facility. The administration believed that the varmint problem was caused by its past pest-control vendor who had provided substandard treatment due to the state's failure to timely pay for its services. At the time of JHA's visit, administration had just finished contracting with a new pest-control vendor and hoped it would provide better results.

Inmates also noted the bathroom was generally disgusting and in a state of disrepair, which JHA staff and volunteers confirmed. A rusty-colored liquid dripped from the ceilings, which inmates had to artfully dodge as they brushed their teeth or used the restroom. The walls were similarly discolored with patches of rust and grime.

Inmates in Building 1 also reported that air constantly blew through the air vents, making the cells very cold. Some inmates had stuffed toilet paper into the vents to block the airflow. They indicated that they risked being issued a disciplinary ticket for doing this, but that it was worth the risk, because their cells were uncomfortably cold.

Throughout JHA's visit, we also heard from both inmates and staff about the lack of property boxes for inmates to store their personal belongings. Administration acknowledged this was a significant issue and estimated they were short more than 400 property boxes. If inmates do not have a secure place to store their belongings, they are inviting theft, which could lead not only to the loss of property, but also fights between inmates. Administration explained that it was doing everything it could to order more property boxes and repair broken ones.

Multiple inmates also complained of being issued underwear and clothing that was stained, heavily used, and worn threadbare. Based on the tattered clothing JHA saw inmates wearing on the date of our visit, it is fair to say these inmates' reports were accurate. Administration reported that in addition to the clothes inmates are already wearing on arriving at the facility, they are given two pairs of pants, two pairs of socks, two boxers, two shirts and one coat. Laundry service is available five days a week. Shoes are issued on an "as needed" basis. Inmates are also provided with one blanket, one pillowcase and one set of sheets. General population inmates have the opportunity to shop at the commissary about twice a month, and are allowed one hour of outside recreation/yard time three days a week, for a total of three hours yard time per week.

JHA also had the opportunity to visit Building 19, a three-story structure that houses both general population and segregation inmates and is one of Vienna's original buildings. The first floor of Unit 19 houses segregation inmates in both double-bunk cells and a small "bullpen" area. There were 26 inmates in segregation on the date of JHA's visit. The second and third floors of Building 19 house inmates on double bunk-beds in dormitories with communal living, shower and bathroom areas. On the date of JHA's visit, 200 inmates were housed on the second floor of Building 19 and 400 inmates were housed on the third floor.

JHA found housing conditions on the second and third floors of Building 19 to be deplorable and generally unfit for the 600 hundred men who lived there. As JHA entered the second floor, we saw hundreds of inmates with nothing to do except pace around the room or huddle around a small television in the corner of the room. A Vienna staff member seemed to recognize the stunned look on our faces. "This is a nightmare," he said quietly to one of JHA's staff. "This should not be."

The second floor of Building 19 features a large open area lined with metal bunk beds for approximately 200 inmates. The third floor is divided into four separate quadrants, filled with metal bunk beds for about 400 inmates. On both floors, windows were broken and without screens. As a result, birds had flown into the living areas and built nests in the light fixtures. Inmates complained that mice, cockroaches, and other insects were everywhere.

JHA volunteers saw what appeared to be rodent droppings on the floors of Building 19. Multiple inmates reported that rodent and vermin infestation was even worse in the dietary unit and dining hall. An inmate who worked in the dietary unit confirmed that mice were everywhere in the dining hall and frequently ran across the floors during meals. Inmates also reported that they were not given sufficient time to consume meals, as they were only allotted five minutes to eat.

Inmates told JHA that because Building 19 lacked air conditioning, the building was unbearably hot in the summer time, and because several windows were broken, it could become frigid in the winter. Inmates use sheets and paper to cover broken windows. The administration indicated it was in the process of soliciting contractors to have the windows fixed, and hoped that the project would be completed before harsh winter weather set in.

The metal bunk beds were also in varying states of disrepair. One inmate showed a JHA staff member how some of the beds were not bolted to the floor and could easily tip over if a heavier inmate shifted his weight unevenly when attempting to climb onto the top bunk. Another inmate showed a JHA staff member how several top bunk mattresses lacked sufficient support. As a result, when a person laid down on the top bunk, his mattress would sink and, in some instance, come close to touching the person in the bunk below.

In the living area, half of the lights were not functioning. Some fixtures showed clear water damage and appeared beyond repair. On the third floor, JHA volunteers observed large brown rectangular ventilation units that did not appear to be functioning. The vents were covered in grime and dust.

JHA found conditions in the bathrooms on both floors to be particularly disturbing. On entering the second floor bathroom, a JHA volunteer noted a strong smell of fecal matter and sewage, which several inmates reported was a constant problem. The floors were wet and slippery. One section of the bathroom had a significant amount of water leaking from the ceiling, which an inmate was trying to mop up. Throughout the bathroom, pipes

in the ceiling were exposed and in serious disrepair. The second floor bathroom contained three toilets and three sinks, but inmates reported the toilets often do not work. Inmates also reported that when using the toilets, brown liquid drips onto them from the ceiling above.

Because the second floor bathroom lacks showers, all Building 19 inmates must share the seven showers that are located on the third floor. Inmates reported that several of these showers were unusable because they lacked sufficient water pressure and merely dribbled out a small stream of water. A second floor inmate explained that at 3:00 p.m. each day, correctional staff usher inmates from the second floor to the third floor to shower. Because of the sheer number of persons demanding to use the showers, it is rare that all second floor inmates have the opportunity to shower each day.

In addition to showers, the third floor bathroom contained four toilets, four sinks and two urinals. Upon walking into the third floor bathroom, JHA volunteers immediately noted a strong paint smell and signs that it had been recently painted. Despite these cosmetic efforts, the air was noticeably stuffy, humid, and fetid, and the shower seemed to lack functioning ventilation. As in the second floor bathroom, water dripped from the ceilings' exposed and rusted pipes. Apart from the conditions of the bathroom, the third floor had only one functioning phone at the time of JHA's visit. Already frustrated by the conditions of their confinement, inmates reported that the lack of adequate phones has led to repeated fights.

Exacerbating the situation, there are only a handful of correctional officers assigned to monitor inmates in Building 19. Administration reported that two correctional officers are assigned to monitor the second floor and three correctional officers are assigned to the third floor 24 hours a day. However, a correctional officer that JHA spoke with indicated to the contrary that only two correctional officers are assigned to the third floor during the night shift.

In either case, JHA finds these security staffing levels to be insufficient and unsafe. Indeed, an inmate reported to JHA that, in the absence of a sufficient security presence, inmates often begin fights and "jump" each other on the stairway between the second and third floors because there are no correctional officers assigned to monitor the area.

Perhaps the most powerful condemnation of Building 19's conditions came from an inmate that JHA spoke with who was recently released from Vienna, but previously lived in Building 19's dorms. He reported that, while he was at Vienna, he knew several inmates who purposefully started fights and committed major rule infractions solely for purposes of being transferred from Vienna to another facility. Although these inmates apparently recognized their infractions would result in a lengthy period of segregation, the loss of good time credit time, and serving a longer sentence in higher security, they found these preferable to living in Building 19's awful conditions.

## Segregation

Vienna's segregation cells are located on the first and third floors of Building 19. They

can hold approximately 30 people in total. The first floor segregation area consists of double-bunk cells and a bullpen area that holds roughly ten inmates. The third floor contains several additional individual segregation cells.

During JHA's visit, most of the inmates we interviewed were in segregation for refusing housing. According to administration, inmates typically will not spend longer than two weeks in segregation because inmates who commit serious infractions leading to longer segregation times are usually "stepped up" and transferred to a higher security facility. Administration further reported that, at the time of JHA's visit, none of the inmates in segregation were receiving psychotropic medications or mental health treatment.

Segregation inmates are allowed one hour of out-of-cell recreation time per week and to shower once every three days. In addition, segregation inmates are permitted to have one one-hour "no contact" visit with family behind a glass enclosure each week. Segregation inmates are fed all meals in their cells and their access to personal property is limited, as televisions and radios are forbidden. Access to commissary is also limited.  Once a week, segregation inmates are permitted only to buy writing paper, envelopes or shower shoes from the commissary. Hygiene products and pens are provided on an "as needed" basis, as is access to library services.

As in Vienna's other living units, JHA saw evidence and heard multiple reports of cockroach and insect infestation in segregation housing. However, we were most struck by the exceedingly harsh living conditions of the bullpen segregation area. The bullpen, which contained a single toilet and a single sink, was cramped, dark, windowless, poorly ventilated and generally miserable in every respect. On the date of JHA's visit, it housed ten inmates in double bunk beds. These inmates, left to lie on their beds for hours in the dark, were thoroughly despondent and dejected. Unlike the inmates in segregation that JHA generally encounters on visits, the inmates in the bullpen were neither animated nor eager to speak with us, but seemed listless and defeated.

The administration acknowledged that the bullpen was far from an ideal place for housing segregation inmates. It indicated that, if possible, it would like to knock down the bullpen's walls to create individual segregation cells.  The administration nevertheless found the bullpen to be workable and tolerable, at least for the foreseeable future, on the basis that inmates were generally not housed there for more than a few weeks. JHA asked the administration to consider the possibility of mitigating the harsh living conditions of bullpen inmates by giving them more yard time. The administration stated that increasing yard time was not a top priority given the facility's more urgent, immediate challenges, but that it would consider the possibility.

## Physical and Mental Health

While Vienna has a medical observation room and a mental health unit, the facility lacks an infirmary and crisis cells for inmates experiencing severe psychological episodes. When inmates require an infirmary or are placed on crisis/suicide watch, they must be housed in Shawnee Correctional Center, a male medium-security prison that is adjacent

to Vienna.

Both the medical and mental health offices are located on the first floor of Building 19. The facility is authorized for and employs one full-time physician and one full-time pharmacy technician. While authorized to employ eleven full-time nurses, Vienna was understaffed with only ten nurses at the time of JHA's visit. On average, nurses must see and treat 70 to 90 inmates on the sick call each day. In addition, medications must be distributed to inmates through medication lines conducted twice daily out of the centrally located town square.

According to the health care administrator, medical staff members are managing their caseloads fairly well, despite a great need for more nurses. At the same time, the administrator noted that the facility struggles to provide care for inmates with chronic illnesses (see chart), as well as a growing number of mentally

| Number of Vienna Inmates Diagnosed with Chronic Illnesses (Reported 9/27/2011) |
| --- |
| Asthma 138 |
| Cancer 4 |
| Diabetes 64 |
| Hepatitis C 94 |
| Chronic Hepatitis B 1 |
| HIV 22 |
| Hypertension 322 |
| Seizures 32 |
| Tuberculosis 29 |

ill inmates with medication needs. A mental health staff member noted that Vienna's lack of crisis cells in particular poses a huge problem, given this growing number of mentally ill inmates. At the time of JHA's visit, Vienna had only one part-time psychiatrist (eight hours per week) and one full-time on site psychologist (40 hours per week) to address the needs of almost 1,700 inmates.

JHA had the opportunity to speak with Vienna's psychologist, and was profoundly impressed with her dedication and professionalism. However, JHA believes that this mental health staffing level cannot possibly begin to meet the needs of an inmate population this size. We also believe that these work conditions will eventually exhaust and burn out even the most dedicated and qualified staff.

The mental health staff member we spoke with noted that she tries to check each inmate who is receiving mental health treatment every 30 days, which means she needs to see about 20 inmates a day. Even as she aims to work at this feverous pace, she is still 62 percent behind. This is not surprising given the demanding mental health needs of Vienna's population.

According to staff, the number of inmates receiving mental health treatment has tripled in the last three years. At the time of JHA's visit, 196 inmates were under psychiatric care. Of these, 152 inmates were receiving psychotropic medications, none involuntarily. The mental health staff member explained that she currently was treating inmates with the following diagnoses: 135 affective disorders, 35 psychotic disorders, five developmentally disabled, and the rest inmates with a variety of general to severe mental disorders. She suspected that some inmates' mental illnesses were exacerbated by the

anxiety of being in a less structured environment than they have grown accustomed to in other prisons. It is equally probable that the high stress from Vienna's overcrowded environment and extremely poor living conditions exacerbate or independently generate new symptoms of mental illnesses.[13]

The mental health staff also described how the lack of crisis cells interferes with her work. When inmates decompensate and need to be closely monitored, Vienna's staff must take them to Shawnee's crisis unit. In a typical month, Vienna's health care staff sends about six to eight inmates to Shawnee for this purpose. Even though these inmates are housed in Shawnee's crisis unit, they remain Vienna's responsibility. Consequently, Vienna's sole mental health care worker must regularly visit these inmates, which is important, but takes her away from the facility and the other inmates in her care.

To address the lack of medical and mental health staffing, DOC utilizes telemedicine, a program that uses telecommunications and information technology to administer health care remotely. Both the heath care administrator and mental health staff were ambivalent about telemedicine. In general, they said telemedicine relies on two things that Vienna currently lacks: adequate support staff and an electronic system for medical records

In addition to all these issues, Vienna lacks sufficient dental providers to meet the needs of its population. While the facility is authorized for and employs one full-time dentist and one full-time dental assistant, it does not have a dental hygienist to perform teeth cleanings. Further, it has only one functioning dental chair. Consequently, there are substantial backlogs for inmates to receive dental treatment. At the time of JHA's visit, the administration reported the following wait times: one to two weeks wait for tooth extractions; two years for dentures; two years for fillings; and two and a half years for teeth cleaning.

## Staffing & Inmate Programming

Severe overcrowding, understaffing and lack of programming at Vienna have placed a tremendous strain on correctional staff. A senior correctional officer reported to JHA that while he did not believe in "catering to inmates," increasing programming, inmate jobs and regular recreation times at Vienna was important for safety reasons because inmate idleness and frustration had led to short tempers, increased staff assaults and inmate fighting. As this officer expressed, "We all want to be able to go to work, do our jobs, and come home at the end of the day." This officer was heartened that money was finally being reinvested in Vienna to fix some of its severe physical plant issues, like broken windows in housing units and roofs that were collapsing. However, he was skeptical that the situation would improve significantly without increasing inmate programming and clerical and security staffing levels.

---

[13] *See* Terry A. Kupers M.D., *Trauma and Its Sequelae In Male Prisoners: Effects of Confinement, Overcrowding and Diminished Services*, American Journal of Orthopsychiatry Vol. 66, Issue 2 (April, 1996) (discussing research that links prison overcrowding and diminished services to increased violence, psychiatric decompensation, suicide, hypertension, and other medical and mental health conditions).

With 186 correctional officers, 16 correctional sergeants, and six shift supervisors, Vienna was considered "fully staffed" for these positions at the time of JHA's visit. However, with 14 correctional lieutenants, it was well below its authorized staffing level of 17 lieutenants. Vienna was also severely understaffed with respect to clerical/ administrative support personnel. While authorized for 32 clerical support staff, only 25 of these positions were filled when JHA's visited. Consequently, to make up for this insufficiency in clerical staff, three correctional officers had to be reassigned from their security duties to perform clerical work 22 days each month (for a total of 495 hours monthly).

Alongside of Vienna's current staffing problems, it faces a critical wave of retirements, which, according to the administration, will "cripple" the facility and efforts to improve operations. There are 28 persons retiring, including some of the most senior, experienced staff. Among persons retiring: seven lieutenants, five sergeants, two dietary supervisors, two clinical services supervisors, two counselors, a secretary, three persons in the records office, and a supervisor at the boot camp.

At the time of JHA's visit, there were four Adult Basic Education (ABE) classes offered. A total of 58 inmates were enrolled in these, and 170 inmates were on the waitlist for ABE classes. In addition, there were two GED classes in which 31 inmates were enrolled. A total of 43 inmates were on the waitlist for GED classes.

Vienna offers some vocational training to inmates, including courses in auto body, auto mechanics, commercial custodial work, food services, career technologies and cosmetology. Administration did not provide specific data to JHA on the number of inmates involved in vocational training, but indicated that the number was very small. The vast majority of Vienna's inmates do not have the opportunity to participate in any educational or vocational courses.

Vienna's administrators reported to JHA that when they first arrived at the facility, almost 90 percent of inmates had job assignments. As a result, Vienna was running $2,000 over budget each month in paying inmate wages. Administrators explained that to get the budget under control, they had to cut about 1,000 inmate jobs, which left a great number of inmates idle, frustrated, and without a means to earn money. According to administration, the job cuts were necessary, not only for budgetary reasons, but because there was not enough work to go around. Thus, multiple inmates were being assigned to jobs and getting paid for work that required only one man.

JHA agrees that budgetary constraint and fiscal responsibility are essential to a well-run facility. However, JHA remains troubled by the whole-scale cutting of inmate jobs at Vienna, particularly given the lack of other educational and vocational opportunities for Vienna inmates. Prison employment helps rehabilitate inmates, decrease recidivism, and reduce inmate idleness, increasing safety and security in the correctional environment.[14]

---

[14] *See* Kerry L. Pyle, *Prison Employment: A Long-Term Solution To the Overcrowding Crisis*, 77 Boston University Law Review 178 (1997); Jessie L. Krienert, Mark S. Fleisher, *Crime and Employment: Critical Issues in Crime Reduction for Corrections* (2004 AltaMira Press).

To balance the needs of both rehabilitation and budgetary responsibility, Vienna's administration should explore and seriously consider bringing an industry to Vienna, as this could help to both increase inmate employment and work skills and reduce costs to taxpayers through the sale of inmate-produced goods.

## Visiting Area

General population inmates are allowed eight personal visits per month. Visits can occur on weekend days and on one weekday each week. There are no time limits on the visits, with the exception that when the visiting room becomes overcrowded, visits will be limited to two hours. Visiting hours are held Monday through Friday from 9 a.m. to 6 p.m., and on Saturdays, Sundays and holidays from 9 a.m. to 2 p.m. and from 3:30 p.m. to 8:30 p.m. Visitors and inmates can hold hands above the visiting tables and are allowed to hug and kiss once upon greeting and once upon leaving. Inmates are also permitted to hold their infant children. As previously stated, segregation inmates are limited to one one-hour "no contact" visit with immediate family members behind a glass enclosure each week.

JHA had the opportunity to see Vienna's visiting room. While there some crayons and books for children, the area was otherwise very drab, dreary and institutional looking. Administration reported that work was scheduled to soon begin painting a mural in the visiting room. At the time of JHA's visit, the visiting room was furnished with 16 tables, each table having four adjoining chairs. These furnishings were paint-chipped and in shabby condition, adding to the general gloominess of the surroundings.

As DOC refurbishes Vienna, it should improve the visiting area, making it more family and kid friendly. Visiting areas serve a vital function in any prison. They not only provide inmates with space to meet with family, friends, and loved ones, but they can also help reduce recidivism and save taxpayer money. A recent study from Minnesota Department of Corrections found that inmates who received regular visits were "significantly less likely to recidivate."[15]

Moreover, parent-child visitation has beneficial effects on the emotional adjustment of children to the grief and loss caused by parental incarceration. Given that prison-visiting rooms are, in fact, public spaces often used by children, the needs of children for a physically and emotionally safe visiting environment should be recognized. Monochromatic visiting rooms areas with sparse metallic furnishings and fixtures are reminiscent of medical settings, which are often frightening to children and offer no visual reassurance. Inexpensive modifications to prison visiting rooms, such as painting

---

[15] *See* Minnesota Department of Corrections, "The Effects of Prison Visitation on Offender Recidivism," Nov 2011, found at http://www.doc.state.mn.us/publications/publications.htm.

visiting room walls with bright colors or murals can help to lessen the stress of this environment for children and incarcerated parents alike.[16]

## Population & Facility Demographics

The average age of inmates at Vienna is 35. Approximately 12 percent of Vienna's population is 50 or older. The racial-ethnic makeup of Vienna's population is roughly 67 percent African American, 21 percent White, 11 percent Hispanic, and approximately 1 percent Native American and Asian combined.

###

---

[16] *See* Denise Johnston, *Parent-Child Visits In Jails,* Children's Environments, Vol. 12 (1) 33-56 (March 1995) available at http://colorado.edu/journals/cye/12_1/12_1article2.pdf.

*This report was written by John Maki, Executive Director, and Maya Szilak, Director of the Prison Monitoring Project, for the John Howard Association. Maya may be reached at (312) 503-6302 or mszilak@thejha.org.*

*Contributing to this report were citizen observers: Laurie Jo Reynolds and Scott Main.*

Since 1901, JHA has provided public oversight of Illinois' juvenile and adult correctional facilities. Every year, JHA staff and trained volunteers inspect prisons, jails and detention centers throughout the state. Based on these inspections, JHA regularly issues reports that are instrumental in improving prison conditions.



JHA's work on healthcare in DOC is made possible through a generous grant by the Michael Reese Health Trust.

# EXHIBIT B

STATE OF ILLINOIS
DEPARTMENT OF CORRECTIONS

VIENNA CORRECTIONAL CENTER

LIMITED SCOPE COMPLIANCE EXAMINATION

For the Two Years Ended June 30, 2008

Performed as Special Assistant Auditors
For the Auditor General, State of Illinois

STATE OF ILLINOIS
DEPARTMENT OF CORRECTIONS
VIENNA CORRECTIONAL CENTER
LIMITED SCOPE COMPLIANCE EXAMINATION
ANALYSIS OF OPERATIONS
For the Two Years Ended June 30, 2008


CENTER FUNCTIONS AND PLANNING PROGRAM

The Vienna Correctional Center (Center) receives General Revenue Fund (001) appropriations for the ordinary and necessary expenditures of both the Center and the Illinois Impact Incarceration program (Dixon Springs Boot Camp).

Center Function

Vienna Correctional Center (Center) is a minimum security institution located in Johnson County, seven miles east of Vienna, Illinois and is adjacent to the Shawnee Correctional Center. The Center has an official capacity of 925 residents at May 31, 2008 and 2007, respectively.

The mission of the Center is to provide for the protection of society through the humane and secure incarceration of adult male offenders based upon the foundation of legislative and judicial decisions. The Center's administration is committed toward the instilling of responsibility and mature decision making in its inmates through increasing levels of reasonable freedom. By providing extensive and high quality educational programs, work assignment opportunities, public service, leisure time activities and religious avenues, the Center is expected to go far beyond the provision of the minimum necessities of food, sanitation, clothing, housing and medical services to the residents of the facility.

The mission of Dixon Springs Impact Incarceration Program is to promote lawful behavior in youthful offenders who are incarcerated for the first time. The Center's administration is committed toward providing a structured, self-esteem, and positive self-concept while addressing the underlying issues which led to the incarceration.

The Center is accredited by the American Correctional Association.

The Warden of the Center is Yolande Johnson. The Center's address is: Vienna Correctional Center, 6695 State Route 146 East, Vienna, Illinois 62995.

Center Planning Program

The Center has developed goals and objectives with respect to its functions and programs. An annual statement of functions and planning is prepared which presents goals and objectives by the following functional areas: administration, fiscal, operations and programs.

The Center's planning program is adequate to meet the Center's needs.

# EXHIBIT C



# ILLINOIS DEPARTMENT OF CORRECTIONS

# Quarterly Report
July 1, 2013

## Pat Quinn
*Governor*

## S.A. Godinez
*Director*

## <u>Contents</u>

| Topic | Table |
|---|---|
| Population by Facility | 1 |
| Facility Population by Offense Type | 2 |
| Educational and Vocational Program Participation | 3 |
| Capacity by Facility | 4 |
| Facility Population by Cell Type | 5 |
| Facility Floor Space | 6 |
| Facility Staff Ratios | 7 |
| Capital Projects Currently Funded | 8 |
| Projected Prison Population | 9 |
| Population Projection Comparison | 9a |
| Intake, Exits, and Transfers by Facility | 10 |
| Adult Transition Centers | 11 |

## <u>Population by Facility</u>

As of May 31, 2013

| Facility | Population |
|---|---:|
| Big Muddy River Correctional Center | 1,898 |
| Centralia Correctional Center | 1,586 |
| Danville Correctional Center | 1,942 |
| Decatur Correctional Center (female) | 696 |
| Dixon Correctional Center | 2,400 |
| East Moline Correctional Center | 1,412 |
| Graham Correctional Center | 2,082 |
| Hill Correctional Center | 1,828 |
| Illinois River Correctional Center | 2,128 |
| Jacksonville Correctional Center | 1,458 |
| Lawrence Correctional Center | 2,381 |
| Lincoln Correctional Center | 1,013 |
| Logan Correctional Center (female) | 1,960 |
| Menard Correctional Center | 3,640 |
| Pinckneyville Correctional Center | 2,537 |
| Pontiac Correctional Center | 1,963 |
| Robinson Correctional Center | 1,209 |
| Shawnee Correctional Center | 2,117 |
| Sheridan Correctional Center | 2,057 |
| Southwestern Correctional Center | 698 |
| Stateville Correctional Center | 4,001 |
| Taylorville Correctional Center | 1,201 |
| Vandalia Correctional Center | 1,672 |
| Vienna Correctional Center | 1,898 |
| Western Illinois Correctional Center | 2,105 |
| Adult Transition Centers | 925 |
| Electronic Detention | 93 |
| Federal/Other State* | 30 |
| Women and Children's Program | 3 |
| In-Transit | 0 |
| **Total** | **48,933** |

Note: Adult Transition Centers are listed individually in Table 4 and Table 11.

* Illinois inmates placed in facilities managed by other states or the federal government

Source: Retrieved from Offender Tracking System, May 31, 2013

Table 1

## Facility Population by Offense Type

As of May 31, 2013

| Facility | Murder | Class X | Class 1 | Class 2 | Class 3 | Class 4 | Unclassified [1] | Total |
|---|---|---|---|---|---|---|---|---|
| **Maximum** | | | | | | | | |
| Menard Correctional Center | 2,066 | 925 | 233 | 221 | 82 | 113 | 0 | 3,640 |
| Pontiac Correctional Center | 680 | 561 | 247 | 297 | 87 | 91 | 0 | 1,963 |
| Stateville Correctional Center | 1,145 | 677 | 493 | 748 | 289 | 649 | 1 | 4,002 |
| Maximum sub-total | 3,891 | 2,163 | 973 | 1,266 | 458 | 853 | 1 | 9,605 |
| **Female** | | | | | | | | |
| Decatur Correctional Center (medium) | 2 | 83 | 133 | 189 | 124 | 165 | 0 | 696 |
| Logan Correctional Center (maximum) | 345 | 335 | 249 | 430 | 287 | 311 | 3 | 1,960 |
| Female sub-total | 347 | 418 | 382 | 619 | 411 | 476 | 3 | 2,656 |
| **Medium** | | | | | | | | |
| Big Muddy River Correctional Center | 87 | 689 | 344 | 371 | 153 | 89 | 165 | 1,898 |
| Centralia Correctional Center | 131 | 505 | 286 | 380 | 141 | 143 | 0 | 1,586 |
| Danville Correctional Center | 341 | 669 | 313 | 364 | 125 | 130 | 0 | 1,942 |
| Dixon Correctional Center | 404 | 789 | 356 | 465 | 193 | 193 | 0 | 2,400 |
| Graham Correctional Center | 102 | 433 | 431 | 569 | 272 | 275 | 0 | 2,082 |
| Hill Correctional Center | 500 | 657 | 240 | 296 | 68 | 67 | 0 | 1,828 |
| Illinois River Correctional Center | 271 | 722 | 341 | 451 | 164 | 179 | 0 | 2,128 |
| Lawrence Correctional Center | 265 | 918 | 450 | 457 | 148 | 143 | 0 | 2,381 |
| Pinckneyville Correctional Center | 278 | 823 | 541 | 566 | 172 | 157 | 0 | 2,537 |
| Shawnee Correctional Center | 82 | 536 | 476 | 569 | 197 | 257 | 0 | 2,117 |
| Sheridan Correctional Center | 0 | 327 | 639 | 774 | 152 | 165 | 0 | 2,057 |
| Western Illinois Correctional Center | 267 | 676 | 324 | 488 | 154 | 195 | 1 | 2,105 |
| Medium sub-total | 2,728 | 7,744 | 4,741 | 5,750 | 1,939 | 1,993 | 166 | 25,061 |
| **Minimum** | | | | | | | | |
| East Moline Correctional Center | 0 | 218 | 263 | 421 | 176 | 333 | 1 | 1,412 |
| Jacksonville Correctional Center | 57 | 315 | 328 | 409 | 153 | 196 | 0 | 1,458 |
| Lincoln Correctional Center | 70 | 303 | 170 | 275 | 92 | 103 | 0 | 1,013 |
| Robinson Correctional Center | 23 | 274 | 232 | 365 | 167 | 148 | 0 | 1,209 |
| Southwestern Illinois Correctional Center | 0 | 51 | 215 | 243 | 109 | 80 | 0 | 698 |
| Taylorville Correctional Center | 30 | 403 | 257 | 319 | 105 | 87 | 0 | 1,201 |
| Vandalia Correctional Center | 0 | 177 | 299 | 502 | 247 | 446 | 1 | 1,672 |
| Vienna Correctional Center | 0 | 206 | 478 | 608 | 244 | 362 | 0 | 1,898 |
| Minimum sub-total | 180 | 1,947 | 2,242 | 3,142 | 1,293 | 1,755 | 2 | 10,561 |
| | | | | | | | | |
| **Total Institutions** | **7,146** | **12,272** | **8,338** | **10,777** | **4,101** | **5,077** | **172** | **47,883** |
| Adult Transition Centers | 0 | 74 | 442 | 236 | 90 | 83 | 0 | 925 |
| Electronic Detention | 0 | 0 | 3 | 52 | 18 | 20 | 0 | 93 |
| Federal/Other State[2] | 15 | 11 | 1 | 3 | 0 | 0 | 0 | 30 |
| Women and Children's Program | 0 | 1 | 0 | 2 | 0 | 0 | 0 | 3 |
| **Total** | **7,161** | **12,358** | **8,784** | **11,070** | **4,209** | **5,180** | **172** | **48,934** |

Note:  Data on class of crime are obtained from the Offender Tracking System. Class of crime data reflect the highest
class of crime for which an inmate has been committed.

Note: Data entry delay may cause some discrepancy with other counts.

 1. Unclassified cases include Sexually Dangerous Persons and contempt of court.

 2. Illinois inmates placed in facilities managed by other states or the federal government

Source: Retrieved from Offender Tracking System, May 31, 2013

Table 2

### Educational and Vocational Program Participation  As of May 31, 2013

| Educational: | Big Muddy River | Centralia | Danville | Decatur | Dixon | Dixon STC / Psych | Dixon Springs IIP | DuQuoin IIP | East Moline | Graham | Hardin County Work Camp | Hill | Illinois River | Jacksonville | Lawrence | Lincoln | Logan | Menard | Menard MSU |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Mandatory Basic Education | 212 | 110 | 109 | 26 | 137 | 39 | | 46 | 70 | 8 | | 165 | 32 | 67 | 93 | 37 | 104 | 38 | |
| Basic Education | 36 | 11 | 3 | 5 | 11 | 10 | 25 | | | 10 | | 13 | | 2 | 1 | | 37 | 16 | |
| English as Second Language | 48 | | | | | | | | | | | | | | | | | | |
| Chapter 1 | 26 | | | | | | | | | | | | | | | | | | |
| GED | 133 | 138 | 45 | 62 | 75 | 2 | 44 | 33 | 61 | 68 | | 79 | 78 | 82 | 54 | 63 | 138 | 69 | |
| Special Education | 21 | | | | | | | | | | | | | | | | | | |
| Literacy Program | | | | | | | | | | | | | 35 | | | | | | |
| Non-Degree College Education | 82 | | 245 | 78 | | | | | | 115 | | 250 | 110 | 52 | 243 | 69 | | | |
| College-2 year degree | 12 | 19 | 49 | 10 | 17 | 4 | | | 5 | 13 | | 47 | 83 | 8 | 14 | 33 | 4 | 1 | |
| College-4 year degree | | | | | | | | | | | | | | 1 | | | | | |
| Educational Sub-Total | 570 | 278 | 451 | 181 | 240 | 55 | 69 | 79 | 136 | 214 | 0 | 554 | 338 | 212 | 405 | 202 | 283 | 124 | 0 |
| **Vocational:** | | | | | | | | | | | | | | | | | | | |
| Auto Body | | | | | | | | | | | | | | | | | | | |
| Automotive Technology | 20 | | 18 | | | | | | | 21 | | | | | | | | | |
| Bachelor Living | | | | | 9 | | | | | | | | | | | | | | |
| Barbering | | | | | | | | | | | | | | | | | | | |
| Career Technologies | | 28 | 32 | 30 | 31 | | | | | 30 | | 13 | 13 | 15 | 21 | 15 | 25 | | 12 |
| Commercial Custodian | | 36 | 17 | | 24 | | | | 21 | 18 | | 25 | | 48 | 13 | 18 | | | |
| Construction Occupations | | 20 | 19 | | 16 | | | | 20 | 17 | 20 | | 14 | 15 | | 18 | 15 | 12 | |
| Cosmetology | | | | | 16 | | | | | | | | | | | | | | |
| Dog Grooming | | | | | | | | | | | | | | | | | | | |
| Dog Training | | | | | | | | | | | | | | | | | | | |
| Electronics | | 29 | | | | | | | | | | | | | | | | | |
| Food Service | 21 | 19 | | 20 | 16 | | | | 18 | | | | 18 | | | | | | |
| Graphic Arts / Print Management | | | | | | | | | | | | | | | | 15 | | | |
| Horticulture | 20 | | 19 | | | | | | | | | | 17 | 20 | | | 19 | | |
| Laundry/Dry Cleaning | | | | | | | | | | | | | | | | | | | |
| Industrail Maintence | | 15 | | | | | | | | | | | | | | | | | |
| Manage First | | 15 | | | | | | | | | | | | | | | | | |
| Tech-Related Math | | | 15 | | | | | | | | | | | | | | | | |
| Warehousing | | | | | | | | | | | | | | | | | | | |
| Welding | | | | | | | | | | | | | | | | | | | |
| Vocational Sub-Total | 61 | 162 | 120 | 50 | 103 | 9 | 0 | 0 | 59 | 86 | 20 | 38 | 62 | 98 | 49 | 51 | 59 | 12 | 12 |
| **Total Educational & Vocational** | 631 | 440 | 571 | 231 | 343 | 64 | 69 | 79 | 195 | 300 | 20 | 592 | 400 | 310 | 454 | 253 | 342 | 136 | 12 |
| | | | | | | | | | | | | | | | | | | | |
| **Students Served (Non-Duplicated)** | 497 | 393 | 413 | 178 | 321 | 60 | 60 | 77 | 181 | 240 | 20 | 474 | 284 | 254 | 355 | 192 | 322 | 120 | 12 |

Notes: Table 3 represents the number of inmates who participated in vocational and academic programs. This is a duplicated count because an inmate can be involved in more than one academic and/or vocational program.

The category "Non-Degree College Education" was added in the July 2009 report to account for all students who are included in the Student Served (Non-Duplicated)

Total number served in May 2013: 8,101

Source: Retrieved from Offender Tracking System, May 31, 2013

Table 3

### Educational and Vocational Program Participation (cont.)

| Educational: | Pinckneyville | Pittsfield Work Camp | Pontiac | Pontiac MSU | Robinson | Shawnee | Sheridan | Southwestern Illinois | Stateville | Stateville MSU | Taylorville | Vandalia | Vandalia Work Camp | Vienna | Western Illinois | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Mandatory Basic Education | 167 | 42 | | 45 | 66 | 214 | 141 | 60 | 98 | | 21 | 155 | | 185 | 63 | 2,550 |
| Basic Education | | 1 | | 23 | 16 | 22 | 14 | 3 | 4 | | 1 | 3 | | 1 | 9 | 277 |
| English as Second Language | | | | | | | | | | | | | | | | 48 |
| Chapter 1 | | | | | | | | | | | | | | | | 26 |
| GED | 94 | 36 | | 36 | 93 | 107 | 51 | 40 | 49 | | 53 | 110 | | 101 | 76 | 2,070 |
| Special Education | | | | | | | | | | | | | | | | 21 |
| Literacy Program | | | | | | | | | | | | | | | | 35 |
| Non-Degree College Education | 166 | | | | 199 | 26 | 30 | 135 | | | | 103 | | 76 | 132 | 2,111 |
| College-2 year degree | 24 | | | | 19 | 5 | | 7 | 1 | | 1 | 12 | | 11 | 16 | 415 |
| College-4 year degree | | | | | 2 | | | 1 | | | | 1 | | | | 5 |
| Educational Sub-Total | 451 | 79 | 0 | 104 | 395 | 374 | 236 | 246 | 152 | 0 | 76 | 384 | 0 | 374 | 296 | 7,558 |
| **Vocational:** | | | | | | | | | | | | | | | | |
| Auto Body | | | | | | | | | | | | 18 | | 18 | | 36 |
| Automotive Technology | | | | | 18 | | | | | | | | | 16 | 17 | 110 |
| Bachelor Living | | | | | | | | | | | | | | | | 9 |
| Barbering | | | | | | | 20 | | 5 | | | | | | | 25 |
| Career Technologies | 11 | | 14 | | 29 | 15 | 30 | 48 | | | 28 | 27 | 18 | 42 | 22 | 549 |
| Commercial Custodian | 18 | | | | 20 | 16 | | 44 | | | 18 | | | 41 | | 377 |
| Construction Occupations | 18 | | | | | | | 34 | | | 19 | 19 | | | 16 | 292 |
| Cosmetology | | | | | | | | | | | | | | 22 | | 38 |
| Dog Grooming | | | | | | | | | | | | | | | | 0 |
| Dog Training | | | | | | | | | | | | | | | | 0 |
| Electronics | | | | | | | | | | | | | | | | 29 |
| Food Service | 17 | | | | 16 | | 31 | | | | | | | 21 | 15 | 212 |
| Graphic Arts / Print Management | | | | | | | | | | | | | | | | 15 |
| Horticulture | | | | | 19 | | | 22 | | | 18 | 18 | | | | 172 |
| Laundry/Dry Cleaning | | | | | | | | | | | | | | | | 0 |
| Industrail Maintence | | | | | | | | | | | | | | | | 15 |
| Manage First | | | | | | | | | | | | | | | | 15 |
| Tech-Related Math | | | | | | | | | | | | | | | 22 | 37 |
| Warehousing | | | | | | | 35 | 50 | | | | | | | | 85 |
| Welding | | | | | | | 24 | | | | | 15 | | 25 | | 64 |
| Vocational Sub-Total | 64 | 0 | 14 | 0 | 84 | 49 | 140 | 198 | 5 | 0 | 83 | 97 | 18 | 185 | 92 | 2,080 |
| **Total Educational & Vocational** | **515** | **79** | **14** | **104** | **479** | **423** | **376** | **444** | **157** | **0** | **159** | **481** | **18** | **559** | **388** | **9,638** |
| | | | | | | | | | | | | | | | | |
| **Students Served (Non-Duplicated)** | **426** | **76** | **14** | **99** | **373** | **406** | **370** | **325** | **144** | **0** | **154** | **412** | **18** | **500** | **331** | **8,101** |

Notes: Table 3 represents the number of inmates who participated in vocational and academic programs. This is a duplicated count because an inmate can be involved in more than one academic and/or vocational program.

The category "Non-Degree College Education" was added in the July 2009 report to account for all students who are included in the Student Served (Non-Duplicated)

Total number served in May 2013: 8,101

Source: Retrieved from Offender Tracking System, May 31, 2013

Table 3

## Capacity by Facility

As of May 31, 2013

| | Operational Capacity/Bedspace[1] | | | | | Design/Rated Capacity[2] | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Facility | Current Population | Current | Percent | Est. Jan. 2014 | Est. Jul. 2014 | Current | Percent | Est. Jan. 2014 | Est. Jul. 2014 |
| Big Muddy River Correctional Center | 1,898 | 1,958 | 97% | 1,958 | 1,958 | 952 | 199% | 952 | 952 |
| Centralia Correctional Center | 1,586 | 1,669 | 95% | 1,669 | 1,669 | 950 | 167% | 950 | 950 |
| Danville Correctional Center | 1,942 | 1,966 | 99% | 1,966 | 1,966 | 896 | 217% | 896 | 896 |
| Decatur Correctional Center (female) | 696 | 717 | 97% | 717 | 717 | 500 | 139% | 500 | 500 |
| Dixon Correctional Center | 2,400 | 2,527 | 95% | 2,527 | 2,527 | 1,430 | 168% | 1,430 | 1,430 |
| East Moline Correctional Center | 1,412 | 1,446 | 98% | 1,446 | 1,446 | 688 | 205% | 688 | 688 |
| Graham Correctional Center | 2,082 | 2,110 | 99% | 2,110 | 2,110 | 1,174 | 177% | 1,174 | 1,174 |
| Hill Correctional Center | 1,828 | 1,866 | 98% | 1,866 | 1,866 | 896 | 204% | 896 | 896 |
| Illinois River Correctional Center | 2,128 | 2,198 | 97% | 2,198 | 2,198 | 1,011 | 210% | 1,011 | 1,011 |
| Jacksonville Correctional Center | 1,458 | 1,625 | 90% | 1,625 | 1,625 | 1,100 | 133% | 1,100 | 1,100 |
| Lawrence Correctional Center | 2,381 | 2,458 | 97% | 2,458 | 2,458 | 2,257 | 105% | 2,257 | 2,257 |
| Lincoln Correctional Center | 1,013 | 1,018 | 100% | 1,018 | 1,018 | 500 | 203% | 500 | 500 |
| Logan Correctional Center (female) | 1,960 | 2,012 | 97% | 2,012 | 2,012 | 1,106 | 177% | 1,106 | 1,106 |
| Menard Correctional Center | 3,640 | 3,749 | 97% | 3,749 | 3,749 | 3,098 | 117% | 3,098 | 3,098 |
| Pinckneyville Correctional Center | 2,537 | 2,565 | 99% | 2,565 | 2,565 | 2,434 | 104% | 2,434 | 2,434 |
| Pontiac Correctional Center | 1,963 | 2,192 | 90% | 2,192 | 2,192 | 1,800 | 109% | 1,800 | 1,800 |
| Robinson Correctional Center | 1,209 | 1,223 | 99% | 1,223 | 1,223 | 600 | 202% | 600 | 600 |
| Shawnee Correctional Center | 2,117 | 2,254 | 94% | 2,254 | 2,254 | 1,046 | 202% | 1,046 | 1,046 |
| Sheridan Correctional Center | 2,057 | 2,098 | 98% | 2,098 | 2,098 | 1,304 | 158% | 1,304 | 1,304 |
| Southwestern Correctional Center | 698 | 710 | 98% | 710 | 710 | 600 | 116% | 600 | 600 |
| Stateville Correctional Center | 4,001 | 4,053 | 99% | 4,053 | 4,053 | 3,162 | 127% | 3,162 | 3,162 |
| Taylorville Correctional Center | 1,201 | 1,221 | 98% | 1,221 | 1,221 | 600 | 200% | 600 | 600 |
| Vandalia Correctional Center | 1,672 | 1,802 | 93% | 1,802 | 1,802 | 1,100 | 152% | 1,100 | 1,100 |
| Vienna Correctional Center | 1,898 | 1,982 | 96% | 1,982 | 1,982 | 925 | 205% | 925 | 925 |
| Western Illinois Correctional Center | 2,105 | 2,240 | 94% | 2,240 | 2,240 | 1,102 | 191% | 1,102 | 1,102 |
| **Correctional Center Subtotal** | **47,882** | **49,659** | **96%** | **49,659** | **49,659** | **31,231** | **153%** | **31,231** | **31,231** |
| Crossroads Adult Transition Center[3] | 368 | 380 | 97% | 380 | 380 | 250 | 147% | 250 | 250 |
| Fox Valley Adult Transition Center (female) | 112 | 128 | 88% | 128 | 128 | 100 | 112% | 100 | 100 |
| North Lawndale Adult Transition Center[3] | 201 | 200 | 101% | 200 | 200 | 200 | 101% | 200 | 200 |
| Peoria Adult Transition Center | 244 | 248 | 98% | 248 | 248 | 200 | 122% | 200 | 200 |
| **Adult Transition Center Subtotal** | **925** | **956** | **97%** | **956** | **956** | **750** | **123%** | **750** | **750** |
| Electronic Detention | 93 | 93 | 100% | 93 | 93 | 93 | 100% | 93 | 93 |
| Federal/Other State[4] | 30 | 30 | 100% | 30 | 30 | 30 | 100% | 30 | 30 |
| Women & Children's Program | 3 | 15 | 20% | 15 | 15 | 15 | 20% | 15 | 15 |
| **Total** | **48,933** | **50,753** | **96%** | **50,753** | **50,753** | **32,119** | **152%** | **32,119** | **32,119** |

Note: Data entry delay may cause some discrepancy with other counts.

1. Operational Capacity/Bedspace is the maximum number of inmates a facility can hold.

2. Rated/Design Capacity is the original rated capacity of the facility when it was first constructed.

3. Contractually-operated Adult Transition Center

4. Illinois inmates placed in facilities managed by other states or the federal government.

Sources: Retrieved from Offender Tracking System, May 31, 2013; Department of Corrections Data

Table 4

## **Facility Population by Cell Type**

As of May 31, 2013

| Facility | Single-Celled | | Double-Celled | | Multi-Celled | | Uncelled | | Total |
|---|---|---|---|---|---|---|---|---|---|
| | Number | Percent | Number | Percent | Number | Percent | Number | Percent | |
| Big Muddy River Correctional Center | 36 | 2% | 1,748 | 92% | 114 | 6% | 0 | 0% | 1,898 |
| Centralia Correctional Center | 22 | 1% | 1,518 | 96% | 45 | 3% | 0 | 0% | 1,585 |
| Danville Correctional Center | 18 | 1% | 1,812 | 93% | 112 | 6% | 0 | 0% | 1,942 |
| Decatur Correctional Center (female) | 12 | 2% | 16 | 2% | 668 | 96% | 0 | 0% | 696 |
| Dixon Correctional Center | 383 | 16% | 1,392 | 58% | 625 | 26% | 0 | 0% | 2,400 |
| East Moline Correctional Center | 27 | 2% | 638 | 45% | 747 | 53% | 0 | 0% | 1,412 |
| Graham Correctional Center | 32 | 2% | 1,926 | 93% | 124 | 6% | 0 | 0% | 2,082 |
| Hill Correctional Center | 29 | 2% | 1,796 | 98% | 3 | 0% | 0 | 0% | 1,828 |
| Illinois River Correctional Center | 9 | 0% | 1,920 | 90% | 199 | 9% | 0 | 0% | 2,128 |
| Jacksonville Correctional Center | 16 | 1% | 0 | 0% | 1,442 | 99% | 0 | 0% | 1,458 |
| Lawrence Correctional Center | 68 | 3% | 2,310 | 97% | 3 | 0% | 0 | 0% | 2,381 |
| Lincoln Correctional Center | 29 | 3% | 0 | 0% | 984 | 97% | 0 | 0% | 1,013 |
| Logan Correctional Center (female) | 76 | 4% | 606 | 31% | 1,278 | 65% | 0 | 0% | 1,960 |
| Menard Correctional Center | 291 | 8% | 3,328 | 91% | 21 | 1% | 0 | 0% | 3,640 |
| Pinckneyville Correctional Center | 123 | 5% | 2,038 | 80% | 376 | 15% | 0 | 0% | 2,537 |
| Pontiac Correctional Center | 709 | 36% | 1,254 | 64% | 0 | 0% | 0 | 0% | 1,963 |
| Robinson Correctional Center | 14 | 1% | 0 | 0% | 1,195 | 99% | 0 | 0% | 1,209 |
| Shawnee Correctional Center | 46 | 2% | 1,784 | 84% | 287 | 14% | 0 | 0% | 2,117 |
| Sheridan Correctional Center | 29 | 1% | 1,970 | 96% | 58 | 3% | 0 | 0% | 2,057 |
| Southwestern Illinois Correctional Center | 3 | 0% | 0 | 0% | 695 | 100% | 0 | 0% | 698 |
| Stateville Correctional Center | 601 | 15% | 3,226 | 81% | 119 | 3% | 55 | 0% | 4,001 |
| Taylorville Correctional Center | 5 | 0% | 0 | 0% | 1,196 | 100% | 0 | 0% | 1,201 |
| Vandalia Correctional Center | 36 | 2% | 2 | 0% | 1,634 | 98% | 0 | 0% | 1,672 |
| Vienna Correctional Center | 10 | 1% | 1,230 | 65% | 655 | 35% | 3 | 0% | 1,898 |
| Western Illinois Correctional Center | 51 | 2% | 1,826 | 87% | 228 | 11% | 0 | 0% | 2,105 |
| **Total** | **2,675** | **6%** | **32,340** | **68%** | **12,808** | **27%** | **58** | **0%** | **47,881** |

Note: Uncelled refers to when an inmate has been brought into a facility, but not assigned to a cell when the Offender Tracking System Housing Report was run.

Note: Data entry delay may cause some discrepancy with other counts.

Source: Retrieved from Offender Tracking System, May 31, 2013

Table 5

## **Facility Floor Space**

As of May 31, 2013

| Facility | Approximate Square Feet per Inmate |
|---|:---:|
| Big Muddy River Correctional Center | 31 |
| Centralia Correctional Center | 32 |
| Danville Correctional Center | 29 |
| Decatur Correctional Center (female) | 40 |
| Dixon Correctional Center | 21 |
| East Moline Correctional Center | 47 |
| Graham Correctional Center | 24 |
| Hill Correctional Center | 31 |
| Illinois River Correctional Center | 30 |
| Jacksonville Correctional Center | 29 |
| Lawrence Correctional Center | 28 |
| Lincoln Correctional Center | 26 |
| Logan Correctional Center (female) | 38 |
| Menard Correctional Center | 37 |
| Pinckneyville Correctional Center | 34 |
| Pontiac Correctional Center | 47 |
| Robinson Correctional Center | 28 |
| Shawnee Correctional Center | 31 |
| Sheridan Correctional Center | 30 |
| Southwestern Illinois Correctional Center | 31 |
| Stateville Correctional Center | 38 |
| Taylorville Correctional Center | 29 |
| Vandalia Correctional Center | 26 |
| Vienna Correctional Center | 33 |
| Western Illinois Correctional Center | 30 |
| **Average** | **32** |

Note:  The approximate distribution of floor space per inmate only includes actual living area.
This does not include dayrooms, control rooms, janitor closets, plumbing chases, showers,
laundry rooms, and various offices.

Source: Department of Corrections Data

Table 6

## Facility Staff Ratios

As of May 31, 2013

| Facility | Inmate-to-Security Staff Ratio | Inmate-to-Total Staff Ratio | Security Staff per Inmate Ratio | Total Staff per Inmate Ratio |
|---|---|---|---|---|
| Big Muddy River Correctional Center | 8.6:1 | 6.6:1 | 0.117:1 | 0.151:1 |
| Centralia Correctional Center | 5.6:1 | 4.5:1 | 0.180:1 | 0.224:1 |
| Danville Correctional Center | 8.5:1 | 6.8:1 | 0.117:1 | 0.147:1 |
| Decatur Correctional Center (female) | 5.4:1 | 3.5:1 | 0.186:1 | 0.287:1 |
| Dixon Correctional Center | 5.9:1 | 4.6:1 | 0.168:1 | 0.216:1 |
| East Moline Correctional Center | 7.5:1 | 5.4:1 | 0.134:1 | 0.186:1 |
| Graham Correctional Center | 6.5:1 | 5.1:1 | 0.153:1 | 0.194:1 |
| Hill Correctional Center | 8.4:1 | 6.7:1 | 0.119:1 | 0.149:1 |
| Illinois River Correctional Center | 9.2:1 | 7.2:1 | 0.109:1 | 0.140:1 |
| Jacksonville Correctional Center | 5.6:1 | 4.3:1 | 0.178:1 | 0.233:1 |
| Lawrence Correctional Center | 8.2:1 | 6.5:1 | 0.122:1 | 0.153:1 |
| Lincoln Correctional Center (female) | 6.3:1 | 4.9:1 | 0.159:1 | 0.204:1 |
| Logan Correctional Center | 6.4:1 | 5.0:1 | 0.157:1 | 0.201:1 |
| Menard Correctional Center | 5.9:1 | 4.5:1 | 0.168:1 | 0.220:1 |
| Pinckneyville Correctional Center | 7.8:1 | 5.9:1 | 0.129:1 | 0.169:1 |
| Pontiac Correctional Center | 3.7:1 | 3.1:1 | 0.269:1 | 0.322:1 |
| Robinson Correctional Center | 6.8:1 | 5.2:1 | 0.147:1 | 0.191:1 |
| Shawnee Correctional Center | 8.4:1 | 6.4:1 | 0.119:1 | 0.156:1 |
| Sheridan Correctional Center | 6.3:1 | 4.9:1 | 0.158:1 | 0.204:1 |
| Southwestern Illinois Correctional Center | 4.2:1 | 3.1:1 | 0.239:1 | 0.319:1 |
| Stateville Correctional Center | 4.8:1 | 3.8:1 | 0.207:1 | 0.262:1 |
| Taylorville Correctional Center | 7.3:1 | 5.5:1 | 0.136:1 | 0.183:1 |
| Vandalia Correctional Center | 6.9:1 | 5.1:1 | 0.146:1 | 0.197:1 |
| Vienna Correctional Center | 8.0:1 | 5.9:1 | 0.125:1 | 0.170:1 |
| Western Illinois Correctional Center | 7.9:1 | 6.2:1 | 0.127:1 | 0.162:1 |
| **Average** | **6.3:1** | **4.9:1** | **0.160:1** | **0.206:1** |

Note: Reflects the average number of staff and average inmate population for FY13 through May 31, 2013

Source: Department of Corrections Data

Table 7

## **Capital Projects Currently Funded**

| Location | Project Completion Date | Phase-in Date | Beds Phased-in | Full Occupancy Date | Total Number of Beds |
|---|---|---|---|---|---|

*No current capital projects*

Table 8

**Projected Prison Population**
**Twelve Months Subsequent to the Reporting Date**

| Month | Year | Population |
|-------|------|-----------:|
| July | 2013 | 48,880 |
| August | 2013 | 49,015 |
| September | 2013 | 49,149 |
| October | 2013 | 48,984 |
| November | 2013 | 49,118 |
| December | 2013 | 49,253 |
| January | 2014 | 49,087 |
| February | 2014 | 49,222 |
| March | 2014 | 49,356 |
| April | 2014 | 49,191 |
| May | 2014 | 49,325 |
| June | 2014 | 49,462 |

This population forecast reflects the Department's efforts to improve the method for projecting prison population utilizing a simulation tool that includes past experience and policy changes. Conceptually, the model is designed around the movement of individuals through the prison system. The data reflect Fiscal Year 2012 experience. The underlying assumptions are:

1. New felony admissions, based on average growth rates by class of crime and gender were increased by 3.9% (3.4% for males and 8.9% for females).

2. Defaulter admissions (technical violations and new offense violations) were based on the probability (violation rate) that 40.8% of all inmates on supervision will violate supervision and be returned to prison. The violation rate is computed by adding the percent of new offense violators (6.8%) with the percent of technical violators (33.9%).

3. Admissions were seasonally adjusted based on the past ten years' average percentage distribution by month.

4. Offense class distributions were based on actual distributions of admissions by class of crime for Fiscal Year 2012 as reported in the Offender Tracking System (OTS).

5. Sentence estimates for new admissions were based on the Fiscal Year 2012 actual distribution of sentence lengths by offense class. These data were obtained from OTS.

6. All eligible inmates will receive their day-for-day good time, reduced by the average net revoked/restored days for each offense class.

7. Jail credits and probation credits were based on actual admission distribution of Fiscal Year 2012 OTS data by offense class.

8. An average of 32 days good conduct credit for behavioral adjustment and program services participation of MGT/SMGT/ED/ET/GED (good conduct credit types) per inmate will be awarded.

9. Projected exits for inmates in the current population as of June 30, 2012 were based on the sentence calculation module of OTS. For those with indeterminate sentences, it was assumed that those inmates who have yet to see the Prisoner Review Board on the minimum sentence will exit on their projected maximum release date.

10. As a result of Public Act 90-593, certain offenders will serve a greater proportion of their sentence if their crime was committed after the effective date of June 19, 1998, and their offense is provided under the Rules and Regulations for Early Release (730 ILCS 5/3-6-3). These Truth-in-Sentencing admissions are gradually phased in over the duration of the projections.

Table 9

## **Population Projection Comparison**

Based on FY2012 Data

| Month | Year | Actual Population | Population Projection | Difference | Percent Difference |
|---|---|---|---|---|---|
| June | 2012 | 48,324 | 48,512 | -188 | -0.39% |
| July | 2012 | 48,739 | 48,541 | 198 | 0.41% |
| August | 2012 | 48,996 | 48,599 | 397 | 0.82% |
| September | 2012 | 49,134 | 48,622 | 512 | 1.05% |
| October | 2012 | 49,417 | 48,678 | 739 | 1.52% |
| November | 2012 | 49,348 | 48,743 | 605 | 1.24% |
| December | 2012 | 49,058 | 48,803 | 255 | 0.52% |
| January | 2013 | 49,321 | 48,707 | 614 | 1.26% |
| February | 2013 | 49,171 | 48,821 | 350 | 0.72% |
| March | 2013 | 49,278 | 48,938 | 340 | 0.69% |
| April | 2013 | 49,219 | 48,762 | 457 | 0.94% |
| May | 2013 | 48,933 | 48,901 | 32 | 0.07% |

Source: Historical Department of Corrections Population Forecasts

## Intake, Exits, and Transfers by Facility

As of May 31, 2013

|  | Jul | Aug | Sep | Oct | Nov | Dec | Jan | Feb | Mar | Apr | May | Jun | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| BMR-In | 5 | 9 | 11 | 11 | 11 | 8 | 14 | 9 | 11 | 9 | 13 |  | **111** |
| Ex | 54 | 63 | 54 | 60 | 62 | 69 | 66 | 49 | 70 | 65 | 82 |  | **694** |
| Tr-In | 101 | 103 | 91 | 102 | 90 | 112 | 100 | 74 | 90 | 84 | 111 |  | **1,058** |
| Tr-Out | 33 | 50 | 42 | 57 | 38 | 37 | 52 | 23 | 36 | 34 | 43 |  | **445** |
| CEN-In | 5 | 3 | 10 | 4 | 4 | 5 | 4 | 12 | 8 | 4 | 3 |  | **62** |
| Ex | 68 | 74 | 81 | 70 | 85 | 81 | 62 | 70 | 80 | 89 | 77 |  | **837** |
| Tr-In | 122 | 122 | 100 | 110 | 114 | 108 | 112 | 93 | 218 | 126 | 62 |  | **1,287** |
| Tr-Out | 36 | 42 | 28 | 34 | 38 | 28 | 37 | 37 | 48 | 51 | 49 |  | **428** |
| DAN-In | 5 | 9 | 4 | 3 | 6 | 11 | 6 | 5 | 10 | 7 | 7 |  | **73** |
| Ex | 66 | 87 | 63 | 54 | 67 | 67 | 77 | 62 | 77 | 79 | 107 |  | **806** |
| Tr-In | 128 | 138 | 93 | 93 | 81 | 71 | 135 | 70 | 208 | 97 | 162 |  | **1,276** |
| Tr-Out | 33 | 51 | 38 | 38 | 19 | 21 | 38 | 16 | 24 | 41 | 33 |  | **352** |
| DCT-In | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |  | **1** |
| Ex | 68 | 65 | 58 | 65 | 59 | 55 | 47 | 61 | 76 | 96 | 120 |  | **770** |
| Tr-In | 88 | 54 | 78 | 84 | 60 | 64 | 32 | 67 | 103 | 97 | 115 |  | **842** |
| Tr-Out | 0 | 4 | 4 | 3 | 3 | 0 | 2 | 2 | 0 | 3 | 0 |  | **21** |
| DIX-In | 5 | 7 | 7 | 13 | 4 | 10 | 11 | 4 | 9 | 6 | 14 |  | **90** |
| Ex | 99 | 118 | 85 | 97 | 112 | 109 | 108 | 115 | 95 | 112 | 113 |  | **1,163** |
| Tr-In | 210 | 188 | 107 | 134 | 116 | 142 | 139 | 136 | 108 | 127 | 132 |  | **1,539** |
| Tr-Out | 38 | 57 | 32 | 43 | 24 | 38 | 32 | 37 | 30 | 39 | 36 |  | **406** |
| DWI-In | 225 | 245 | 199 | 236 | 196 | 146 | 244 | 171 | 127 | 0 | 0 |  | **1,789** |
| Ex | 58 | 70 | 65 | 77 | 50 | 68 | 65 | 54 | 61 | 0 | 0 |  | **568** |
| Tr-In | 1 | 4 | 1 | 5 | 1 | 0 | 3 | 3 | 20 | 0 | 0 |  | **38** |
| Tr-Out | 168 | 124 | 180 | 173 | 143 | 174 | 80 | 122 | 1,179 | 0 | 0 |  | **2,343** |
| EMO-In | 2 | 1 | 0 | 3 | 0 | 2 | 0 | 0 | 2 | 0 | 0 |  | **10** |
| Ex | 84 | 90 | 74 | 91 | 103 | 115 | 111 | 106 | 117 | 122 | 125 |  | **1,138** |
| Tr-In | 118 | 247 | 119 | 133 | 145 | 135 | 179 | 149 | 148 | 158 | 177 |  | **1,708** |
| Tr-Out | 32 | 47 | 41 | 46 | 37 | 43 | 52 | 39 | 35 | 42 | 59 |  | **473** |
| GRA-In | 267 | 330 | 272 | 289 | 251 | 223 | 298 | 249 | 283 | 261 | 313 |  | **3,036** |
| Ex | 75 | 116 | 79 | 72 | 87 | 79 | 88 | 83 | 97 | 111 | 103 |  | **990** |
| Tr-In | 52 | 90 | 76 | 83 | 44 | 59 | 78 | 53 | 155 | 42 | 93 |  | **825** |
| Tr-Out | 227 | 261 | 210 | 295 | 227 | 191 | 270 | 229 | 257 | 215 | 264 |  | **2,646** |
| HIL-In | 3 | 1 | 3 | 4 | 5 | 4 | 5 | 4 | 0 | 2 | 5 |  | **36** |
| Ex | 59 | 54 | 60 | 57 | 67 | 74 | 63 | 52 | 59 | 61 | 59 |  | **665** |
| Tr-In | 118 | 125 | 110 | 102 | 91 | 104 | 129 | 89 | 100 | 99 | 131 |  | **1,198** |
| Tr-Out | 53 | 51 | 44 | 53 | 31 | 36 | 58 | 39 | 44 | 44 | 86 |  | **539** |
| IRI-In | 11 | 9 | 10 | 9 | 10 | 11 | 18 | 13 | 14 | 16 | 9 |  | **130** |
| Ex | 73 | 109 | 81 | 93 | 86 | 89 | 103 | 79 | 96 | 87 | 102 |  | **998** |
| Tr-In | 139 | 158 | 142 | 132 | 99 | 99 | 171 | 106 | 243 | 145 | 121 |  | **1,555** |
| Tr-Out | 34 | 43 | 46 | 47 | 24 | 20 | 41 | 40 | 42 | 60 | 63 |  | **460** |
| JAC-In | 8 | 5 | 2 | 3 | 7 | 4 | 6 | 5 | 4 | 8 | 5 |  | **57** |
| Ex | 78 | 88 | 83 | 98 | 110 | 95 | 98 | 111 | 98 | 111 | 130 |  | **1,100** |
| Tr-In | 131 | 139 | 148 | 159 | 173 | 123 | 165 | 155 | 139 | 149 | 90 |  | **1,571** |
| Tr-Out | 36 | 50 | 61 | 71 | 60 | 39 | 60 | 50 | 36 | 55 | 103 |  | **621** |
| LAW-In | 3 | 2 | 9 | 4 | 12 | 4 | 5 | 9 | 6 | 1 | 7 |  | **62** |
| Ex | 97 | 139 | 133 | 128 | 121 | 109 | 111 | 102 | 99 | 125 | 126 |  | **1,290** |
| Tr-In | 249 | 238 | 213 | 215 | 177 | 168 | 228 | 141 | 185 | 189 | 205 |  | **2,208** |
| Tr-Out | 61 | 102 | 62 | 97 | 78 | 51 | 111 | 71 | 71 | 46 | 71 |  | **821** |
| LIN-In | 0 | 0 | 1 | 0 | 2 | 1 | 1 | 2 | 4 | 2 | 1 |  | **14** |
| Ex | 65 | 67 | 77 | 76 | 66 | 89 | 88 | 87 | 62 | 36 | 54 |  | **767** |
| Tr-In | 85 | 59 | 88 | 91 | 85 | 111 | 48 | 48 | 1,037 | 57 | 78 |  | **1,787** |
| Tr-Out | 9 | 1 | 6 | 13 | 16 | 12 | 11 | 1 | 902 | 25 | 15 |  | **1,011** |
| LOG-In | 8 | 26 | 8 | 5 | 10 | 6 | 6 | 8 | 90 | 254 | 249 |  | **670** |
| Ex | 78 | 85 | 57 | 62 | 64 | 76 | 61 | 65 | 66 | 180 | 157 |  | **951** |
| Tr-In | 14 | 21 | 103 | 249 | 120 | 55 | 16 | 174 | 1,960 | 4 | 5 |  | **2,721** |
| Tr-Out | 239 | 107 | 30 | 30 | 26 | 32 | 159 | 29 | 1,497 | 100 | 121 |  | **2,370** |
| MEN-In | 97 | 159 | 77 | 110 | 120 | 101 | 140 | 98 | 114 | 119 | 133 |  | **1,268** |
| Ex | 61 | 68 | 46 | 52 | 69 | 57 | 55 | 60 | 51 | 59 | 58 |  | **636** |
| Tr-In | 64 | 127 | 90 | 80 | 79 | 84 | 114 | 86 | 76 | 75 | 115 |  | **990** |
| Tr-Out | 96 | 158 | 125 | 144 | 130 | 92 | 188 | 125 | 168 | 147 | 187 |  | **1,560** |

Table 10

## Intake, Exits, and Transfers by Facility

As of May 31, 2013

| | Jul | Aug | Sep | Oct | Nov | Dec | Jan | Feb | Mar | Apr | May | Jun | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| PNK-In | 4 | 4 | 3 | 3 | 5 | 4 | 7 | 3 | 5 | 13 | 4 | | **55** |
| Ex | 163 | 186 | 137 | 143 | 156 | 145 | 163 | 142 | 138 | 152 | 169 | | **1,694** |
| Tr-In | 290 | 297 | 219 | 237 | 197 | 184 | 278 | 192 | 169 | 281 | 312 | | **2,656** |
| Tr-Out | 62 | 88 | 68 | 83 | 66 | 55 | 99 | 65 | 69 | 96 | 78 | | **829** |
| PON-In | 3 | 0 | 0 | 1 | 3 | 3 | 2 | 0 | 1 | 1 | 2 | | **16** |
| Ex | 104 | 110 | 90 | 104 | 99 | 93 | 83 | 96 | 99 | 140 | 139 | | **1,157** |
| Tr-In | 124 | 156 | 93 | 115 | 80 | 229 | 126 | 139 | 140 | 120 | 94 | | **1,416** |
| Tr-Out | 70 | 78 | 48 | 63 | 43 | 42 | 91 | 68 | 58 | 54 | 65 | | **680** |
| ROB-In | 16 | 14 | 9 | 8 | 12 | 12 | 8 | 14 | 8 | 9 | 16 | | **126** |
| Ex | 66 | 63 | 56 | 58 | 78 | 72 | 64 | 65 | 64 | 73 | 68 | | **727** |
| Tr-In | 90 | 100 | 86 | 106 | 85 | 84 | 124 | 82 | 89 | 94 | 90 | | **1,030** |
| Tr-Out | 30 | 44 | 36 | 35 | 21 | 21 | 55 | 30 | 28 | 24 | 37 | | **361** |
| SHA-In | 4 | 6 | 4 | 4 | 8 | 4 | 9 | 12 | 9 | 5 | 8 | | **73** |
| Ex | 83 | 137 | 98 | 108 | 132 | 109 | 120 | 124 | 110 | 136 | 149 | | **1,306** |
| Tr-In | 208 | 205 | 155 | 181 | 168 | 146 | 251 | 179 | 250 | 200 | 141 | | **2,084** |
| Tr-Out | 56 | 55 | 55 | 69 | 47 | 53 | 78 | 48 | 67 | 66 | 90 | | **684** |
| SHE-In | 0 | 0 | 0 | 0 | 0 | 16 | 0 | 0 | 0 | 0 | 0 | | **16** |
| Ex | 57 | 75 | 83 | 71 | 85 | 76 | 79 | 98 | 88 | 103 | 111 | | **926** |
| Tr-In | 162 | 193 | 84 | 102 | 98 | 181 | 209 | 107 | 155 | 191 | 173 | | **1,655** |
| Tr-Out | 29 | 46 | 14 | 23 | 19 | 16 | 31 | 22 | 17 | 45 | 39 | | **301** |
| STA-In | 2,120 | 2,237 | 1,830 | 1,958 | 1,851 | 1,651 | 2,028 | 1,695 | 1,923 | 2,017 | 1,985 | | **21,295** |
| Ex | 222 | 270 | 283 | 303 | 340 | 326 | 354 | 351 | 368 | 396 | 364 | | **3,577** |
| Tr-In | 55 | 40 | 105 | 86 | 90 | 66 | 94 | 120 | 99 | 95 | 97 | | **947** |
| Tr-Out | 1,880 | 1,849 | 1,805 | 1,704 | 1,689 | 1,452 | 1,742 | 1,680 | 1,568 | 1,788 | 1,613 | | **18,770** |
| SWC-In | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | | **0** |
| Ex | 35 | 51 | 44 | 44 | 47 | 43 | 32 | 37 | 38 | 50 | 46 | | **467** |
| Tr-In | 49 | 80 | 62 | 82 | 55 | 40 | 80 | 53 | 64 | 67 | 66 | | **698** |
| Tr-Out | 18 | 29 | 19 | 35 | 20 | 14 | 32 | 21 | 20 | 26 | 20 | | **254** |
| TAM-In | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | | **0** |
| Ex | 19 | 10 | 5 | 11 | 12 | 2 | 0 | 0 | 0 | 0 | 0 | | **59** |
| Tr-In | 4 | 2 | 11 | 15 | 18 | 5 | 0 | 0 | 0 | 0 | 0 | | **55** |
| Tr-Out | 37 | 66 | 7 | 8 | 4 | 239 | 0 | 0 | 0 | 0 | 0 | | **361** |
| TAY-In | 2 | 11 | 8 | 13 | 9 | 7 | 7 | 6 | 6 | 11 | 13 | | **93** |
| Ex | 49 | 62 | 41 | 35 | 54 | 45 | 45 | 52 | 45 | 70 | 70 | | **568** |
| Tr-In | 56 | 94 | 55 | 59 | 60 | 47 | 79 | 81 | 60 | 71 | 91 | | **753** |
| Tr-Out | 10 | 16 | 18 | 32 | 15 | 19 | 34 | 23 | 21 | 27 | 19 | | **234** |
| VAN-In | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 2 | | **3** |
| Ex | 130 | 152 | 125 | 121 | 134 | 135 | 124 | 128 | 132 | 129 | 160 | | **1,470** |
| Tr-In | 220 | 215 | 198 | 204 | 183 | 182 | 205 | 171 | 180 | 209 | 201 | | **2,168** |
| Tr-Out | 64 | 63 | 84 | 69 | 60 | 46 | 70 | 65 | 41 | 76 | 53 | | **691** |
| VIE-In | 0 | 0 | 0 | 0 | 0 | 0 | 1 | 0 | 1 | 2 | 1 | | **5** |
| Ex | 161 | 169 | 149 | 167 | 178 | 143 | 175 | 151 | 181 | 163 | 187 | | **1,824** |
| Tr-In | 280 | 220 | 233 | 253 | 261 | 202 | 233 | 228 | 203 | 229 | 242 | | **2,584** |
| Tr-Out | 90 | 68 | 78 | 86 | 80 | 56 | 69 | 83 | 46 | 62 | 89 | | **807** |
| WIL-In | 3 | 7 | 4 | 5 | 6 | 2 | 2 | 6 | 1 | 4 | 4 | | **44** |
| Ex | 104 | 138 | 108 | 84 | 97 | 109 | 96 | 89 | 88 | 77 | 139 | | **1,129** |
| Tr-In | 166 | 228 | 148 | 168 | 159 | 163 | 158 | 170 | 163 | 127 | 258 | | **1,908** |
| Tr-Out | 51 | 64 | 69 | 74 | 64 | 53 | 79 | 70 | 67 | 55 | 64 | | **710** |
| **TOT-In** | **2,796** | **3,085** | **2,471** | **2,686** | **2,532** | **2,235** | **2,822** | **2,325** | **2,636** | **2,752** | **2,795** | | **29,135** |
| **Ex** | **2,276** | **2,716** | **2,315** | **2,401** | **2,620** | **2,530** | **2,538** | **2,489** | **2,555** | **2,822** | **3,015** | | **28,277** |
| **Tr-In** | **3,324** | **3,643** | **3,008** | **3,380** | **2,929** | **2,964** | **3,486** | **2,966** | **6,362** | **3,133** | **3,362** | | **38,557** |
| **Tr-Out** | **3,492** | **3,614** | **3,250** | **3,425** | **3,022** | **2,880** | **3,571** | **3,035** | **6,371** | **3,221** | **3,297** | | **39,178** |

In = Intake;  Ex = Exit;  Tr-In = Transfers In;  Tr-Out = Transfers Out

Note:  The Department of Corrections manages its population from a total system perspective. Provided in Table 10 are historical data on

intake (court + supervision violators), exits (adult transition center, Mandatory Supervised Release, parole, discharge, death),

inter-institutional transfers in and inter-institutional transfers out.

Source: Retrieved from Offender Tracking System, May 31, 2013

Table 10

## <u>Adult Transition Centers</u>

As of May 31, 2013

| Center | Population | Bedspace | Rated Capacity |
|---|---|---|---|
| Crossroads Adult Transition Center* | 368 | 380 | 250 |
| Fox Valley Adult Transition Center (female) | 112 | 128 | 100 |
| North Lawndale Adult Transition Center* | 201 | 200 | 200 |
| Peoria Adult Transition Center | 244 | 248 | 200 |
| **Total** | **925** | **956** | **750** |

* Contractually-operated Adult Transition Center

Sources: Retrieved from Offender Tracking System, May 31, 2013; Department of Corrections Data

Table 11

This page intentionally left blank.

**ILLINOIS DEPARTMENT OF CORRECTIONS**
1301 Concordia Court
P.O. Box 19277
Springfield, IL 62794-9277
Tel: (217) 558-2200
TDD: (800) 526-0844
info@doc.illinois.gov
http://www.idoc.state.il.us/

# EXHIBIT
# D



**Illinois**
Department of
**Corrections**

**Pat Quinn**
Governor

**S.A. Godinez**
Director

Vienna Correctional Center / 6695 State Rte 146 East / Vienna, IL 62995 / Telephone: (618) 658-8371 / TDD: (800) 526-0844 / Fax: (618) 658-9761

## MEMORANDUM

DATE:  January 5, 2012

TO:  All Concerned

FROM:  Warden Randy Davis
Vienna Correctional Center/Dixon Springs IIIP

SUBJECT:  Building 19

I have received numerous grievances since my arrival mid-December 2011 concerning the living conditions in Building 19, 2nd and 3rd floors.

These conditions which inmates are complaining are not new and have been present since reopening this area for housing. However, I want to assure all inmates living in Building 19 that I am reviewing these housing areas and although I believe they are livable need many improvements. I also realize many of you have not been in the military but the open dorm type of housing is common in both the military and in many prisons.

Hopefully, you have noticed in my short time as the Warden at this facility there have been some notable improvements in Building 19 and I can assure you we have many more planned. However, as in all cases real improvements take time, money and cooperation (specifically from all those who live in this building on a regular basis.)

Improvements have already been made in the ventilation, plumbing, recreation and commissary operation which affect all inmates housed in this Unit. Recently temporary panels were put over the windows to allow for improved heating and ventilation. The plan is to replace the existing windows; however this will take at least a year. In saying that, expect the panels to be removed in the spring to allow for the inmates to open windows as temperatures rise. Again this will occur until the windows are replaced. Recreation areas in Building 19 are small; however we are adding a few more sitting areas and have or are placing larger TV's on the wings. In addition we are trying to keep outside recreation areas open as much as possible to allow for more outside recreation. The long range plan is to identify an area where more recreation can be provided to those inmates who are housed in Building 19. When the time changes the gym will be open 7 days a week and for many of the days recreation will be operated both days and evenings.

There are currently no hazardous conditions in Building 19 according to inspections and outside reviewers.

We have many goals for the future which will effect the entire population. These goals include many of which we hope to complete during the upcoming months. These goals include some continued renovations of Building 19 to include work in the bathrooms, identifying another area for recreations, increased outdoor recreation, increased educational programs, etc. Many of the goals have been completed or are in the process.

CC: file
Building 19 Bulletin Boards
Grievance Officer
Clinical

# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ILLINOIS
### BENTON DIVISION

| | | |
|---|---|---|
| MICHAEL BOYD, PAUL LEE and KENDRICK PEARSON, on behalf of themselves and all others similarly situated, | ) ) ) ) | Civil Action No. 3:12-cv-00704-JPG |
| Plaintiffs, | ) ) | CJRA TRACK:  D |
| v. | ) ) | PRESUMPTIVE TRIAL MONTH: |
| S. A. GODINEZ, Director of the Illinois Department of Corrections and RANDY DAVIS, Warden of Vienna Correctional Center, in their official capacities, | ) ) ) ) | July 14, 2014

Judge J. Phil Gilbert |
| Defendants. | ) ) ) | Magistrate Judge Philip M. Frazier |

## CERTIFICATE OF SERVICE

I, Kathleen Lally, hereby certify that on October 29, 2013, I electronically filed Plaintiffs'

First Amended Complaint, Exhibit Index and Exhibits thereto with the Clerk of Court using the

CM/ECF system, which will send notification of such filing to all counsel of record.


Dated:  October 29, 2013

s/Kathleen P. Lally
Counsel for Plaintiffs
LATHAM & WATKINS LLP
233 South Wacker Drive, Suite 5800
Chicago, Illinois  60606
Telephone:  312-876-7700
Facsimile:  312-993-9767