## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ILLINOIS
## BENTON DIVISION

| | | |
|---|---|---|
| MICHAEL BOYD, PAUL LEE, and KENDRICK PEARSON, and J.B. WASHUP on behalf of themselves and all others similarly situated, | ) ) ) ) ) | Case No. 3:12-cv-00704-MJR-RJD |
| Plaintiffs, | ) ) | Chief Judge Michael J. Reagan |
| v. | ) ) | Magistrate Judge Reona J. Daly |
| S. A. GODINEZ, Director of the Illinois Department of Corrections and RANDY DAVIS, Warden of Vienna Correctional Center, in their official capacities, | ) ) ) ) ) | |
| Defendants. | ) | |

## MEMORANDUM IN SUPPORT OF
## PLAINTIFFS' MOTION FOR VOLUNTARY DISMISSAL

Date:  December 9, 2016

Mark S. Mester
  mark.mester@lw.com
Kathleen P. Lally
  kathleen.lally@lw.com
Robert C. Collins III
  robert.collins@lw.com
Malorie R. Medellin
  malorie.medellin@lw.com
LATHAM & WATKINS, LLP
330 North Wabash Avenue, Suite 2800
Chicago, Illinois 60611
Telephone:  (312) 876-7700
Facsimile:  (312) 993-9767

Alan Mills
  alanmills@comcast.net
UPTOWN PEOPLE'S LAW CENTER
4413 North Sheridan
Chicago, Illinois 60640
Telephone: (773) 769-1411
Facsimile: (773) 769-2224

## TABLE OF CONTENTS

                                                                                  **Page**

I.      INTRODUCTION ..................................................................................................1

II.     RELEVANT FACTUAL AND PROCEDURAL BACKGROUND ..................................3

      A.     Plaintiffs Brought Suit In 2012 To Address Constitutional Violations At
            Vienna And, In Particular, The Living Conditions In Building 19 .........................3

      B.     The Court Certified A Class For Settlement Purposes, The Parties
            Actively Engaged In Productive Settlement Discussions, But Ultimately
            Resumed Active Litigation ..................................................................................4

      C.     The October 31, 2016 Tour Of Vienna And Deposition Confirmed That
            Conditions At Vienna Had Significantly Improved....................................................5

      D.     The Testimony Of Mr. Atchison, Chief Of Operations For IDOC,
            Confirmed The Conditions Observed During The Tour And Clarified
            Future Plans For Building 19...............................................................................6

III.    DISCUSSION ....................................................................................................8

      A.     Legal Standard For Voluntary Dismissal Of A Certified Class Action..................9

      B.     Voluntary Dismissal Is Appropriate Here Because Plaintiffs And Their
            Counsel Believe They Can No Longer Prove An Eighth Amendment
            Violation ...........................................................................................................10

      C.     Voluntary Dismissal Would Not Prejudice The Class, Because Plaintiffs
            Would Retain The Right To Refile This Action, Class Members Would
            Retain The Right To File Individual Actions And Class Counsel Would
            Continue To Monitor Conditions At Vienna .......................................................12

      D.     Proposed Notice ................................................................................................13

IV.    CONCLUSION..................................................................................................14

## TABLE OF AUTHORITIES

### CASES

**Page(s)**

Austin v. Pennsylvania Dep't. of Corrs.,
  876 F. Supp. 1437 (E.D. Pa. 1995)............................................................................................ 13

Baker v. Am.'s Mortg. Servicing,
  58 F.3d 321 (7th Cir. 1995) ..................................................................................................... 9

Beaulieu v. Ludeman,
  690 F.3d 1017 (8th Cir. 2012) .......................................................................................... 10, 12

Buller v. Owner Operator Indep. Driver Risk Retention Grp., Inc.,
  461 F. Supp. 2d 757 (S.D. Ill. 2006) ................................................................................... 8, 9

Chicago United Indus. v. City of Chicago,
  445 F.3d 940 (7th Cir. 2006) .................................................................................................. 11

Cranley v. Nat'l Life Ins. Co. of Vermont,
  144 F. Supp. 2d 291 (D. Vt. 2001) ..................................................................................... 8, 12

Crowder v. Lash,
  687 F.2d 996 (7th Cir. 1982) .................................................................................................. 13

Davis v. Ball Memorial Hosp. Ass'n,
  753 F.2d 1410 (7th Cir. 1985) ................................................................................................ 10

Fed'n of Adver. Indus. Representatives, Inc. v. City of Chicago,
  326 F.3d 924 (7th Cir. 2003) .................................................................................................. 10

Lovell v. Brennan,
  728 F.2d 560 (1st Cir. 1984) ......................................................................................... 10, 11, 12

Mullane v. Cent. Hanover Bank & Trust,
  339 U.S. 306 (1950) ................................................................................................................ 14

Rice ex rel. Rice v. Corr. Med. Servs.,
  675 F.3d 650 (7th Cir. 2012) .................................................................................................. 12

Roubideaux v. N. Dakota Dept. of Corr. & Rehab.,
  570 F.3d 966 (8th Cir. 2009) ........................................................................................... 10, 12

Schemmer v. ChartOne, Inc.,
  No. 1:05-cv-2923, 2008 WL 1929980 (N.D. Ohio Apr. 29, 2008)............................................ 8

Synfuel Techs. v. DHL Express (USA),
  463 F.3d 646 (7th Cir. 2006) .................................................................................................... 9

ii

Page(s)

Vassalle v. Midland Funding,
  708 F.3d 747 (6th Cir. 2013) ................................................................................................. 9

**RULES**

Fed. R. Civ. P. 23 .............................................................................................. 8, 9, 12, 13

In support of their motion to·dismiss without prejudice and in accordance with the parties' Joint Status Report (Dkt. #112) and the Court's November 22, 2016 Order (Dkt. #113), Plaintiffs, by and through Class Counsel,[1] hereby state as follows:

## I.   INTRODUCTION

When Plaintiffs filed this case in 2012, the living conditions at Vienna Correctional Center ("Vienna") were inhumane and amounted to cruel and unusual punishment in violation of the Eighth Amendment to the United States Constitution. The most dire conditions could be seen in the building known as "Building 19," which had been characterized by watchdog groups as the "worst of the worst." Building 19 housed roughly 600 prisoners in dormitory-style spaces that were never designed or intended for housing. Inmates slept in bunk beds that were less than 18 inches apart and under pipes that were crumbling, a roof that leaked and surrounded by old and broken single-paned windows. Most notably, Building 19 lacked sufficient toilets, sinks, urinals and showers for the number of inmates housed there. Indeed, Building 19 had no showers on its second floor, which housed approximately 200 inmates. And those facilities that it did have were not properly ventilated, allowing mold to grow, and frequently leaked and clogged from overuse, leading to a constant smell of sewage.

The ultimate goal of Plaintiffs and Class Counsel in filing the lawsuit was to reduce the prison population and close Building 19 entirely, though they recognized that obtaining such relief would be difficult. At a minimum, therefore, Plaintiffs and Class Counsel sought significant repairs to Building 19 and the other Housing Units, including adding additional

---

[1]   On October 31, 2013, the Court certified a class for settlement purposes and appointed Mark S. Mester, Kathleen P. Lally and Alan Mills as Class Counsel. See Mem. and Order (Dkt. #52).

toilets, sinks and showers, fixing leaks and clogs and improving the windows and temperature control.

Fortunately, the Illinois Department of Corrections ("IDOC") has recently made significant and material improvements to the living conditions at Vienna. The population of Vienna has decreased significantly, falling 42% from 1,899 inmates in 2012 to 1,107 inmates as of October 28, 2016. IDOC no longer houses a single inmate in general population in Building 19 and no longer places inmates in the cramped, dormitory-style segregation room in Building 19. IDOC has also replaced all of the windows in the two-person cells in the six Housing Units. Equally significant, IDOC has confirmed that it has no intention of housing inmates in general population in Building 19 or in the dormitory-style segregation room, except on an emergency basis. IDOC has also confirmed that should its plans change, it would need to conduct extensive repairs prior to repopulating Building 19.

These changes are significant. By depopulating Building 19, IDOC resolved the unconstitutional conditions general population inmates experienced in Building 19. For the general population inmates in Building 19, this was obviously a positive result. While IDOC has not addressed all of the problems in the Housing Units, Class Counsel do not believe the remaining issues provide a continued basis for their Eighth Amendment claims. As a result, Class Counsel seek to voluntarily dismiss this case without prejudice. Plaintiffs and their counsel, however, intend to remain vigilant. Defendants have agreed to provide written notice to Class Counsel should Defendants intend to repopulate Building 19 within two years of the date of dismissal, and Plaintiffs reserve all rights to refile claims seeking to address Constitutional violations at Vienna.

2

## II.    RELEVANT FACTUAL AND PROCEDURAL BACKGROUND

The factual background relevant to this motion is set forth below.  See disc. infra at II.A-D.

### A.    Plaintiffs Brought Suit In 2012 To Address Constitutional Violations At Vienna And, In Particular, The Living Conditions In Building 19

Plaintiffs filed this action on June 13, 2012 and amended their complaint on October 29, 2013 in order to add an additional Named Plaintiff (i.e., Plaintiff J.B. Washup).  See Compl. (Dkt. #1); see also Am. Compl. (Dkt. #51).  Plaintiffs alleged a variety of deplorable conditions at Vienna -- including a mold problem sufficiently severe that mold would grow so thick that it would break off and fall on prisoners, infestation of insects and inadequate ventilation in the Housing Units due to broken windows -- many of which stemmed from the severe overcrowding at Vienna.  See Am. Compl. ¶¶ 18-46.

Plaintiffs' most concerning allegations, however, revolved around Building 19.  See Am. Compl. ¶¶ 47-59.  Relying on their personal experiences as well as on a report by the John Howard Association, Plaintiffs alleged that Building 19 was "widely recognized as the worst of the worst."  Id. ¶ 47.  Inmates in Building 19 were crammed together in bunks placed less than 18 inches apart from each other.  See id. ¶ 50.  Although Building 19 housed roughly 600 prisoners, it had an insufficient number of toilets, sinks, and urinals, many of which did not function due to leaks and clogs and often overflowed, leaving a sewage smell.  See id. ¶¶ 53-54. The second floor bathroom of Building 19 had no functioning showers.  See id. ¶ 56.  All prisoners in Building 19 had to deal with "exposed insulation, pipes with chipping and flaking paint and exposed electrical wiring throughout."  Id. ¶ 49.

Plaintiffs brought this action on behalf of themselves and all prisoners residing at Vienna and alleged that conditions at Vienna violated the Eighth Amendment's prohibition on cruel and

3

unusual punishment. See id. ¶¶ 63, 69-96. Plaintiffs sought a declaration that conditions at Vienna were unconstitutional and a permanent injunction ordering Defendants to conform the conditions to the dictates of the Constitution. See id. ¶¶ 83, 96. Plaintiffs and Class Counsel ideally hoped for an order shuttering Building 19 to general population housing but realistically intended to insist on substantial improvements. See Declaration of Kathleen P. Lally ("Lally Decl."), Ex. A, at ¶ 4.

### B. The Court Certified A Class For Settlement Purposes, The Parties Actively Engaged In Productive Settlement Discussions, But Ultimately Resumed Active Litigation

On October 31, 2013, the Court granted Plaintiffs' Unopposed Motion for Class Certification for the Purposes of Settlement and certified, for settlement purposes, a class of "[a]ll inmates housed at Vienna Correctional Center since June 13, 2012, and all inmates to be housed at Vienna Correctional Center." See Memo. and Order (Dkt. #52) at 4. The parties then engaged in over two years of settlement negotiations. See Lally Decl., Ex. A, ¶ 10-11. As part of settlement negotiations, the parties discussed a settlement that would have required IDOC to make significant repairs to Building 19, including replacing the roof, replacing the heating, ventilation and air conditioning ("HVAC") ductwork, repairing faulty plumbing, adding additional showers, toilets, urinals, and sinks and replacing the shower faucets and shower heads in Building 19 to reduce leaks. See id. ¶ 16. The proposed settlement would have also required IDOC to repair and replace exterior windows in the Housing Units and Building 19 and to remediate (as appropriate) mold and asbestos at Vienna (especially in Building 19). See id. Though the parties were close to an agreement, the settlement negotiations were ultimately unsuccessful, due primarily to budgetary shortfalls. See id. ¶ 17. As a result, the parties returned to active litigation. See Joint Status Report (Dkt. #94) ¶¶ 1-3.

4

During renewed written discovery, Defendants admitted that they no longer housed inmates in general population in Building 19 and no longer intended to do so in the future. See IDOC Answers to Plaintiffs' First Set of Requests for Admission, Ex. B, at 1-6, 15-16; Vienna Answers to Plaintiffs' First Set of Requests for Admission, Ex. C, at 1-6, 15-16. In light of these admissions, the parties renewed their efforts to amicably resolve this dispute. See Joint Motion to Stay Discovery Deadlines (Dkt. #107). In particular, Plaintiffs requested leave to conduct an inspection of Vienna and a limited deposition of IDOC under Fed. R. Civ. P. 30(b)(6). See id. ¶¶ 4-6; see also Order (Dkt. #110).

### C.    The October 31, 2016 Tour Of Vienna And Deposition Confirmed That Conditions At Vienna Had Significantly Improved

Counsel for all parties toured Vienna on October 31, 2016, which was the third time that Class Counsel had toured Vienna. See Lally Decl., Ex. A, ¶ 23. During the tour, counsel inspected all general population and segregation housing spaces on all three floors of Building 19, the exterior of all six Housing Units, the interior of one Housing Unit, the dining area and the kitchen facilities at Vienna. See id. ¶¶ 24, 27-29. As of October 31, 2016, counsel observed that no general population inmates resided in Building 19 and that many of the bunk beds had either been moved or removed from the general population areas. See id. ¶ 24. The third floor of Building 19 contained an old segregation unit, which had also been depopulated. See id. Likewise, no inmates were housed in the cage-like segregation bunk room in the first floor segregation unit. See id. ¶ 25. Defendants informed Class Counsel that currently inmates only reside temporarily in two areas of Building 19:  in six two-bed segregation cells on the first floor of Building 19 and in the infirmary. See id. ¶ 26.

The parties also walked past the six Housing Units. While windows in certain of the dayroom areas and guard areas had not been replaced, Defendants informed counsel all of the

windows in inmate cells had been replaced, which Class Counsel observed. See Lally Decl., Ex. A, ¶ 27. The parties toured Housing Unit 6, including the dayrooms, bathrooms and one of the inmate cells. See id. ¶ 28.[2] Although Housing Unit 6, and the bathrooms in particular, could have been cleaner and were in need of some maintenance, Class Counsel did not observe any significant damage or mold. See id. Finally, the parties toured the dining facilities at Vienna, including the eating area, the food preparation areas and the food storage areas. See id. ¶ 29. Class Counsel did not see any pests, and the dining facilities generally appeared clean. See id.

**D.    The Testimony Of Mr. Atchison, Chief Of Operations For IDOC, Confirmed The Conditions Observed During The Tour And Clarified Future Plans For Building 19**

Following the tour, Class Counsel conducted a limited deposition of Michael P. Atchison, Chief of Operations for IDOC, pursuant to Fed. R. Civ. P. 30(b)(6). See Dep. of Michael P. Atchison ("Atchison Dep."), Ex. D. Mr. Atchison confirmed that IDOC no longer houses inmates in general population in Building 19 or in the dormitory-style segregation bunk room and, instead, only houses inmates in the six two-bed segregation cells and the infirmary on the first floor. See id. at 12:13-16, 13:17-14:3. Moreover, Mr. Atchison further confirmed that IDOC:

- Decided to depopulate Building 19 between May and June 2016 (id. at 14:4-20);

- Has no plans to house inmates in Building 19, except in the six two-bed segregation cells and in the infirmary (id. at 13:17-14:3, 29:10-20);

- Does not house inmates at Vienna in locations other than the six Housing Units, segregation on the first floor in Building 19 and the infirmary in Building 19 and does not plan to house inmates in other locations (id. at 46:6-19); and

---

[2]    The decision to tour Housing Unit 6 was made during the tour (not prior to the tour) and was at the request of Class Counsel, not Defendants' counsel. See Lally Decl., Ex. A, ¶ 28. As such, Defendants and their counsel had no indication which Housing Unit would be examined. See id.

- Only reserves the right to house inmates temporarily in other locations or the unpopulated areas in Building 19 in emergency circumstances, such as a flood, tornado or other natural disaster (id. at 17:7-17, 24:10-17).

Moreover, Mr. Atchison also confirmed that IDOC has capital projects planned for Building 19, which are dependent on funding being available. See Atchison Dep., Ex. D, 18:9-19:21. These projects include repairs to the roof, renovations to the bathrooms, increases to bathroom capacity (including additional sinks, toilets, and showers to comply with building codes), installing showers on the second floor of Building 19, improvements to the HVAC system in Building 19 and replacing the windows in Building 19. See id. at 19:22-22:14, 22:22-24:6, 24:24-26:2. Mr. Atchison acknowledged that IDOC would need to make these repairs prior to housing inmates in general population in Building 19. See id. at 19:22-20:9 ("the roof is the one that we really need to get done, because . . . even if there's no one there, you don't want water leaking into certain areas"); id. at 21:4-22:14, 22:22-24:6 ("we would have to have a proper number of toilets, urinals and showers . . . we would meet that before we would ever permanently occupy that again"); id. at 25:4-21, 26:2 (HVAC system was another project to ensure that "there's enough air handlers . . . that can make the air temperature . . . consistent throughout those large rooms").

Finally, Mr. Atchison confirmed that IDOC has replaced all the windows in the living cells in the Housing Units at Vienna. See Atchison Dep., Ex. D, at 39:16-19. While the windows in officer areas in the Housing Units and in the dayrooms in Housing Units 5 and 6 have not been replaced due to budgetary issues, the delay in installing windows in these areas does not affect the temperature or ventilation in areas where inmates sleep. See id. at 39:20-24, 40:10-14, 39:16-19. Furthermore, IDOC has procured replacement windows for the dayrooms and officer areas but had to halt the installation process because of the inability of the legislature to approve a budget. See id. at 39:24-40:14. Since IDOC is dependent on funding from the

7

legislature, its ability to undertake projects to improve living conditions is hampered by the budgetary crisis in the state. See id. at 18:9-19:9 ("my point being is that we take this seriously, and we should, but we are very much beholden to funding"); id. at 39:9-15. But because Building 19 has been depopulated, the unconstitutional conditions in the general population areas of Building 19 have been addressed, notwithstanding budgetary constraints. See disc. infra at III.B.

## III.    DISCUSSION

Given the significant improvements to the living conditions that are at the heart of this action, Class Counsel seek voluntary dismissal without prejudice to the right of Plaintiffs and the class to refile should conditions worsen or should other material information come to light. See disc. infra at III.C; supra at II.C-D. Because the Court has certified a class for purposes of settlement, however, the requirements of Rule 23(e) apply. See Buller v. Owner Operator Indep. Driver Risk Retention Grp., Inc., 461 F. Supp. 2d 757, 764 (S.D. Ill. 2006) ("Rule 23(e) only applies to the claims, issues, or defenses of a certified class[.]"). Where dismissal will bind the class, the Court may only grant a request for voluntary dismissal following (i) "direct notice in a reasonable manner to all class members who would be bound by the proposal" and (ii) "a hearing and on finding that it is fair, reasonable, and adequate" if the "proposal would bind class members." Fed. R. Civ. P. 23(e).

In this case, the dismissal sought would be without prejudice, such that no class members would be bound. See Schemmer v. ChartOne, Inc., No. 1:05-cv-2923, 2008 WL 1929980, at *2 (N.D. Ohio Apr. 29, 2008) (voluntary dismissal without prejudice means "that any class member would be free to bring a subsequent action" and would not be bound). Thus, this Court need not find that the proposal is fair, reasonable and adequate in order to grant this motion. See, e.g., Cranley v. Nat'l Life Ins. Co. of Vermont, 144 F. Supp. 2d 291, 305 (D. Vt. 2001) (motion to

dismiss state law claims without prejudice granted because "no one's rights are being cut off").

Nonetheless, as discussed further, dismissal of this action is fair, reasonable and adequate. See disc. infra at III.B. Further, Class Counsel recognize their fiduciary duties to the class prior to dismissal and intend to provide direct notice to the class pursuant to Fed. R. Civ. P. 23(e). See disc. infra at III.D.

### A.    Legal Standard For Voluntary Dismissal Of A Certified Class Action

As discussed above, because a class has been certified, the requirements of Rule 23(e) apply, and voluntary dismissal requires court approval. See Baker v. Am.'s Mortg. Servicing, 58 F.3d 321, 324 (7th Cir. 1995).[3] Courts have, in turn, considered a variety of factors in evaluating whether dismissal is "fair, reasonable, and adequate," including the likelihood of success, the relief awarded if successful, whether a settlement (or dismissal) would waive other viable claims and whether proper procedures were adopted for giving notice to the class.[4] See, e.g., Synfuel Techs. v. DHL Express (USA), 463 F.3d 646, 653 (7th Cir. 2006) (factors to consider include the strength of plaintiffs' case compared to amount of settlement offer, the complexity and expense of litigation, and the opinion of competent counsel); Vassalle v. Midland Funding, 708 F.3d 747, 759 (6th Cir. 2013) ("[D]ue process requires that notice to the class be reasonably calculated

---

[3]    Fed. R. Civ. P. 23 was amended in 2003 to require court approval after a class had been certified. See Fed. R. Civ. P. 23(e)(1)(A) advisory committee's notes, 2003 amends. Although Baker is a pre-2003 decision involving dismissal prior to class certification, the principle that court approval is required in this case still applies, because a class has been certified for purposes of settlement. See Buller, 461 F. Supp. 2d at 764 ("The 2003 amendments make clear that Rule 23(e) only applies to the claims, issues, or defenses of a certified class.").

[4]    The cases cited in this section consider the factors that courts look at when evaluating settlements of class claims for fairness. See disc. infra at III.A. Based on the language of Rule 23(e), however, the same analysis applies to whether voluntary dismissal is fair, reasonable and adequate. See Fed. R. Civ. P. 23(e) ("The claims, issues, or defenses of a certified class may be settled, voluntarily dismissed, or compromised only with the court's approval. The following procedures apply to a proposed settlement, voluntary dismissal, or compromise.") (emphasis added).

9

under all the circumstances to apprise interested parties of the pendency of the action and afford

them an opportunity to present their objections."). As discussed below, voluntary dismissal is

appropriate here because (i) there would be difficulties in prevailing on the merits, (ii) dismissal

without prejudice will not waive any class member's future claims or otherwise bind the class,

(iii) the underlying conditions at Vienna that were at issue in this litigation have improved and

(iv) the proposed notice comports with due process. See disc. infra at III.B-C.

### B.    Voluntary Dismissal Is Appropriate Here Because Plaintiffs And Their Counsel Believe They Can No Longer Prove An Eighth Amendment Violation

IDOC's actions since May 2016 have materially altered the conditions at Vienna and

provide much of the relief that Plaintiffs sought when bringing this action. See Fed'n of Adver.

Indus. Representatives, Inc. v. City of Chicago, 326 F.3d 924, 929 (7th Cir. 2003) ("[W]hen the

defendants are public officials, we place greater stock in their acts of self-correction[.]"). While

the Housing Units continue to require maintenance and improvement, Class Counsel believe that

current conditions at Vienna do not provide the basis for a viable Eighth Amendment claim. See

Lovell v. Brennan, 728 F.2d 560, 563-64 (1st Cir. 1984) (conditions that were "unpleasant, if not

harsh" did not amount to an Eighth Amendment violation). "When the claims of all the class

members are moot, the action is moot." Davis v. Ball Memorial Hosp. Ass'n, 753 F.2d 1410,

1416 (7th Cir. 1985).

Courts in other Circuits have held that improvements in prison conditions while a suit is

pending can render claims for injunctive relief moot. See, e.g., Beaulieu v. Ludeman, 690 F.3d

1017, 1024 (8th Cir. 2012) (claims for injunctive relief regarding housing in a specific prison

building mooted where defendants made changes preventing plaintiffs from being housed in that

building again); Roubideaux v. N. Dakota Dept. of Corr. & Rehab., 570 F.3d 966, 976 (8th Cir.

2009) (class action equal protection claims for injunctive relief based on incarceration of all

10

female prisoners at specific prisons mooted where all female inmates were transferred out of those prisons); <u>Lovell</u>, 728 F.2d at 563-64 (improved food, clothing, and medical care and preventative maintenance and cleaning programs that raised conditions at prison to a level where they were no longer unconstitutional precluded an injunction).

While "[i]t is true that mere cessation of the conduct sought to be enjoined does not moot a suit to enjoin the conduct, lest dismissal of the suit leave the defendant free to resume the conduct . . . [t]he case may nevertheless be moot if the defendant can demonstrate that there is no reasonable expectation that the wrong will be repeated." <u>Chicago United Indus. v. City of Chicago</u>, 445 F.3d 940, 947 (7th Cir. 2006) (claims for injunctive relief mooted in action by individual plaintiff seeking injunction against city prohibiting it from cancelling contracts where city reinstated contracts and promised that plaintiff would be entitled to a full evidentiary hearing if harm were repeated). Where the defendant is a government actor, "there is a rebuttable presumption that the objectionable behavior will not recur." <u>Id.</u>

Plaintiffs and Class Counsel brought this action to remedy the unconstitutional conditions at Vienna, especially the unconscionable overcrowding and deplorable living conditions in Building 19. <u>See</u> Am. Compl. ¶ 47; disc. <u>supra</u> at II.A. As confirmed by Class Counsel upon their inspection of Vienna and by the sworn testimony of IDOC's chief of operations, Vienna's population has decreased substantially, general population inmates are no longer housed in Building 19 and IDOC has made repairs to the Housing Units, including replacing the windows in all living cells. <u>See</u> Lally Decl., Ex. A, ¶¶ 24, 27. These changes materially improve the conditions in the prison. <u>See</u> <u>Lovell</u>, 728 F.2d at 563-64 (improvements at prison raised conditions to a level where they were no longer unconstitutional). These changes provide most of the relief that Plaintiffs sought and, in the case of Building 19, go beyond what Class Counsel

thought could be achieved either through settlement or litigation.  See Beaulieu, 690 F.3d at 1024

(claims for injunctive relief regarding housing in specific prison building moot where defendants

made changes to prevent housing plaintiffs in that building again); see also Roubideaux, 570

F.3d at 976 (class claims for injunctive relief at specific prisons were moot where inmates were

no longer housed at the prisons).

Conditions at Vienna are certainly not perfect, and the Housing Units are in need of

additional improvements and changes.  See Lally Decl., Ex. A, ¶ 28.  But see Rice ex rel. Rice v.

Corr. Med. Servs., 675 F.3d 650, 665 (7th Cir. 2012).  The substantial improvements made by

IDOC, however, appear to render Plaintiffs' Eighth Amendment claims no longer viable.[5]  See,

e.g., Beaulieu, 690 F.3d at 1024 (repurposing prison building made claims moot); Lovell, 728 F.

F.2d at 563-64 (even though improvements "left something to be desired," conditions at prison

were no longer unconstitutional).  As such, Class Counsel believe that voluntary dismissal is

appropriate in this instance.  See disc. supra at II.C-D.

### C.  Voluntary Dismissal Would Not Prejudice The Class, Because Plaintiffs Would Retain The Right To Refile This Action, Class Members Would Retain The Right To File Individual Actions And Class Counsel Would Continue To Monitor Conditions At Vienna

The class will not be prejudiced by dismissal.  See Cranley, 144 F. Supp. 2d at 305 (no

prejudice where "no one's rights are being cut off").  The dismissal that is requested by Class

Counsel would be without prejudice.  See Mot. to Dismiss at 1.  As such, members of the

---

[5]    Moreover, to the extent that Defendants have reserved their right to challenge class certification for purposes of litigation, Class Counsel would face additional hurdles to obtaining class certification.  See Mem. and Order (Dkt. #44) at 6-8.  Specifically, the Named Plaintiffs in this action are no longer incarcerated, and Class Counsel would likely need to identify new Named Plaintiffs pursuant to the Court's prior rulings.  See Fed. R. Civ. P. 23(a).  Securing new Named Plaintiffs could prove to be difficult, however, given that most inmates at Vienna are incarcerated for less than a year, and inmates have not been housed in general population in Building 19 for almost six months.  See Am. Compl. ¶ 15; disc. supra at II.D.

settlement class have the ability to file similar claims for declaratory and injunctive relief or to file a separate action for money damages.[6]  See, e.g., Austin v. Pennsylvania Dep't. of Corrs., 876 F. Supp. 1437, 1455 (E.D. Pa. 1995) (dismissal without prejudice means that class members are not prevented from bringing a subsequent action).  Plaintiffs also retain their rights to refile this case should conditions at Vienna worsen or should other material information come to light. See Joint Status Report (Dkt. #112) ¶ 15; Mot. to Dismiss at 1.

The parties are also continuing to monitor developments at Vienna.  See Lally Decl., Ex. A, ¶ 30.  Class Counsel have requested that as part of any dismissal, IDOC stipulate to providing written notice if it intends to house general population inmates in Building 19 or reopen the dormitory-style segregation unit any time within two years of dismissal.  See id. ¶ 30.  This stipulation will help protect the inmates at Vienna and enable Class Counsel to ensure that IDOC conducts significant repairs to Building 19 that it has conceded are necessary prior to repopulation so that the unconstitutional conditions at Vienna will not arise again.  See Atchison Dep., Ex. D, 19:22-22:14, 22:22-24:6, 24:24-26:2; disc. supra at II.D.

### D.  Proposed Notice

Because the requested dismissal is without prejudice, it is not strictly necessary to provide notice to the class.  See Fed. R. Civ. P. 23(e)(1); see also, e.g., Austin, 876 F. Supp. at 1455 (notice provision of Rule 23(e) is inapplicable where voluntary dismissal is without prejudice because no one's rights are being cut off).  To fulfill their duties to the class and to

---

[6]     The claims brought in this action are for declaratory and injunctive relief only, and the Court certified a class under Rule 23(b)(2).  See Memo. and Order (Dkt. #52) at 4.  To the extent that any current or former inmate wishes to bring claims for money damages against Vienna or IDOC, nothing in this action precludes such claims.  See, e.g., Crowder v. Lash, 687 F.2d 996, 1007-08 (7th Cir. 1982) (class claims for only declaratory and injunctive relief did not bar prisoner's subsequent complaint for individual damages).

13

ensure that all class members are apprised of their rights, however, Class Counsel propose that notice be provided to the class, that the class be provided with an opportunity to submit objections or other comments to the Court and that the Court hold a fairness hearing following the objection period. See Mullane v. Cent. Hanover Bank & Trust, 339 U.S. 306, 314-15 (1950) (purpose of the notice requirement is to inform interested parties of the pending action and afford them an opportunity to present their objections).

A proposed notice of dismissal is attached hereto as Exhibit E, which notice Defendants have agreed to provide to all inmates living at Vienna. See Lally Decl., Ex. A, ¶ 30. The parties propose that this notice be distributed within 30 days of the Court entering an order approving the notice and authorizing its distribution (the "Order Granting Notice"). The parties further propose that members of the class be allowed to file objections or other comments regarding the proposed dismissal, as specified in the notice, within 30 days of the Order Granting Notice. Finally, the parties propose that the Court hold a fairness hearing after the deadline to file objections has passed and at a time convenient for the Court.

## IV.     CONCLUSION

WHEREFORE, Plaintiffs and Class Counsel respectfully request that the Court enter an order (i) preliminarily granting the request for a dismissal without prejudice, (ii) approving the notice to the class attached hereto as Exhibit E, (iii) directing the parties to provide the approved notice within 30 days, (iv) directing any members of the class who wish to object or otherwise comment on the request for a dismissal to submit such comments within 30 days of the Order Granting Notice and (v) setting a time for a fairness hearing. Plaintiffs further request any other such relief as the Court deems appropriate.

Dated: December 9, 2016                          Respectfully submitted,

                                                 s/ Kathleen P. Lally
                                                 _____

14

One of the attorneys for Plaintiffs Michael Boyd,
Paul Lee, Kendrick Pearson, and J.B. Washup

Mark S. Mester
  mark.mester@lw.com
Kathleen P. Lally
  kathleen.lally@lw.com
Robert C. Collins III
  robert.collins@lw.com
Malorie R. Medellin
  malorie.medellin@lw.com
LATHAM & WATKINS, LLP
330 North Wabash Avenue, Suite 2800
Chicago, Illinois 60611
Telephone: (312) 876-7700
Facsimile: (312) 993-9767

Alan Mills
  alanmills@comcast.net
UPTOWN PEOPLE'S LAW CENTER
4413 North Sheridan
Chicago, Illinois 60640
Telephone: (773) 769-1411
Facsimile: (773) 769-2224

15

## CERTIFICATE OF SERVICE

I hereby certify that on December 9, 2016, I electronically filed Memorandum in Support of Plaintiffs' Motion for Voluntary Dismissal with the Clerk of Court using the CM/ECF system, which will send notification of such filing to all counsel of record.

Dated:  December 9, 2016

s/ *Kathleen P. Lally*
One of the Attorneys for Plaintiffs
LATHAM & WATKINS LLP
330 North Wabash Avenue, Suite 2800
Chicago, Illinois 60611
Telephone:  (312) 876-7700
Facsimile:  (312) 993-9767

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS
BENTON DIVISION

| | | |
|---|---|---|
| MICHAEL BOYD, PAUL LEE, and KENDRICK PEARSON, and J.B. WASHUP on behalf of themselves and all others similarly situated, | ) ) ) ) ) | Case No. 3:12-cv-00704-MJR-RJD |
| Plaintiffs, | ) ) | Chief Judge Michael J. Reagan |
| v. | ) ) | Magistrate Judge Reona J. Daly |
| S. A. GODINEZ, Director of the Illinois Department of Corrections and RANDY DAVIS, Warden of Vienna Correctional Center, in their official capacities, | ) ) ) ) ) | |
| Defendants. | ) | |

EXHIBITS TO MEMORANDUM IN SUPPORT OF
PLAINTIFFS' MOTION FOR VOLUNTARY DISMISSAL

| EXHIBIT | DESCRIPTION |
|---|---|
| A | Declaration of Kathleen P. Lally |
| B | Answers to Plaintiffs' First Set of Requests for Admission to Defendant S.A. Godinez's Successor as Director of the Illinois Department of Corrections |
| C | Answers to Plaintiffs' First Set of Requests for Admission to Defendant Randy Davis' Successor as Warden of Vienna Correctional Center |
| D | Deposition of Michael P. Atchison |
| E | [Draft] Notice of Dismissal of Class Action Lawsuit |

# EXHIBIT A

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS
BENTON DIVISION

| | | |
|---|---|---|
| MICHAEL BOYD, PAUL LEE, and KENDRICK PEARSON, and J.B. WASHUP on behalf of themselves and all others similarly situated, | ) ) ) ) ) | Civil Action No. 3:12-cv-00704-MJR-RJD |
| Plaintiffs, | ) ) | |
| v. | ) ) | Chief Judge Michael J. Reagan |
| S. A. GODINEZ, Director of the Illinois Department of Corrections and RANDY DAVIS, Warden of Vienna Correctional Center, in their official capacities, | ) ) ) ) ) | Magistrate Judge Reona J. Daly |
| Defendants. | ) | |

## DECLARATION OF KATHLEEN P. LALLY

I, Kathleen P. Lally, hereby declare as follows:

1.      I am an attorney with the law firm of Latham & Watkins LLP, counsel of record for Plaintiffs Michael Boyd, Paul Lee, Kendrick Pearson, and J.B. Washup.  I am a member in good standing of the State Bar of Illinois.  I, along with Mark S. Mester of Latham & Watkins LLP and Alan Mills of Uptown People's Law Center, have been appointed class counsel in this case.  I have personal knowledge of the facts contained in this declaration, and if called to do so, I would testify competently thereto.

2.      Plaintiffs brought this action against the Warden of Vienna Correctional Center ("Vienna"), in his official capacity, and the Director of the Illinois Department of Corrections ("IDOC"), in his official capacity, because of unconstitutional living conditions at Vienna that violated the prohibition on cruel and unusual punishment in the Eighth Amendment to the United States Constitution.

## I.    BACKGROUND

3.      Plaintiffs Michael Boyd, Paul Lee, and Kendrick Pearson filed this action on June 13, 2012 because they, and all other inmates at Vienna, were exposed to conditions that deprived them of basic human needs.

4.      We had discussed with Plaintiffs that ideally the lawsuit would result in an order that would prevent general population inmates from being housed in Building 19, but that such an order would be difficult to obtain and as such, the realistic goal of the suit was to obtain improvements to the conditions of Vienna, and more specifically, Building 19.

## II.    DISCOVERY AND INITIAL INSPECTION OF VIENNA IN 2012

5.      Defendants answered the initial Complaint on October 9, 2012. See Answer (Dkt. #17).

6.      Plaintiffs then served document requests and interrogatories on Defendants, and Defendants produced approximately 4,200 pages of documents. These documents included inmate grievances relating to living conditions, work orders and reports relating to repairs and conditions at Vienna, incident reports on items found in food, pest control, and plumbing, other vendor documentation and IDOC and Vienna administrative directives and Inspection Reports.

7.      Plaintiffs also served Defendants with a request to inspect Vienna. On November 16, 2012, my colleagues, Robert Collins and Malorie Medellin, accompanied by Defendants' counsel and representatives, inspected Vienna. Mr. Collins and Ms. Medellin observed, and had photographed, conditions at Vienna. Those pictures documented the inhumane living conditions, especially in Building 19, and showed severe overcrowding, widespread mold and mildew, broken and insufficient bathroom facilities, leaks, pests and rodents and broken and boarded windows.

III.    **SETTLEMENT NEGOTIATIONS**

8.      The parties began discussing settlement in March 2013. These conversations were productive and the parties believed that they would be able to reach a settlement. Accordingly, Plaintiffs moved for class certification for purposes of settlement on August 1, 2013. See Plaintiffs' Unopposed Motion for Class Certification for Purposes of Settlement (Dkt. #33). Given that Plaintiffs were no longer housed at Vienna, the Court raised concerns about Plaintiffs' ability to adequately represent the class. See Memorandum and Order (Dkt. #44), at 9. In response, Plaintiffs amended their Complaint on October 29, 2013, to add J.B. Washup as a named Plaintiff. See Amended Complaint (Dkt. #51).

9.      On October 31, 2013, the Court certified a class for purposes of settlement composed of "[a]ll inmates housed at Vienna Correctional Center since June 13, 2012, and all inmates to be housed at Vienna Correctional Center." See Memorandum and Order (Dkt. #52). The Court appointed Plaintiff J.B. Washup as class representative and appointed Mark S. Mester of Latham & Watkins, Alan Mills of Uptown People's Law Center and me as class counsel.

10.     The parties then engaged in over two years of settlement negotiations, assisted by Magistrate Judge Frazier. The parties met in person or by phone at least a half dozen times to discuss the conditions at Vienna, the repairs and improvements that Plaintiffs contended must be made and the repairs and improvements that were ongoing or planned for Vienna. During this process, the parties exchanged multiple draft settlement agreements, and Defendants provided additional discovery and information to Plaintiffs. My colleagues and I believed that settlement discussions were productive and offered a real path to a mutually agreeable result.

11.     As part of settlement negotiations, the Court conducted two Settlement Conferences with counsel for the parties on December 13, 2013, and June 25, 2015. See Minutes of Settlement Conference (Dkt. #56); Minute Entry (Dkt. #89).

3

12.     During settlement negotiations, Plaintiffs sought to require Defendants to substantially improve living conditions. They asked that Defendants increase the living space each inmate in Building 19 had to at least 25 square feet per inmate and/or construct additional shower and bathroom facilities in Building 19 to reduce the number of inmates per toilet, sink and shower. If Defendants were not able to make either renovation to Building 19, Plaintiffs asked that Defendants agree to remove inmates from Building 19 to reduce the overcrowding.

13.     Plaintiffs also asked Defendants to repair old and/or broken windows in all the Housing Units and Building 19; remediate mold, mildew and asbestos at Vienna; provide regular pest control; conduct repairs in the bathrooms; refrain from painting over mold and mildew without first treating their source; repair broken windows; stop boarding over windows during the winter and ensure food and cooking ingredients were stored in clean, food-safe storage areas.

14.     Plaintiffs sought additional repairs and improvements to Building 19, including repairing and/or replacing the roof, the Heating, Ventilation and Air Conditioning System ("HVAC"), the plumbing and the spring beds in Building 19.

15.     Given the parties' productive discussions, on October 30, 2014, Judge Gilbert, Magistrate Judge Frazier and the parties toured Vienna and met with representatives from Vienna and IDOC to discuss the repairs and improvements to Vienna.

16.     The parties were close to a settlement that would have required IDOC to make significant repairs to Building 19. These repairs would have included replacing the roof; replacing the HVAC ductwork; repairing faulty plumbing; adding additional showers, toilets, urinals, and sinks and replacing the shower faucets and shower heads in Building 19. The proposed settlement would have required IDOC to repair and/or replace exterior windows in the Housing Units and Building 19. Defendants would also have been required to remediate, as

4

appropriate, mold and asbestos at Vienna, especially in Building 19, and to repair and/or replace faulty light fixtures.

17.    Unfortunately, Defendants were ultimately unable to agree to settlement due in part to budgetary shortfalls in the state of Illinois that prevented Defendants from being able to make the necessary repairs.  As a result, the parties returned to active litigation in April 2016. See Joint Status Report (Dkt. #94) at ¶¶ 1-3.

## IV.    PLAINTIFFS LEARNED THAT DEFENDANTS NO LONGER HOUSED GENERAL POPULATION INMATES IN BUILDING 19

18.    In June 2016, Plaintiffs served additional discovery requests on Defendants, including Requests for Admission and Interrogatories that inquired about Defendants plans for Building 19.

19.    In their written responses served in August 2016, Defendants admitted that they no longer house inmates in general population in Building 19 and no longer intend to house inmates in general population in Building 19.  See IDOC Answers to Plaintiffs' First Set of Requests for Admission, Mot. Ex. B at 1-6, 15-16; Vienna Answers to Plaintiffs' First Set of Requests for Admission, Mot. Ex. C at 1-6, 15-16.

20.    My colleague, Robert Collins, also conducted telephone interviews with current inmates at Vienna in August 2016.  During these interviews, Mr. Collins confirmed that no general population inmates were housed in Building 19.

21.    After learning that general population inmates were no longer housed in Building 19, we reached out to Defendants' counsel to renew efforts to resolve this case without additional litigation.

22.    On September 28, 2016, the parties filed a Joint Motion asking the Court to stay all discovery-related deadlines and for leave to conduct both a tour of Vienna and a limited

5

deposition of IDOC pursuant to Fed. R. Civ. P. 30(b)(6). See Joint Mot. to Stay Discovery Deadlines (Dkt. #107). We sought to investigate current conditions at Vienna and to learn IDOC's plans for Building 19. The parties conducted a status conference by telephone with Magistrate Judge Reona J. Daly on October 18, 2016 and informed Judge Daly of the parties' plan. See Minute Entry (Dkt. #110).

## V.     COUNSEL FOR ALL PARTIES TOURED VIENNA ON OCTOBER 31, 2016

23.     Counsel for all parties, along with representatives from Vienna and IDOC, toured Vienna on October 31, 2016. This was the third time that one of my colleagues or I had toured Vienna.

24.     During the tour, we inspected all general population and segregation housing spaces on all three floors of Building 19. No inmates were housed in the dormitory style housing on the second and third floors of Building 19, and many of the beds had been moved or removed from those areas. The third floor of Building 19 also contained a segregation area, but no inmates were housed there.

25.     The first floor of Building 19 contained an infirmary and two segregation areas: six two-bed segregation cells and a cage-like segregation bunk room. We observed inmates in the segregation cells but, unlike during the prior two tours, did not see any inmates in the segregation bunk room.

26.     Representatives from Vienna informed us that inmates only reside temporarily in two areas in Building 19: in the six two-bed segregation cells and the infirmary.

27.     We also inspected the exterior of all six Housing Units and observed that the windows of the inmate cells in all six Housing Units had been replaced, which representatives from Vienna confirmed. Representatives from Vienna also informed me and my colleagues that the windows for the guard areas in all six Housing Units had not been replaced, and the windows

6

in the dayroom areas in Housing Units 5 and 6 had not been replaced. The dayroom areas are recreational areas for the inmates with televisions, tables and chairs.

28. During the tour, we requested a tour of at least one of the Housing Units. The parties then toured Housing Unit 6 including the dayrooms, bathrooms, hallways and one of the inmate cells. We requested to inspect a Housing Unit during the tour and had not informed Defendants or their counsel which Housing Unit we wished to inspect prior to the tour. While Housing Unit 6 could have been cleaner and did appear to need some maintenance, especially in the bathrooms, we did not observe any significant damage or mold in Housing Unit 6.

29. The parties also toured the kitchen and dining facilities at Vienna, including the eating area, the food preparation areas and the food storage areas. These areas generally appeared clean, and we did not observe any pests there.

## VI. DISMISSAL OF THIS ACTION AND NOTICE

30. Following the tour and confirmatory deposition, we discussed voluntary dismissal of this action, without prejudice, with Defendants' counsel. As a condition to voluntary dismissal of this action without prejudice, Defendants have agreed to inform us if Defendants intend to repopulate Building 19 any time within two years of the date of dismissal. Defendants have also agreed to provide notice to all inmates living at Vienna.

31. We intend to continue to monitor any such developments at Vienna following dismissal.

I declare that the foregoing is true and correct under penalty of perjury. Signed this 9th day of December 2016 in Chicago, Illinois.

By:    /s/ Kathleen P. Lally
       Kathleen P. Lally

7

# EXHIBIT B

# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ILLINOIS
### BENTON DIVISION

| | | |
|---|---|---|
| MICHAEL BOYD, PAUL LEE and<br>KENDRICK PEARSON, on behalf of<br>themselves and all others similarly situated,<br><br>                           Plaintiffs,<br><br>v.<br><br>S. A. GODINEZ, Director of the Illinois<br>Department of Corrections, and RANDY<br>DAVIS, Warden of Vienna Correctional Center,<br>in their official capacities,<br><br>                          Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | No. 12-704-MJR/PMF<br><br>Chief Judge Michael J. Reagan<br><br>Magistrate Judge Philip M. Frazier |

## ANSWERS TO
## PLAINTIFFS' FIRST SET OF REQUESTS FOR ADMISSION TO
## DEFENDANT S. A. GODINEZ'S SUCCESSOR
## AS DIRECTOR OF THE ILLINOIS DEPARTMENT OF CORRECTIONS

Director John Baldwin, Defendant S. A. Godinez's successor as Director of the Illinois

Department of Corrections, in his official capacity, by and through his attorney, Lisa Madigan,

Attorney General of the State of Illinois, hereby responds to Plaintiff's First Set of Requests for

Admission, as follows:

## REQUESTS FOR ADMISSION

1.    Admit that inmates are not housed on the second floor of Building 19.

**RESPONSE: Admit**


2.    Admit that Vienna reserves the right to house inmates on the second floor of Building

19.

**RESPONSE: Deny**

3.　Admit that Vienna reserves the right to house inmates on the second floor of Building 19 for any reason, including for non-emergency reasons.

**RESPONSE: Deny**

4.　Admit that inmates are not housed on the first floor of Building 19.

**RESPONSE: Defendant denies there are no inmates housed on the first floor of Building 19, because segregation is located on the first floor. However, defendant admits that general population inmates are not housed on the first floor of Building 19.**

5.　Admit that Vienna reserves the right to house inmates on the first floor of Building 19.

**RESPONSE:　Defendant admits Vienna reserves the right to house segregations status inmates on the first floor of Building 19.**

6.　Admit that Vienna reserves the right to house inmates on the first floor of Building 19 for any reason, including for non-emergency reasons.

**RESPONSE: Deny.**

7.　Admit that Vienna Correctional Center currently houses more inmates than the original rated capacity of Vienna Correctional Center when it was first constructed.

**RESPONSE:　Objection. This request to admit is vague as to the meaning of "original rated capacity."　Notwithstanding said objection, after a reasonable inquire into the information known or readily available, Defendant lacks sufficient knowledge to admit or deny the statement in paragraph 7.**

8.  Admit that the number of inmates housed in Vienna Correctional Center is currently approximately double the original rated capacity of Vienna Correctional Center when it was first constructed.

**RESPONSE: Objection. This request to admit is vague as to the meaning of "original rated capacity." Notwithstanding said objection, after a reasonable inquire into the information known or readily available, Defendant lacks sufficient knowledge to admit or deny the statement in paragraph 8.**

9.  Admit that Vienna reserves the right to house more inmates in Vienna Correctional Center than the original rated capacity of Vienna Correctional Center when it was first constructed.

**RESPONSE: Objection. This request to admit is vague as to the meaning of "original rated capacity." Notwithstanding said objection, Defendant denies Vienna reserves the right to house more inmates at Vienna Correctional Center.**

10.  Admit that Vienna reserves the right to house twice as many inmates as the original rated capacity of Vienna Correctional Center when it was first constructed.

**RESPONSE: Deny**

11.  Admit that Building 19 was not originally designed to house inmates.

**RESPONSE: Objection. This request to admit is vague as to the meaning of "originally designed." Notwithstanding said objection, after a reasonable inquire into the information known or readily available, Defendant lacks sufficient knowledge to admit or deny the statement in paragraph 10.**

12.    Admit that the first floor of Building 19 was not originally designed to house inmates.

**RESPONSE: Objection. This request to admit is vague as to the meaning of "originally designed." Notwithstanding said objection, after a reasonable inquire into the information known or readily available, Defendant lacks sufficient knowledge to admit or deny the statement in paragraph 12.**

13.    Admit that the second floor of Building 19 was not originally designed to house inmates.

**RESPONSE: Objection. This request to admit is vague as to the meaning of "originally designed." Notwithstanding said objection, after a reasonable inquire into the information known or readily available, Defendant lacks sufficient knowledge to admit or deny the statement in paragraph 13.**

14.    Admit that the third floor of Building 19 was not originally designed to house inmates.

**RESPONSE: Objection. This request to admit is vague as to the meaning of "originally designed." Notwithstanding said objection, after a reasonable inquire the information known or readily available, Defendant lacks sufficient knowledge to admit or deny the statement in paragraph 14.**

15.    Admit that Vienna reserves the right to house inmates in other buildings at Vienna Correctional Center that were not originally designed to house inmates.

**RESPONSE: Objection. This request to admit is vague as to the meaning of "originally designed" And "other buildings". Notwithstanding said objection, Defendant admits**

that Vienna Correctional Center reserves the right to house inmates in any housing unit
except Building 19.

16.    Admit that Vienna reserves the right to house inmates for any reason, including for
non-emergency reasons, in other buildings at Vienna Correctional Center that were not originally
designed to house inmates.

**RESPONSE**: **Objection. This request to admit is vague as to the meaning of "originally
designed." Notwithstanding said objection, Defendant admits that Vienna Correctional
Center reserves the right to house inmates in any housing unit except Building 19.**

17.    Admit that Vienna has painted over mold in the Housing Units.

**RESPONSE**: **Objection. This request to admit is argumentative as it assumes mold
actually existed in the housing units. In addition, this request to admit is vague and
overbroad as no timeframe is specified. Notwithstanding said objection, Defendant
denies the statement in paragraph 17.**

18.    Admit that Vienna has painted over mold in the Housing Units rather than Remediate
the Mold.

**RESPONSE**: **Objection. This request to admit is argumentative as it assumes mold
actually existed in the housing units, and assumes that painting over mold is an improper
mold remediation method. In addition, this request to admit is vague and overbroad as**

no timeframe is specified. Notwithstanding said objection, Defendant denies the statement in paragraph 18.

19.    Admit that Vienna has painted over mold in Building 19.

**RESPONSE:** **Objection. This request to admit is argumentative as it assumes mold actually existed in the housing units, and assumes that painting over mold is an improper mold remediation method. In addition, this request to admit is vague and overbroad as no timeframe is specified. Notwithstanding said objection, Defendant denies the statement in paragraph 19.**

20.    Admit that Vienna has painted over mold in Building 19 rather than Remediate the Mold.

**RESPONSE:** **Objection. This request to admit is argumentative as it assumes mold actually existed in the housing units, and assumes that painting over mold is an improper mold remediation method. In addition, this request to admit is vague and overbroad as**

no timeframe is specified. Notwithstanding said objection, Defendant denies the statement in paragraph 20.

21.    Admit that Vienna has painted over mold in the Bathroom Facilities.

**RESPONSE**: Objection. This request to admit is argumentative as it assumes mold actually existed in the housing units, and assumes that painting over mold is an improper mold remediation method. In addition, this request to admit is vague and overbroad as no timeframe is specified. Notwithstanding said objection, Defendant denies the statement in paragraph 21.

22.    Admit that Vienna has painted over mold in the Bathroom Facilities rather than Remediate the Mold.

**RESPONSE**: Objection. This request to admit is argumentative as it assumes mold actually existed in the housing units, and assumes that painting over mold is an improper mold remediation method.. In addition, this request to admit is vague and overbroad as no timeframe is specified. Notwithstanding said objection, Defendant denies the statement in paragraph 22.

23.    Admit that Vienna has painted over mold in the dining hall at Vienna Correctional Center.

**RESPONSE**: Objection. This request to admit is argumentative as it assumes mold actually existed in the housing units, and assumes that painting over mold is an improper mold remediation method. In addition, this request to admit is vague and overbroad as

no timeframe is specified. Notwithstanding said objection, Defendant denies the statement in paragraph 23.

24. Admit that Vienna has painted over mold in the dining hall at Vienna Correctional Center rather than Remediate the Mold.

**RESPONSE**: Objection. This request to admit is argumentative as it assumes mold actually existed in the housing units, and assumes that painting over mold is an improper mold remediation method. In addition, this request to admit is vague and overbroad as no timeframe is specified. Notwithstanding said objection, Defendant denies the statement in paragraph 24.

25. Admit that Vienna painted over mold in the Housing Units in preparation for the inspection of Vienna Correctional Center on November 16, 2012, by Plaintiffs' counsel.

**RESPONSE**: Objection. This request to admit is argumentative as it assumes mold actually existed in the housing units, and assumes that painting over mold is an improper mold remediation method. Notwithstanding said objection, Defendant denies the statement in paragraph 25.

26. Admit that Vienna painted over mold in the Housing Units rather than Remediate the Mold in preparation for the inspection of Vienna Correctional Center on November 16, 2012, by Plaintiffs' counsel.

**RESPONSE**: Objection. This request to admit is argumentative as it assumes mold actually existed in the housing units, and assumes that painting over mold is an improper

mold remediation method. Notwithstanding said objection, Defendant denies the
statement in paragraph 26.

27.    Admit that Vienna painted over mold in Building 19 in preparation for the inspection
of Vienna Correctional Center on November 16, 2012, by Plaintiffs' counsel.

**RESPONSE: Objection. This request to admit is argumentative as it assumes mold
actually existed in the housing units, and assumes that painting over mold is an improper
mold remediation method. Notwithstanding said objection, Defendant denies the
statement in paragraph 27.**

28.    Admit that Vienna painted over mold in Building 19 rather than Remediate the Mold
in preparation for the inspection of Vienna Correctional Center on November 16, 2012, by Plaintiffs'
counsel.

**RESPONSE: Objection. This request to admit is argumentative as it assumes mold
actually existed in the housing units, and assumes that painting over mold is an improper mold
remediation method. Notwithstanding said objection, Defendant denies the statement in
paragraph 28.**

29.    Admit that Vienna painted over mold in the Bathroom Facilities in preparation for the
inspection of Vienna Correctional Center on November 16, 2012, by Plaintiffs' counsel.

**RESPONSE: Objection. This request to admit is argumentative as it assumes mold
actually existed in the housing units, and assumes that painting over mold is an improper**

mold remediation method. Notwithstanding said objection, Defendant denies the statement in paragraph 29.

30.     Admit that Vienna painted over mold in the Bathroom Facilities rather than Remediate the Mold in preparation for the inspection of Vienna Correctional Center on November 16, 2012, by Plaintiffs' counsel.

**RESPONSE: Objection. This request to admit is argumentative as it assumes mold actually existed in the housing units, and assumes that painting over mold is an improper mold remediation method. Notwithstanding said objection, Defendant denies the statement in paragraph 30.**

31.     Admit that Vienna painted over mold in the dining hall at Vienna Correctional Center in preparation for the inspection of Vienna Correctional Center on November 16, 2012, by Plaintiffs' counsel.

**RESPONSE: Objection. This request to admit is argumentative as it assumes mold actually existed in the housing units, and assumes that painting over mold is an improper mold remediation method. Notwithstanding said objection, Defendant denies the statement in paragraph 31.**

32.     Admit that Vienna painted over mold in the dining hall at Vienna Correctional Center rather than Remediate the Mold in preparation for the inspection of Vienna Correctional Center on November 16, 2012, by Plaintiffs' counsel.

**RESPONSE: Objection. This request to admit is argumentative as it assumes mold actually existed in the housing units, and assumes that painting over mold is an improper**

mold remediation method. Notwithstanding said objection, Defendant denies the statement in paragraph 32.

33.    Admit that Vienna painted over mold in the Housing Units in preparation for the inspection of Vienna Correctional Center on October 30, 2014, by Judge J. Phil Gilbert and Magistrate Judge Philip M. Frazier.

**RESPONSE: Objection. This request to admit is argumentative as it assumes mold actually existed in the housing units, and assumes that painting over mold is an improper mold remediation method. Notwithstanding said objection, Defendant denies the statement in paragraph 33.**

34.    Admit that Vienna painted over mold in the Housing Units rather than Remediate the Mold in preparation for the inspection of Vienna Correctional Center on October 30, 2014, by Judge J. Phil Gilbert and Magistrate Judge Philip M. Frazier.

**RESPONSE: Objection. This request to admit is argumentative as it assumes mold actually existed in the housing units, and assumes that painting over mold is an improper mold remediation method. Notwithstanding said objection, Defendant denies the statement in paragraph 34.**

35.    Admit that Vienna painted over mold in Building 19 in preparation for the inspection of Vienna Correctional Center on October 30, 2014, by Judge J. Phil Gilbert and Magistrate Judge Philip M. Frazier.

**RESPONSE: Objection. This request to admit is argumentative as it assumes mold actually existed in the housing units, and assumes that painting over mold is an improper mold remediation method. Notwithstanding said objection, Defendant denies the**

statement in paragraph 35.

36.     Admit that Vienna painted over mold in Building 19 rather than Remediate the Mold
in preparation for the inspection of Vienna Correctional Center on October 30, 2014, by Judge J. Phil
Gilbert and Magistrate Judge Philip M. Frazier.

**RESPONSE**: Objection. This request to admit is argumentative as it assumes mold
actually existed in the housing units, and assumes that painting over mold is an improper
mold remediation method. Notwithstanding said objection, Defendant denies the
statement in paragraph 36.

37.     Admit that Vienna painted over mold in the Bathroom Facilities in preparation for the
inspection of Vienna Correctional Center on October 30, 2014, by Judge J. Phil Gilbert and Magistrate
Judge Philip M. Frazier.

**RESPONSE**: Objection. This request to admit is argumentative as it assumes mold
actually existed in the housing units, and assumes that painting over mold is an improper
mold remediation method. Notwithstanding said objection, Defendant denies the
statement in paragraph 37.

38.     Admit that Vienna painted over mold in the Bathroom Facilities rather than Remediate
the Mold in preparation for the inspection of Vienna Correctional Center on October 30, 2014, by
Judge J. Phil Gilbert and Magistrate Judge Philip M. Frazier.

**RESPONSE**: Objection. This request to admit is argumentative as it assumes mold
actually existed in the housing units, and assumes that painting over mold is an improper

mold remediation method. Notwithstanding said objection, Defendant denies the statement in paragraph 38.

39.    Admit that Vienna painted over mold in the dining hall at Vienna Correctional Center in preparation for the inspection of Vienna Correctional Center on October 30, 2014, by Judge J. Phil Gilbert and Magistrate Judge Philip M. Frazier.

**RESPONSE: Objection. This request to admit is argumentative as it assumes mold actually existed in the housing units, and assumes that painting over mold is an improper mold remediation method. Notwithstanding said objection, Defendant denies the statement in paragraph 39.**

40.    Admit that Vienna painted over mold in the dining hall at Vienna Correctional Center rather than Remediate the Mold in preparation for the inspection of Vienna Correctional Center on October 30, 2014, by Judge J. Phil Gilbert and Magistrate Judge Philip M. Frazier.

**RESPONSE: Objection. This request to admit is argumentative as it assumes mold actually existed in the housing units, and assumes that painting over mold is an improper mold remediation method. Notwithstanding said objection, Defendant denies the statement in paragraph 40.**

41.    Admit that Vienna has used the possibility of transfer from the Housing Units (not including Building 19) to Building 19 as a means of inmate discipline.

**RESPONSE**: Defendant admits that Building 19 contains segregation cells, and inmates are occasionally sentenced to segregation by the Adjustment Committee. Defendant denies threatening transfer to Building 19 as a means of discipline.

42.     Admit that Vienna has in fact transferred inmates from the Housing Units (not including Building 19) to Building 19 as a means of inmate discipline.

**RESPONSE**: Defendant admits that Building 19 contains segregation cells, and inmates are occasionally placed in segregation by the Adjustment Committee due to disciplinary issues. Defendant denies threatening transfer to Building 19 as a means of discipline.

Respectfully submitted,

JOHN BALDWIN, Successor IDOC Director
to S.A. GODINEZ,

Defendant,

LISA MADIGAN, Attorney General,
State of Illinois,

Attorney for Defendant,

Dylan P. Grady #6309120
Assistant Attorney General
500 South Second Street
Springfield, Illinois 62701
(217) 782-2077

Of Counsel.

BY:  Dylan P. Grady
Assistant Attorney General

## CERTIFICATE OF SERVICE

     I hereby certify that on August 1, 2016, I mailed copies of the foregoing Answers to Plaintiffs' First Set of Requests for Admission to John Baldwin, Successor DOC Director to S.A. Godinez, by U.S. Mail, in envelopes fully prepaid and properly addressed to:

Kathleen Patricia Lally
Latham & Watkins, LLP
233 South Wacker Drive, Suite 5800
Chicago, IL. 60606

Alan Mills
Uptown People's Law Center
4413 North Sheridan
Chicago, IL. 60640

Respectfully Submitted,

Dylan P. Grady, #6309120
Assistant Attorney General
500 South Second Street
Springfield, Illinois 62701
Ph. (217) 782-2077
Fax (217) 782-8767
Email: dgrady@atg.state.il.us

# EXHIBIT C

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ILLINOIS
BENTON DIVISION**

MICHAEL BOYD, PAUL LEE and )
KENDRICK PEARSON, on behalf of )
themselves and all others similarly situated, )
            )         No. 12-704-MJR/PMF
                   Plaintiffs, )
v.                           )         Chief Judge Michael J. Reagan
                          )
S. A. GODINEZ, Director of the Illinois )
Department of Corrections, and RANDY )
DAVIS, Warden of Vienna Correctional Center, )
in their official capacities, )
                          )
                   Defendants. )

**ANSWERS TO
PLAINTIFFS' FIRST SET OF REQUESTS FOR ADMISSION TO DEFENDANT <u>RANDY
DAVIS' SUCCESSOR AS WARDEN OF VIENNA CORRECTIONAL CENTER</u>**

       Acting Warden Jean Campanella, Defendant Randy Davis' successor as Warden of Vienna

Correctional Center, in her official capacity, by and through her attorney, Lisa Madigan, Attorney

General of the State of Illinois, hereby responds to Plaintiff's First Set of Requests for Admission,

as follows:

### <u>REQUESTS FOR ADMISSION</u>

       1.     Admit that inmates are not housed on the second floor of Building 19.

**<u>RESPONSE</u>: Admit**

       2.     Admit that Vienna reserves the right to house inmates on the second floor of Building

19.

**<u>RESPONSE</u>: Deny**

3.    Admit that Vienna reserves the right to house inmates on the second floor of Building 19 for any reason, including for non-emergency reasons.

**RESPONSE: Deny**

4.    Admit that inmates are not housed on the first floor of Building 19.

**RESPONSE: Defendant denies there are no inmates housed on the first floor of Building 19, because segregation is located on the first floor. However, defendant admits that general population inmates are not housed on the first floor of Building 19.**

5.    Admit that Vienna reserves the right to house inmates on the first floor of Building 19.

**RESPONSE:  Defendant admits Vienna reserves the right to house segregations status inmates on the first floor of Building 19.**

6.    Admit that Vienna reserves the right to house inmates on the first floor of Building 19 for any reason, including for non-emergency reasons.

**RESPONSE: Deny**

7.    Admit that Vienna Correctional Center currently houses more inmates than the original rated capacity of Vienna Correctional Center when it was first constructed.

**RESPONSE:  Objection. This request to admit is vague as to the meaning of "original rated capacity."  Notwithstanding said objection, after a reasonable inquire into the information known or readily available, Defendant lacks sufficient knowledge to admit or deny the statement in paragraph 7.**

8.    Admit that the number of inmates housed in Vienna Correctional Center is currently approximately double the original rated capacity of Vienna Correctional Center when it was first constructed.

**RESPONSE**: **Objection. This request to admit is vague as to the meaning of "original rated capacity." Notwithstanding said objection, after a reasonable inquire into the information known or readily available, Defendant lacks sufficient knowledge to admit or deny the statement in paragraph 8.**

9.    Admit that Vienna reserves the right to house more inmates in Vienna Correctional Center than the original rated capacity of Vienna Correctional Center when it was first constructed.

**RESPONSE**: **Objection. This request to admit is vague as to the meaning of "original rated capacity." Notwithstanding said objection, Defendant denies Vienna reserves the right to house more inmates at Vienna Correctional Center.**

10.    Admit that Vienna reserves the right to house twice as many inmates as the original rated capacity of Vienna Correctional Center when it was first constructed.

**RESPONSE**: **Deny**

11.    Admit that Building 19 was not originally designed to house inmates.

**RESPONSE**: **Objection. This request to admit is vague as to the meaning of "originally designed." Notwithstanding said objection, after a reasonable inquire into the information known or readily available, Defendant lacks sufficient knowledge to admit or deny the statement in paragraph 10.**

12.    Admit that the first floor of Building 19 was not originally designed to house inmates.

**RESPONSE: Objection. This request to admit is vague as to the meaning of "originally designed." Notwithstanding said objection, after a reasonable inquire into the information known or readily available, Defendant lacks sufficient knowledge to admit or deny the statement in paragraph 12.**

13.    Admit that the second floor of Building 19 was not originally designed to house inmates.

**RESPONSE: Objection. This request to admit is vague as to the meaning of "originally designed." Notwithstanding said objection, after a reasonable inquire into the information known or readily available, Defendant lacks sufficient knowledge to admit or deny the statement in paragraph 13.**

14.    Admit that the third floor of Building 19 was not originally designed to house inmates.

**RESPONSE: Objection. This request to admit is vague as to the meaning of "originally designed." Notwithstanding said objection, after a reasonable inquire the information known or readily available, Defendant lacks sufficient knowledge to admit or deny the statement in paragraph 14.**

15.    Admit that Vienna reserves the right to house inmates in other buildings at Vienna Correctional Center that were not originally designed to house inmates.

**RESPONSE: Objection. This request to admit is vague as to the meaning of "originally designed" And "other buildings".  Notwithstanding said objection, Defendant admits**

that Vienna Correctional Center reserves the right to house inmates in any housing unit except Building 19.

16.    Admit that Vienna reserves the right to house inmates for any reason, including for non-emergency reasons, in other buildings at Vienna Correctional Center that were not originally designed to house inmates.

**RESPONSE**: Objection. This request to admit is vague as to the meaning of "originally designed." Notwithstanding said objection, Defendant admits that Vienna Correctional Center reserves the right to house inmates in any housing unit except Building 19.

17.    Admit that Vienna has painted over mold in the Housing Units.

**RESPONSE**: Objection. This request to admit is argumentative as it assumes mold actually existed in the housing units. In addition, this request to admit is vague and overbroad as no timeframe is specified. Notwithstanding said objection, Defendant denies the statement in paragraph 17.

18.    Admit that Vienna has painted over mold in the Housing Units rather than Remediate the Mold.

**RESPONSE**: Objection. This request to admit is argumentative as it assumes mold actually existed in the housing units, and assumes that painting over mold is an improper mold remediation method. In addition, this request to admit is vague and overbroad as

no timeframe is specified. Notwithstanding said objection, Defendant denies the statement in paragraph 18.

19.     Admit that Vienna has painted over mold in Building 19.

**RESPONSE**: **Objection. This request to admit is argumentative as it assumes mold actually existed in the housing units, and assumes that painting over mold is an improper mold remediation method. In addition, this request to admit is vague and overbroad as no timeframe is specified. Notwithstanding said objection, Defendant denies the statement in paragraph 19.**

20.     Admit that Vienna has painted over mold in Building 19 rather than Remediate the Mold.

**RESPONSE**: **Objection. This request to admit is argumentative as it assumes mold actually existed in the housing units, and assumes that painting over mold is an improper mold remediation method. In addition, this request to admit is vague and overbroad as**

no timeframe is specified. Notwithstanding said objection, Defendant denies the statement in paragraph 20.

21.    Admit that Vienna has painted over mold in the Bathroom Facilities.

**RESPONSE:** Objection. This request to admit is argumentative as it assumes mold actually existed in the housing units, and assumes that painting over mold is an improper mold remediation method. In addition, this request to admit is vague and overbroad as no timeframe is specified. Notwithstanding said objection, Defendant denies the statement in paragraph 21.

22.    Admit that Vienna has painted over mold in the Bathroom Facilities rather than Remediate the Mold.

**RESPONSE:** Objection. This request to admit is argumentative as it assumes mold actually existed in the housing units, and assumes that painting over mold is an improper mold remediation method.. In addition, this request to admit is vague and overbroad as no timeframe is specified. Notwithstanding said objection, Defendant denies the statement in paragraph 22.

23.    Admit that Vienna has painted over mold in the dining hall at Vienna Correctional Center.

**RESPONSE:** Objection. This request to admit is argumentative as it assumes mold actually existed in the housing units, and assumes that painting over mold is an improper mold remediation method. In addition, this request to admit is vague and overbroad as

no timeframe is specified. Notwithstanding said objection, Defendant denies the statement in paragraph 23.

24.    Admit that Vienna has painted over mold in the dining hall at Vienna Correctional Center rather than Remediate the Mold.

**RESPONSE: Objection. This request to admit is argumentative as it assumes mold actually existed in the housing units, and assumes that painting over mold is an improper mold remediation method. In addition, this request to admit is vague and overbroad as no timeframe is specified. Notwithstanding said objection, Defendant denies the statement in paragraph 24.**

25.    Admit that Vienna painted over mold in the Housing Units in preparation for the inspection of Vienna Correctional Center on November 16, 2012, by Plaintiffs' counsel.

**RESPONSE: Objection. This request to admit is argumentative as it assumes mold actually existed in the housing units, and assumes that painting over mold is an improper mold remediation method. Notwithstanding said objection, Defendant denies the statement in paragraph 25.**

26.    Admit that Vienna painted over mold in the Housing Units rather than Remediate the Mold in preparation for the inspection of Vienna Correctional Center on November 16, 2012, by Plaintiffs' counsel.

**RESPONSE: Objection. This request to admit is argumentative as it assumes mold actually existed in the housing units, and assumes that painting over mold is an improper mold remediation method. Notwithstanding said objection, Defendant denies the statement in paragraph 26.**

27.    Admit that Vienna painted over mold in Building 19 in preparation for the inspection of Vienna Correctional Center on November 16, 2012, by Plaintiffs' counsel.

**RESPONSE: Objection. This request to admit is argumentative as it assumes mold actually existed in the housing units, and assumes that painting over mold is an improper mold remediation method. Notwithstanding said objection, Defendant denies the statement in paragraph 27.**

28.    Admit that Vienna painted over mold in Building 19 rather than Remediate the Mold in preparation for the inspection of Vienna Correctional Center on November 16, 2012, by Plaintiffs' counsel.

**RESPONSE: Objection. This request to admit is argumentative as it assumes mold actually existed in the housing units, and assumes that painting over mold is an improper mold remediation method. Notwithstanding said objection, Defendant denies the statement in paragraph 28.**

29.    Admit that Vienna painted over mold in the Bathroom Facilities in preparation for the inspection of Vienna Correctional Center on November 16, 2012, by Plaintiffs' counsel.

**RESPONSE: Objection. This request to admit is argumentative as it assumes mold actually existed in the housing units, and assumes that painting over mold is an improper mold remediation method. Notwithstanding said objection, Defendant denies the statement in paragraph 29.**

30.    Admit that Vienna painted over mold in the Bathroom Facilities rather than Remediate the Mold in preparation for the inspection of Vienna Correctional Center on November 16, 2012, by Plaintiffs' counsel.

**RESPONSE: Objection. This request to admit is argumentative as it assumes mold actually existed in the housing units, and assumes that painting over mold is an improper mold remediation method. Notwithstanding said objection, Defendant denies the statement in paragraph 30.**

31.    Admit that Vienna painted over mold in the dining hall at Vienna Correctional Center in preparation for the inspection of Vienna Correctional Center on November 16, 2012, by Plaintiffs' counsel.

**RESPONSE: Objection. This request to admit is argumentative as it assumes mold actually existed in the housing units, and assumes that painting over mold is an improper mold remediation method. Notwithstanding said objection, Defendant denies the statement in paragraph 31.**

32.    Admit that Vienna painted over mold in the dining hall at Vienna Correctional Center

rather than Remediate the Mold in preparation for the inspection of Vienna Correctional Center on November 16, 2012, by Plaintiffs' counsel.

> **RESPONSE: Objection. This request to admit is argumentative as it assumes mold actually existed in the housing units, and assumes that painting over mold is an improper mold remediation method. Notwithstanding said objection, Defendant denies the statement in paragraph 32.**

33.    Admit that Vienna painted over mold in the Housing Units in preparation for the inspection of Vienna Correctional Center on October 30, 2014, by Judge J. Phil Gilbert and Magistrate Judge Philip M. Frazier.

> **RESPONSE: Objection. This request to admit is argumentative as it assumes mold actually existed in the housing units, and assumes that painting over mold is an improper mold remediation method. Notwithstanding said objection, Defendant denies the statement in paragraph 33.**

34.    Admit that Vienna painted over mold in the Housing Units rather than Remediate the Mold in preparation for the inspection of Vienna Correctional Center on October 30, 2014, by Judge J. Phil Gilbert and Magistrate Judge Philip M. Frazier.

> **RESPONSE: Objection. This request to admit is argumentative as it assumes mold actually existed in the housing units, and assumes that painting over mold is an improper mold remediation method. Notwithstanding said objection, Defendant denies the statement in paragraph 34.**

35.    Admit that Vienna painted over mold in Building 19 in preparation for the inspection of Vienna Correctional Center on October 30, 2014, by Judge J. Phil Gilbert and Magistrate Judge

Philip M. Frazier.

> **RESPONSE**: Objection. This request to admit is argumentative as it assumes mold actually existed in the housing units, and assumes that painting over mold is an improper mold remediation method. Notwithstanding said objection, Defendant denies the statement in paragraph 35.

36.     Admit that Vienna painted over mold in Building 19 rather than Remediate the Mold in preparation for the inspection of Vienna Correctional Center on October 30, 2014, by Judge J. Phil Gilbert and Magistrate Judge Philip M. Frazier.

> **RESPONSE**: Objection. This request to admit is argumentative as it assumes mold actually existed in the housing units, and assumes that painting over mold is an improper mold remediation method. Notwithstanding said objection, Defendant denies the statement in paragraph 36.

37.     Admit that Vienna painted over mold in the Bathroom Facilities in preparation for the inspection of Vienna Correctional Center on October 30, 2014, by Judge J. Phil Gilbert and Magistrate Judge Philip M. Frazier.

> **RESPONSE**: Objection. This request to admit is argumentative as it assumes mold actually existed in the housing units, and assumes that painting over mold is an improper mold remediation method. Notwithstanding said objection, Defendant denies the statement in paragraph 37.

38.     Admit that Vienna painted over mold in the Bathroom Facilities rather than Remediate the Mold in preparation for the inspection of Vienna Correctional Center on October 30, 2014, by Judge J. Phil Gilbert and Magistrate Judge Philip M. Frazier.

**RESPONSE: Objection. This request to admit is argumentative as it assumes mold actually existed in the housing units, and assumes that painting over mold is an improper mold remediation method. Notwithstanding said objection, Defendant denies the statement in paragraph 38.**

39.    Admit that Vienna painted over mold in the dining hall at Vienna Correctional Center in preparation for the inspection of Vienna Correctional Center on October 30, 2014, by Judge J. Phil Gilbert and Magistrate Judge Philip M. Frazier.

**RESPONSE: Objection. This request to admit is argumentative as it assumes mold actually existed in the housing units, and assumes that painting over mold is an improper mold remediation method. Notwithstanding said objection, Defendant denies the statement in paragraph 39.**

40.    Admit that Vienna painted over mold in the dining hall at Vienna Correctional Center rather than Remediate the Mold in preparation for the inspection of Vienna Correctional Center on October 30, 2014, by Judge J. Phil Gilbert and Magistrate Judge Philip M. Frazier.

**RESPONSE: Objection. This request to admit is argumentative as it assumes mold actually existed in the housing units, and assumes that painting over mold is an improper mold remediation method. Notwithstanding said objection, Defendant denies the statement in paragraph 40.**

41.    Admit that Vienna has used the possibility of transfer from the Housing Units (not including Building 19) to Building 19 as a means of inmate discipline.

**RESPONSE**: Defendant admits that Building 19 contains segregation cells, and inmates are occasionally sentenced to segregation by the Adjustment Committee. Defendant denies threatening transfer to Building 19 as a means of discipline.

42.   Admit that Vienna has in fact transferred inmates from the Housing Units (not including Building 19) to Building 19 as a means of inmate discipline.

**RESPONSE**: Defendant admits that Building 19 contains segregation cells, and inmates are occasionally placed in segregation by the Adjustment Committee due to disciplinary issues. Defendant denies threatening transfer to Building 19 as a means of discipline.

Respectfully submitted,

Acting Warden Jean Campanella,
Successor to RANDY DAVIS,

Defendant,

LISA MADIGAN, Attorney General,
State of Illinois,

Attorney for Defendant,

Dylan P. Grady #6309120
Assistant Attorney General
500 South Second Street
Springfield, Illinois 62701
(217) 782-2077

Of Counsel.

BY:   Dylan P. Grady
Assistant Attorney General

## CERTIFICATE OF SERVICE

I hereby certify that on August 1, 2016, I mailed copies of the foregoing Answers to Plaintiffs' First Set of Requests for Admission by Acting Warden Jean Campanella, as Defendant Randy Davis' Successor, by U.S. Mail, in envelopes fully prepaid and properly addressed to:

Kathleen Patricia Lally
Latham & Watkins, LLP
233 South Wacker Drive, Suite 5800
Chicago, IL. 60606

Alan Mills
Uptown People's Law Center
4413 North Sheridan
Chicago, IL. 60640

Respectfully Submitted,

Dylan P. Grady, #6309120
Assistant Attorney General
500 South Second Street
Springfield, Illinois 62701
Ph. (217) 782-2077
Fax (217) 782-8767
Email: dgrady@atg.state.il.us

# EXHIBIT D

Page 1

```
1                IN THE UNITED STATES DISTRICT COURT
              FOR THE SOUTHERN DISTRICT OF ILLINOIS
2                         BENTON DIVISION
3    MICHAEL BOYD, PAUL LEE,    )
     KENDRICK PEARSON and J.B.  )
4    WASHUP, on behalf of       )
     themselves and all others  )
5    similarly situated,        )
                                )
6           Plaintiffs,         )
                                )
7       vs.                     ) Case No.
                                ) 3:12-cv-00704-MRJ-RJD
8                               )
     S.A. GODINEZ, Director of  )
9    Illinois Department of     )
     Corrections, and RANDY     )
10   DAVIS, Warden of Vienna    )
     Correctional Center, in    )
11   their official capacities,)
                                )
12          Defendants.         )
13
14
15           DEPOSITION OF MICHAEL P. ATCHISON
16             Taken on behalf of Plaintiffs
17                  October 31, 2016
18      (Starting time of the deposition:  11:15 a.m.)
19
20
21
22
23
24
25
```

Page 2

1              I N D E X   O F   E X A M I N A T I O N

2

3                                                    Page

4   Questions by Mr. Collins .......................    5

5   Questions by Mr. Grady .........................   52

6   Further Questions by Mr. Collins ...............   56

7

8              I N D E X   O F   E X H I B I T S

9   Exhibit 1 (Notice of Deposition) ...............    7

    Exhibit 2 (Housing Unit Population) ............   34

10

11

12         (The original exhibits were retained by the

    court reporter, to be attached to Mr. Collins'

13  transcript.)

14

15

16

17

18

19

20

21

22

23

24

25

Page 3

1          IN THE UNITED STATES DISTRICT COURT
         FOR THE SOUTHERN DISTRICT OF ILLINOIS
2                    BENTON DIVISION
3  MICHAEL BOYD, PAUL LEE,    )
   KENDRICK PEARSON and J.B.  )
4  WASHUP, on behalf of       )
   themselves and all others  )
5  similarly situated,        )
                              )
6          Plaintiffs,        )
                              )
7      vs.                    )  Case No.
                              )  3:12-cv-00704-MRJ-RJD
8                             )
   S.A. GODINEZ, Director of  )
9  Illinois Department of     )
   Corrections, and RANDY     )
10 DAVIS, Warden of Vienna    )
   Correctional Center, in    )
11 their official capacities,)
                              )
12         Defendants.        )
13         VIDEOTAPED DEPOSITION OF WITNESS, MICHAEL P.
14 ATCHISON, produced, sworn, and examined on the 31st
15 day of October, 2016, between the hours of nine
16 o'clock in the forenoon and six o'clock in the evening
17 of that day, at the offices of Vienna Correctional
18 Center, 6695 State Route No. 146 E, Vienna, Illinois
19 62995, before BRENDA ORSBORN, a Certified Shorthand
20 Reporter within and for the State of Illinois, in a
21 certain cause now pending in the United States
22 District Court for the Southern District of Illinois,
23 Benton Division, wherein Michael Boyd, et al. are the
24 Plaintiffs and S.A. Godinez, et al. are the
25 Defendants.

Page 4

1                    A P P E A R A N C E S
2        For the Plaintiffs:
3        Mr. Robert C. Collins III
         Ms. Kathleen P. Lally
4        Mr. Sajid Saleem
         Latham & Watkins LLP
5        330 North Wabash Avenue, Suite 2800.
         Chicago, Illinois 60611
6        (312) 876-7700
         robert.collins@lw.com
7        kathleen.lally@lw.com
         sajid.saleem@lw.com
8        and
         Mr. Alan Mills
9        Uptown People's Law Center
         4413 North Sheridan
10       Chicago, Illinois 60640
         (773) 769-1411
11       alan@uplcchicago.org
12
13
14       For the Defendants:
15       Mr. Dylan P. Grady
         Office of the Attorney General
16       500 S. Second Street
         Springfield, Illinois 62706
17       (217) 782-9056
         dgrady@atg.state.il.us
18
19
20       The Court Reporter:
21       Ms. Brenda Orsborn, RPR/CSR/CCR
         Missouri CCR No. 914
22       Illinois CSR No. 084-003460
         Veritext Legal Solutions
23       100 South 4th Street, Suite 550
         St. Louis, Missouri 63102
24       (314) 203-2987
25

Page 5

1          IT IS HEREBY STIPULATED AND AGREED, by and

2     between counsel for Plaintiffs and counsel for

3     Defendants that the DEPOSITION OF MICHAEL P. ATCHISON

4     may be taken in shorthand by Brenda Orsborn, a

5     Certified Court Reporter, and afterwards transcribed

6     into typewriting; and the signature of the witness is

7     expressly waived.

8                    MICHAEL P. ATCHISON,

9     of lawful age, being produced, sworn and examined on

10    behalf of the Defendant, deposes and says:

11                   *   *   *   *   *

12                   EXAMINATION

13    QUESTIONS BY MR. COLLINS:

14        Q.    Good morning, sir.  How are you?

15        A.    Good morning.  Thank you.  How are you?

16        Q.    Just for the record, I am Robert Collins.

17    I'm a lawyer at Latham & Watkins in Chicago, and I

18    represent the Plaintiffs as well as the class that's

19    been certified here for purposes of settlement.  Would

20    you, just for the record, also introduce yourself?

21        A.    My name is Michael P. Atchison.  I'm Deputy

22    Chief -- or, I'm sorry.  I'm Chief of Operations for

23    the Department of Corrections.

24        Q.    And how long have you been Chief of

25    Operations?

Page 6

1    A.    Since March 16th of this year.

2    Q.    Of 2016?

3    A.    Yes.

4    Q.    What was your position before that?

5    A.    Deputy Chief of Operations, which explains

6  my slip of the tongue.

7    Q.    How long did you hold the position of Deputy

8  Chief?

9    A.    Since January 26th of 2013.

10    Q.    And what was your position before

11  January 26th of 2013?

12    A.    I was warden at Menard Correctional Center.

13    Q.    How long were you the warden at Menard?

14    A.    About 13 months, from December 1st of 2011

15  until I left.

16    Q.    Have you ever been deposed before?

17    A.    Yes.

18    Q.    So I won't go through all the ground rules,

19  but just so that we're on the same page, we have a

20  court reporter here who obviously will be taking down

21  everything that we discuss, so I would just ask

22  that -- I will do my best not to talk over you, and if

23  you could do your best not to talk over me so that the

24  court reporter can get it all down.  I will do my

25  best, as well, to ask you clear questions that you

Page 7

1    understand, but please let me know if you don't

2    understand any questions.  I will try to rephrase or

3    define or make it so that you're clear.

4          A.    Understood.

5          Q.    You understand that you're under oath?

6          A.    I do.

7          Q.    And if you don't ask me any questions or if

8    you answer a question, I'll assume that you understood

9    the question.  Fair enough?

10         A.    Yes, sir.

11         Q.    Any questions before we get going?

12         A.    No.

13         Q.    Great.  The other thing I'll just make sure

14   that we're okay about, if you need a break at any

15   time, just let me know, and we'll take a break.  The

16   only thing I would ask is if there's a question

17   pending, you answer that, and then we'll take a break.

18         A.    Understood.

19               MR. COLLINS:  Can you mark this?  I'm going

20   to mark this as Exhibit 1.

21               [Marked Exhibit No. 1.]

22         Q.    (By Mr. Collins) Chief, I'm handing you a

23   copy of what's been marked as Exhibit 1 to your

24   deposition.  This is Plaintiff's Notice of Deposition

25   of Defendant Director of the Illinois Department of

Page 8

1    Corrections and Warden of Vienna Correctional Center

2    in their Official Capacity Pursuant to the Federal

3    Rules of Civil Procedure 30(b)(6).

4              Have you seen this before?

5        A.    Yes.

6        Q.    And can you please turn to Page 4?

7        A.    Yes.

8        Q.    Have you seen these examination topics

9    before?

10       A.    I believe so.

11       Q.    And do you understand that you are here in

12   your capacity as an official of the Department of

13   Corrections to testify on behalf of the Department of

14   Corrections?

15       A.    Yes, I do.

16       Q.    And you're prepared to do so?

17       A.    Yes, I am.

18       Q.    What are your -- let me start that over.

19              As the Chief of Operations, what are your

20   responsibilities for Vienna Correctional Center?

21       A.    As Chief of Operations, I oversee

22   essentially the operations of all 25 existing

23   correctional facilities and their satellite units or

24   facilities as well, which includes the offender

25   population and the staffing composition.  I oversee

Page 9

1    the deployment of the workforce.  I oversee offender

2    movement, security custody control and the well-being

3    of staff and offenders alike.

4        Q.    Do you have any responsibility for

5    maintenance of facilities?

6        A.    Yes.  That would fall under that umbrella,

7    correct.

8        Q.    And would maintenance include repairs,

9    upkeep, renovation, that type of thing?

10       A.    It would, yes.

11       Q.    Did you prepare for your deposition today?

12       A.    Only in reviewing the examination topics and

13   recollecting, yes.

14       Q.    Chief, do you know how many inmates Vienna

15   Correctional Center was designed to house?

16       A.    Not offhand, I do not.

17       Q.    Do you know what the term "design capacity"

18   means?

19       A.    I know in somewhat of an abstract form, I

20   understand it.  I am not confident in whether my

21   understanding was the original understanding when it

22   was dubbed "design capacity."

23       Q.    What's your understanding?

24       A.    My understanding is that regardless of the

25   age of the facility, that is what the architects, the

Page 10

1  designers, the builders had in mind for the particular

2  facility.

3      Q.    And are you familiar with the term

4  "operational capacity"?

5      A.    Yes.

6      Q.    What does that term mean?

7      A.    Operational capacity, unless I'm incorrectly

8  recollecting here, is what the facility and the agency

9  as a whole is able -- the capacity at which it is able

10  to operate safely and securely with enough room for

11  open beds in case you had to have -- move population

12  from one place to another.

13      Q.    Do you know how operational capacity

14  compares to design capacity?

15      A.    Only in how I formulated my opinion in that

16  the designers or the architects of the facility,

17  again, regardless of the year and regardless of how

18  many buildings were in the original design, because

19  many facilities add on buildings, and that design

20  capacity may not have been adjusted for the additional

21  buildings built.  But the difference to me is what the

22  mind of an architect had in mind and in what a

23  facility or agency administrators have in mind for the

24  use, utilization or the population type.

25      Q.    Do you know what Vienna Correctional

Page 11

1    Center's current operational capacity is?

2        A.    I'm sorry.  I don't know that off the top of

3    my head.  I can take a swing at it, but --

4        Q.    Do you know how the current operational

5    capacity at Vienna compares to its design capacity?

6        A.    No.

7        Q.    Do you know what factors would go into how

8    the operational capacity would be determined for

9    Vienna?

10       A.    The factors would include -- I may be

11   repeating what I said earlier, but the mission or

12   security level of the facility, what programmatic

13   opportunities there may be and the population of the

14   overall -- the overall population of offenders in IDOC

15   at the time as well.

16       Q.    And by "programmatic opportunities," is that

17   vocational/educational type students?

18       A.    Yes.

19       Q.    Do you know whether the operational capacity

20   of Vienna Correctional Center has changed since this

21   lawsuit was filed in mid-2012?

22       A.    I don't believe it has.  The population has

23   reduced, but I don't believe our capacities have been

24   altered.  I may -- can I qualify that?

25       Q.    Sure.

Page 12

1          A.    I'm only say saying I don't know because I

2    don't know if what we have managed within our ability

3    to say we will no longer use certain buildings for

4    housing, if that has been translated to a computer

5    system that says those beds are no longer there.  Do

6    you know what I'm saying?

7          Q.    Let me ask you a few questions to make sure

8    I understand what you're saying.  So let's take -- we

9    just walked through Building 19.

10         A.    Right.

11         Q.    Is it correct to say that other than the

12   first floor segregation -- let me start that over.

13              Is it correct to say that other than those

14   six segregation cells on the first floor, IDOC is not

15   housing inmates in Building 19?

16         A.    Yes.

17         Q.    And does IDOC have any plans to house

18   inmates in Building 19 other than those six cells?

19         A.    No, not at all.

20         Q.    So help me understand how you're

21   distinguishing operational capacity of Building 19

22   versus what IDOC intends to do?

23         A.    I'm only saying I didn't check before we

24   came here today.  I would like to assume that we

25   have -- that our bed space capacity has been reduced,

Page 13

1    and this meaning operational, has been reduced in

2    accordance with the number of beds that were

3    depopulated in Building 19.  Again, I didn't review

4    our Daily Operational Report comparing it from today's

5    capacity to six months ago or approximate to six

6    months ago.  I can testify to the intent of the agency

7    and that we don't want elbows rubbing.  We want elbow

8    room.  We want what's best for our population and

9    staff, alike, and that includes making room and

10   eliminating areas that are less appealing than others

11   from within our walls.

12        Q.   So is it the intent of IDOC not to house

13   inmates in general population in Vienna?

14        A.   In Building 19.

15        Q.   I'm sorry.  Let me try that again.  That was

16   my mistake.

17             Is it the intent of IDOC not to house

18   general population inmates in Building 19?

19        A.   That is correct.  And if I may define, there

20   may be -- there are beds in our infirmary that are

21   also on the ground floor, and they technically are

22   general population inmates, but that's a temporary

23   location for them.

24        Q.   Okay.  So other than the six cells in the

25   first floor segregation unit and whatever beds you

Page 14

1    would need in the infirmary, IDOC's intent is not to

2    house inmates in Building 19?

3        A.    That is correct.

4        Q.    I want to understand how that came about.

5    So when was the decision made to depopulate the

6    general population sections of Building 19, other than

7    the infirmary?

8        A.    May or June of this year.

9        Q.    Why was that decision made?

10       A.    Well, as we -- as we watched our population,

11   overall population decline over the last few years,

12   and also knowing the objective and goals of the

13   governor and this administration to reduce our

14   incarceration rate or reduce our population by

15   25 percent in ten years, that we are confident in our

16   resolve that we can make adjustments where they are

17   most -- where there's the most benefit, and by

18   benefit, I mean, what's best for the offenders that

19   are living in a dormitory that would rather live in a

20   room with one other person, maybe, and -- period.

21       Q.    Who made the decision to depopulate Building

22   19?

23       A.    Myself and in discussion with the chief of

24   staff and the director.

25       Q.    And by the director, you mean the director

Page 15

1    of IDOC?

2         A.    Yes.

3         Q.    And who is the chief of staff?

4         A.    Rob -- or Edwin Bob Bowen.

5         Q.    Was that decision to depopulate Building 19

6    formalized in some way?

7         A.    Unless formal is anything beyond an e-mail

8    and then, you know, discussions and meetings among the

9    persons I just mentioned, no, not that I am aware.

10   The plan to actually effect the moves is probably in a

11   separate document for how many we move each week and

12   where they're going and how we actually make all the

13   moving -- move all the moving parts to make it happen,

14   that's, I believe, in a separate document.

15        Q.    So was -- were all sections of Building 19

16   depopulated at the same time?

17        A.    No.

18        Q.    When were they each done?

19        A.    Through the course of -- I want to say four

20   to six weeks, from late May to throughout June,

21   possibly, in that general time frame, and I don't

22   recall which, which of the -- whether it was the

23   second floor or the third floor that went first, but

24   there was a strategy on how we could make the moves

25   and what would be the most efficient and safe for

Page 16

1    everyone involved.

2         Q.    Where did the inmates that were removed from

3    Building 19 go?

4         A.    Some of them went into empty beds here at

5    Vienna in the housing units that are existing here.

6    Vienna proper, so to speak.  Some of them went to

7    other medium or minimum facilities, probably minimum,

8    throughout the state.  To really accommodate a lot of

9    the -- those offenders that were in Building 19, I

10   want to say that they screened hundreds of people that

11   were already here at Vienna for possibly work camp

12   placement or placement in another minimum facility,

13   and it's a trickle-down effect.  You can take

14   offenders that are appropriate for one area and move

15   them to another so that you can backfill with other

16   offenders that are more appropriate.  We knew that we

17   had some beds in work camps that could be filled, so

18   we made deliberate moves to allow for the depopulation

19   of 19.

20        Q.    And I want to talk about each section of

21   Building 19, because there are several different

22   sections in Building 19.

23        A.    Okay.

24        Q.    So let's start with the second floor,

25   general population wing.

Page 17

1          A.    Yes.

2          Q.    That one's depopulated now, correct?

3          A.    Yes.

4          Q.    And IDOC doesn't have any plans to put

5     inmates in that second floor wing?

6          A.    No.

7          Q.    Does IDOC reserve the right to put inmates

8     in that wing?

9          A.    Only in the case of an emergency.  If we had

10    a catastrophic event and we had to move offenders from

11    an area that was damaged or was not safe, we would.

12         Q.    And what do you mean by an emergency or

13    catastrophic event?

14         A.    A flood, a tornado, a natural disaster.

15         Q.    Would it be fair to characterize that

16    reservation as temporary housing?

17         A.    Yes.  Yep.

18         Q.    Would you need to do anything in terms of

19    maintenance or repair to that second floor wing before

20    you could house inmates in there for emergency

21    purposes?

22         A.    For emergency, no.  If we had -- again, when

23    I think of emergency, I think of we've got to get

24    these people out of this area because it's not safe.

25    So what's better, an unsafe, water up to their knees,

Page 18

1    or put a bucket to catch a dripping roof here?  So

2    yes, we will manage a crisis appropriately, but if we

3    were to lose hundreds of beds at a particular facility

4    due to a tornado and temporary turned into long-term

5    temporary, yes, we're going to put into effect the

6    capital projects that we already have.  It's not to

7    say that we won't anyway, because we have a building

8    structure, we have an asset that we want to preserve.

9        Q.   You mentioned the capital projects.  What

10   are you referring to?

11       A.   Capital projects are, in layman's terms,

12   which is all I really know, are major renovations,

13   major building projects that require a state agency,

14   such as IDOC, to solicit the assistance of the Capital

15   Development Board, which is not a state agency, and

16   they have their own architects.  They have their own

17   engineers that will do an initial evaluation of our

18   need, and we go on a list of needed capital projects

19   statewide, across multiple agencies, and we -- it's

20   safe to say that we weekly, at least, are discussing

21   our priority lists as they change, as they evolve with

22   CDB and with the Governor's Office of Management and

23   Budget because it requires funding.  It requires

24   legislative funding.  And I, speaking for myself, am

25   not afraid to very emphatically impress upon my

Page 19

1   principals in this matter the importance of one

2   project or another and why this project is now the

3   priority, and well, gosh darn-it, I guess we'll have

4   to move that down the list even though it was number

5   one last week, and deservedly so.

6           So my point being is that we take this

7   seriously, and we should, but we are very much

8   beholden to funding, so we work our end of it as

9   vigorously as we can.

10      Q.    And I'm just trying to get a sense -- I just

11  want to make sure I understand, when you mentioned

12  capital projects, were you referring to any specific

13  capital projects for Building 19?

14      A.    No.  Just there's one project that's

15  assigned to Building 19, roofing and windows and

16  bathrooms and things like that.

17      Q.    Are any of those projects you just referred

18  to still planned to done --

19      A.    Yes.

20      Q.    -- to Building 19?

21      A.    Yes.

22      Q.    Could you tell me exactly what those planned

23  projects are?

24      A.    What they are or where --

25      Q.    What they are.

Page 20

1      A.    With Building 19?

2      Q.    Correct.

3      A.    The roof, primarily the roof, and, again, I

4    don't know exactly if that's a separate project from

5    bathroom renovations, but the roof is the one that we

6    really need to get done, because it does affect -- you

7    know, even if there's no one there, you don't want

8    water leaking into certain areas, so the roof is very

9    much on our high priority list, still.

10     Q.    Do you have the funding right now to be able

11   to replace the roof or fix the roof?

12     A.    I don't know.  I don't know.  I'd like to

13   think so, but I don't know.  I just don't know.

14     Q.    Do you have it actually scheduled to do that

15   project for the roof?

16     A.    I believe it was scheduled, and the material

17   was actually moved in, some of the material at some

18   point.  I don't recall -- I don't recall what the --

19   this was for deciding, well, let's not do the roof now

20   because we have a greater emergency somewhere else,

21   but it is still planned and still high on the list of

22   work to do.

23     Q.    You -- I think you mentioned, also,

24   bathrooms?

25     A.    Yes.  If I recall, at least for housing

Page 21

1    offenders there, we would have to renovate the

2    bathrooms.  If we don't house offenders there, I doubt

3    that we would renovate those bathrooms.

4        Q.    If you were to house inmates back in general

5    population in Building 19, what would you need to do

6    to the bathrooms?

7        A.    I believe increase the capacity or we only

8    house it within the capacity of the -- what, you know,

9    the plumbing codes and building codes, so many toilets

10   or so many offenders per toilet, per shower,

11   et cetera.

12       Q.    Do you know what building codes or housing

13   codes you're referring to there?

14       A.    I believe it's life safety codes that

15   architects refer to.  I don't know if they're part of

16   a statute or exactly where, but I usually only see

17   snippets of information, not the entirety of an act or

18   a code.

19       Q.    If you wanted to check the applicable code,

20   how would you do that?

21       A.    I would contact our Capital Programs Unit.

22   It's a unit within our agency that has a record of all

23   of that.

24       Q.    And that unit has the codes that would apply

25   to the number of bathroom facilities, toilets, sinks?

Page 22

1      A.    Yes, as would CDB, actually, CDB's probably

2  -- I'd probably go to them first, because they're

3  going to know exactly, and it's probably cited within

4  their projects what -- which codes are being -- are

5  the driving force behind some of the moves and what

6  they have to work within.

7      Q.    So do you know specifically what would need

8  to be done in Building 19 to meet those codes you're

9  referring to?

10     A.    Only that I believe that we have to increase

11 the number of toilets and showers, and there may be

12 some structural improvements that go along with that.

13 I believe that the main thing was just not enough for

14 that number of people.

15     Q.    Would you need to add showers on the second

16 floor?

17     A.    I don't recall.  I don't know.

18     Q.    Do you know whether there were showers on

19 the second floor for the general population?

20     A.    I believe so, but 25 facilities, I just

21 don't -- and I just walked through.

22     Q.    No, I know.  It's fair.  So I'll just tell

23 you that when Building 19 had inmates on the second

24 floor, there were no showers on the second floor.

25 Inmates would have to go to the third floor.

Page 23

1      A.    Gotcha.   So we would need showers on that

2   floor.

3      Q.    You would need showers on the second floor?

4      A.    Yes.

5      Q.    Go ahead.

6      A.    Except in the case of an emergency.

7      Q.    No, I understood.   In addition to having to

8   add showers on the second floor, do you know how

9   many -- whether the number of toilets or sinks or

10  urinals on the second floor was sufficient?

11     A.    I don't know.   I assume that they were not,

12  and that was part of the project.

13     Q.    Let's go up to the third floor of Building

14  19.

15     A.    Uh-huh.

16     Q.    There are four wings, correct?

17     A.    Yes.

18     Q.    And each wing held about a hundred inmates?

19     A.    Correct.

20     Q.    And let's start with the bathrooms.   Do you

21  know, in order for IDOC to house any inmates in

22  general population, other than for emergencies,

23  whether any improvements would need to be done to the

24  third floor bathrooms?

25     A.    I believe so.

Page 24

1      Q.    What would these improvements be?

2      A.    Increased number of -- approximate to 400

3   offenders or beds, we would have to have a proper

4   number of toilets, urinals and showers.  I don't know

5   the exact ratios, but we would meet that before we

6   would ever permanently occupy that again.

7      Q.    And when you say "that," you're referring to

8   those building codes we were talking about?

9      A.    Yes.

10      Q.    The same question that I asked you about the

11   second floor, but now about the third floor.  Does the

12   IDOC reserve the right or ability to house inmates in

13   general population on the third floor?

14      A.    In the case of an emergency, yes.

15      Q.    Other than in the case of an emergency?

16      A.    I believe that the right may exist, but the

17   will is not there to do that.

18      Q.    The same answer for the second floor?

19      A.    I would say yes.  But, again, the -- it's

20   hard to say what we have a right to do.  I mean, I'd

21   say that the right's there, but it's, again, there's a

22   big difference between can and should, and that's

23   about the best I can say about that.

24      Q.    So let me make sure I understand that.  So

25   IDOC probably could house inmates in general

Page 25

1    population, but shouldn't, the way it exists right

2    now?

3         A.   Exactly.

4         Q.   Any plans for the HVAC system in Building

5    19?

6         A.   Yes, that is another project.  I do recall

7    that, yes.

8         Q.   What do you recall about that project?

9         A.   I don't know -- I don't recall what the -- I

10   believe that there's probably the ventilation system,

11   the entire -- whether there's enough air handlers or

12   enough -- something that can make the air temperature

13   -- I'm at a loss for words here -- consistent

14   throughout those large rooms.

15        Q.   And is that one of the capital projects you

16   were talking about?

17        A.   Yes.

18        Q.   Is that something that would need to be done

19   before inmates would be housed in general population,

20   other than for emergency?

21        A.   Correct.

22        Q.   What about the windows in Building 19?  Any

23   capital project plan for those?

24        A.   Yes.  That's also part of one, and that's

25   also the same answer.  Except in the case of an

Page 26

1   emergency, we would be required to replace these

2   windows.

3        Q.    Anything else that IDOC would need to do to

4   the general population areas in Building 19 to house

5   inmates there, other than for an emergency?

6        A.    Not that I'm aware of.  Not that I've been

7   told.

8        Q.    What are the plans for the general

9   population areas of Building 19?

10       A.    Well, the department's in the process of

11  reviewing programs, determining what our -- what

12  programs are effective that we currently employ and

13  then putting into place evidence-based programs to

14  replace some that aren't necessarily effective, and

15  that would be considered potential space for

16  programming, whether it's a Bible study or making

17  signs or, you know, some sort of restorative justice.

18  The department is always discussing opportunities to

19  improve the quality of life both for the offenders and

20  for the population.  That's the whole concept behind

21  restorative justice, so yeah, there's potential for

22  that there, but, again, some of the these projects,

23  before we even used it for those programs, we would

24  need to -- we would need to make a -- we won't give up

25  on a capital project.  Trust me.

Page 27

1      Q.    And at this point, any concrete plans to use

2  those areas in Building 19 for programs?

3      A.    No.

4      Q.    Basically, is the current concrete plan for

5  those general population areas of Building 19 to leave

6  them empty?

7      A.    Yes.

8      Q.    Two other questions about Building 19 and

9  what would need to be done to house inmates there

10 other than for emergency.  Would you need to do

11 anything to the plumbing itself?

12     A.    I don't recall if there's any plumbing needs

13 there.  I don't recall.

14     Q.    Do you know what their requirements are for

15 the plumbing system?

16     A.    No, sir.

17     Q.    Do you know how you would go about finding

18 out how what the requirements are?

19     A.    Yes.  I would ask, probably starting with

20 the chief engineer here, what he or she may know, and

21 moving on up with the existing project and consulting

22 with the Capital Development Board.

23     Q.    Are there any standards that you know of

24 that the plumbing has to meet?

25     A.    I'm sure there are plumbing standards.  I

Page 28

1   don't know.  I can't cite them.

2       Q.   How would you determine what those plumbing

3   standards are?

4       A.   Again, speaking with a chief engineer here,

5   either myself, or I would assign someone to discuss it

6   and consulting with the Capital Development Board.

7       Q.   And would the plumbing need to meet the

8   standards that the Capital Development Board would set

9   in order to house inmates in general population, other

10  than for an emergency?

11      A.   Yes.

12      Q.   The same question about pest control.  Would

13  anything need to be done in Building 19 to address

14  pest control in order to house inmates for general

15  population, other than emergency?

16      A.   I believe that was part of the suit, but I

17  have never seen anything other than two-legged humans

18  in that building.  I've been in this agency for almost

19  31 years, and I've seen conditions that would be a

20  little bit different, but I've never seen that in that

21  building.  If there are windows broken out and a bird

22  would fly in, sure, that would be something that goes

23  with that.  But pest control is something that is --

24  that's standard operating procedure.

25      Q.   What do you mean by standard operating

Page 29

1    procedure there?

2         A.    Throughout all of our facilities.  If -- you

3    have routine sprays.  You have routine management of

4    varmints coming inside fences or even in buildings.

5    We will contract with a company that will get rid of

6    them, but usually it's just insects, spraying for

7    those and having either a contract or we have staff

8    that are certified in the application or utilization

9    of those pest controls.

10        Q.    Let's talk now about that segregation unit

11   on the third floor.

12        A.    Yes.

13        Q.    Let me be more clear or more specific.  The

14   segregation unit on the third floor of Building 19,

15   what plans, if any, does IDOC have for that unit?

16        A.    None at all.  We're using the beds somewhere

17   else.

18        Q.    So no plans to house any inmates in that

19   segregation?

20        A.    No.

21        Q.    Do you know when the last time that unit was

22   used to house inmates?

23        A.    I believe we vacated that area even before

24   we vacated the general population wings, because our

25   initiative to reduce our segregation numbers has been

Page 30

1    ongoing for a couple of years now.

2        Q.    What's that initiative?

3        A.    It's a big question.  We are in the middle

4    of a process in which we are amending our rules that

5    govern segregation, among other ancillary parts of the

6    discipline and grievance procedures.  It's called

7    Department Rule 504.  But even prior to us working

8    specifically on the rule amendments, we have, as an

9    agency, working within the discretion of the rule and

10   the limits set for the rule, reducing our reliance on

11   segregation as a form of discipline.  So we have been

12   getting away from the -- what we've always done, its

13   mentality, to what's the right way to do this.  So

14   that's a side effect, I believe, especially at a

15   lower-level facility like Vienna where you just don't

16   have the need for a large wing or a large number of

17   beds for segregation.

18       Q.    So the same -- a similar question for that

19   third floor segregation unit.  Would it be that IDOC's

20   reservation would be the ability to house inmates in

21   there for purposes of emergencies only?

22       A.    Could you repeat that?

23       Q.    Yeah.  Of course.  For that third floor

24   Building 19 segregation unit, is it fair to say that

25   IDOC's intent or plan is to only house inmates in that

Page 31

1    third floor unit of segregation for purposes of

2    emergency?

3         A.   Yes, that's correct.

4         Q.   Okay.  Let's talk about the first floor

5    segregation unit.  Do you know what the capacity of

6    that unit is?

7         A.   There are six cells, and I believe there are

8    two beds per cell, so 12.

9         Q.   What about the bunk area?

10        A.   That's been taken offline as well.

11        Q.   When was that first floor segregation bunk

12   area taken offline?

13        A.   Probably within the last few weeks because

14   of our reduced numbers, and instead of just saying,

15   "Well, we won't use it," we decided let's make it to

16   where it's very difficult to use by taking it offline.

17        Q.   How do you distinguish between those two?

18        A.   In an emergency, taking that off our

19   capacity numbers.

20        Q.   Okay.  So IDOC's plan or intent would be to

21   only use that bunk area of the first floor segregation

22   unit for purposes of an emergency?

23        A.   That's correct.

24        Q.   Temporary housing?

25        A.   Correct.

Page 32

1      Q.    Was there a reason that IDOC stopped using

2   that bunk area?

3      A.    Yeah.  Yes.  Me recognizing that I never had

4   liked that either, and I said, "Why is it even there?"

5      Q.    Why didn't you like it?

6      A.    It's counter to the premise that you

7   wouldn't have a -- sort of a dormitory-style

8   segregation room.  If you had -- if you have to

9   manage -- if you had an altercation between two

10  offenders, then you're dealing with -- if there were

11  six bunks in there, then you're dealing with six

12  offenders instead of just the two, so it's not

13  necessary.  It's not best practice.

14     Q.    If IDOC changed its plan and decided to

15  again use that first floor bunk area for segregation,

16  is there any maintenance or repairs or improvements

17  that would need to be done?

18     A.    We won't use it for segregation as long as I

19  have any say in it.

20     Q.    You mentioned earlier a computer system that

21  tracks beds; is that right?

22     A.    Yes.

23     Q.    What are the -- are there various

24  classifications for an inmate bed?

25     A.    Yes.

Page 33

1    Q.    What are those?

2    A.    The ones that I am most familiar with, and

3    there may be more that I'm not aware of, but general

4    population, segregation and protective custody.

5    Q.    And do you know how the formerly general

6    population beds in Building 19 are classified in the

7    system currently?

8    A.    I can't speak to it.  I wish I would have

9    looked before today, but I would like to think that

10   they are taking -- they're no longer classified, but

11   they're no longer there, that the actual capacity is

12   reduced by that amount, but I can't testify directly

13   to that.

14   Q.    What about the beds in that bunk area in the

15   first floor segregation?

16   A.    That's recent enough that I -- you know, it

17   may still be in the works of being taken off the

18   capacity.

19   Q.    And what about the beds in the third floor

20   segregation?

21   A.    That should be gone as well.

22   Q.    And by gone, you mean not even listed?

23   A.    Correct.

24   Q.    Is it IDOC's plan that the -- that the beds

25   in the general population areas of Building 19 would

Page 34

1    no longer be listed?

2        A.    That's correct.

3        Q.    And the same answer for that bunk area in

4    the first floor segregation?

5        A.    That's correct.  I'm sure we can produce the

6    documents that show --

7            MR. COLLINS:  That might just be the easiest

8    way to do it.

9            MR. GRADY:   (Nodding head.)

10           MR. COLLINS:  Sorry.  I'm trying to be

11   efficient and save some time.

12           THE WITNESS:  Not at all.  I appreciate

13   that.

14       Q.    (By Mr. Collins) Let's talk about the

15   housing units.  There are six housing units?

16       A.    Yes.

17       Q.    Do you know how many inmates each housing

18   unit was originally designed to hold?

19       A.    No, I'm sorry, I don't.

20       Q.    Do you know what the operational capacity of

21   each of the housing units is currently?

22       A.    No.

23           [Marked Exhibit No. 2.]

24       Q.    I'm going to hand you Exhibit 2.  Chief, do

25   you recognize this document?

Page 35

1       A.    I recognize it for what it is.  I have not

2  seen this particular document previously.  It appears

3  to be the actual population by housing unit and by

4  wing in Vienna.

5       Q.    Okay.  And take a look at the No. 1.  See,

6  it says, "Number of inmates currently housed at VCC,"

7  Vienna Correctional Center, "including in each housing

8  unit and in Building 19, and including each wing,

9  floor, segregation or other housing section of each

10  housing unit and in Building 19."

11       A.    Yes.

12       Q.    And then it lists the total number of

13  offenders as 1,107 as of October 25, 2016?

14       A.    Yes.

15       Q.    Do you know whether that number is accurate

16  as of that date?

17       A.    I don't know.  I would be reliant on the

18  same people that you got this from to tell me that.

19       Q.    Do you see the first line then says Housing

20  Unit No. -- I'm sorry.  It says "H.U. 1."

21       A.    Yes.

22       Q.    And would that mean Housing Unit 1?

23       A.    Yes.

24       Q.    It says 163 inmates?

25       A.    Correct.

Page 36

1        Q.    And then it lists 1A equals 41, 1B equals

2    42, et cetera.  Does that mean that Wing A of Housing

3    Unit 1 has 41 inmates?

4        A.    Yes.

5        Q.    And Wing B has 42, and Wing C has 39 and

6    Wing D has 41?

7        A.    Yes.

8        Q.    And that would apply for all the other six

9    housing units?

10       A.    Yes.

11       Q.    Do you know, for example, looking at Housing

12   Unit 1, whether 163 inmates is the total number of

13   inmates that Housing Unit 1 can hold?

14       A.    Without knowing -- without even seeing

15   their, you know, the number of beds they have in each

16   room, I can't say for sure.  I would assume that each

17   of the rooms has two beds because it's minimum

18   security.  We have rare instances of a need for a

19   single person cell.  They have much more freedom of

20   movement here, so I would assume that anything under,

21   like for that -- like Housing Unit 1, I would assume

22   that the capacity is at least 42, so 1B Wing is 42.

23   All of the other ones are a little bit under that.  A

24   couple of these actually have -- like Housing Unit 4

25   has 47 in some of their wings.  I don't know if it's a

Page 37

1    longer -- has more rooms than the other wings, but --

2         Q.    Yeah.  Do you know whether most of the

3    housing unit wings can currently hold 48 -- about 48

4    inmates?

5         A.    I would bet that that's what they could

6    hold, but by looking at these numbers, I bet we --

7    instead of packing full one particular wing and having

8    lots of room, we spread out the room as economically

9    and as properly as we could, so --

10        Q.    Let me -- let me ask the question this way.

11   If it's right that there are about 48 beds in each of

12   the housing unit wings or whatever that specific

13   number actually is, does IDOC have any plans or intent

14   to house more inmates in those wings?

15        A.    No.  Again, I speak to the overall resolve

16   to decrease population and to reduce recidivism and --

17   so no.

18        Q.    Can you look down to the second part of this

19   exhibit?  Do you see where it says "Building 19"?

20        A.    Yes.

21        Q.    And then the third line is "OU equals zero."

22        A.    Yes.

23        Q.    What is the "OU"?

24        A.    I don't know what the "O" and the "U" stands

25   for, but it means it's the term or the code used

Page 38

1   for -- it's sort of a place holder.  So if they're

2   moving -- in the process of moving one offender to

3   another room, you can't move that offender until they

4   move this offender out.  This offender may go to OU

5   while this one is moved in.  When you have multiple

6   rooms, this is sort of like a temporary limbo area

7   designation.  It's just -- it's not a real place.

8       Q.   Okay.  Do you see where it say as "HCU

9   equals zero"?

10      A.   Yes.

11      Q.   What is a "HCU"?

12      A.   Healthcare Unit.

13      Q.   Okay.  I've got it.  So that's a real place.

14      A.   It is.  I'm so glad they put "OU" on there.

15  I could have avoided all that.

16      Q.   I enjoyed it.  Back to the housing units.

17  Let's talk about, first, are there any current plans

18  to do any repairs or improvements on the housing

19  units?

20      A.   Yes.  There's -- again, I didn't review the

21  capital list for Vienna specifically, but in

22  conversations I've had today, as recent as today,

23  there were unfinished window projects for some of the

24  areas that are not living units for the offenders,

25  such as the officer's desk and day rooms, so, yes,

Page 39

1   those are projects that still need to be completed.

2       Q.    Any other ones that you know of?

3       A.    I want to say there's an electrical grid

4   loop replacement that we have to get done and

5   probably -- probably quite a few other ones, but every

6   facility has -- you know, if we're talking about ten

7   years or more deferred maintenance, then, yeah, I'm

8   sure we have quite a bit.

9       Q.    What do you mean by "ten years of deferred

10  maintenance"?

11      A.    Well, in a perfect world, you would have a

12  project, and you would submit an affidavit.  The

13  warden would submit saying this is what we have and

14  this is why we need this done, and it would be done

15  immediately, but, again, funding.

16      Q.    Right.  So let's do the windows first.  Have

17  all of the windows in the cells in the housing units

18  been replaced with new windows?

19      A.    Yes.

20      Q.    So the only windows that have not been

21  replaced so far are either in the day room areas or

22  where the officers sit?

23      A.    Correct, as I have been informed.  I haven't

24  walked everywhere myself.

25      Q.    And is it your understanding that Vienna

Page 40

1    does have the windows to replace those other areas,

2    meaning the day rooms and the officer area?

3        A.   Yes.   Whether they're still physically here,

4    I don't know, but I do know that they are part of a

5    project that was stopped midstream, and it will be

6    finished.

7        Q.   And why was it stopped midstream?

8        A.   I assume because of the budgetary or the

9    lack of a budget.

10       Q.   So the only reason that IDOC hasn't been

11   able to replace the windows in the diet -- in the day

12   room area and the officer area is due to budgetary

13   issues?

14       A.   Correct.

15       Q.   Are any repairs or improvements planned to

16   any of the bathroom facilities in the housing units?

17       A.   I believe so.   I don't recall seeing that

18   recently, but I believe that that's also been --

19   that's also part of the projects, yes.

20       Q.   Would those projects be documented

21   somewhere?

22       A.   In our -- well, in our capital project

23   survey and the final survey and in our request for the

24   capital project as well.

25       Q.   So all of the projects requested would be

Page 41

1    documented in that survey --

2        A.   Yes.

3        Q.   -- for Vienna?

4        A.   Yes.

5        Q.   Regardless of whether a capital project has

6    been requested or not for the bathroom facilities in

7    the housing units, to your knowledge, are any repairs

8    or improvements needed to the bathroom facilities in

9    the housing units?

10           MR. GRADY:  Objection, knowledge.

11       Q.   (By Mr. Collins) You can answer.

12       A.   Okay.  I would say that, yes, everywhere

13   there's -- plumbing is ongoing, replacing parts,

14   replacing showers, replacing flush valves, those are

15   -- keeping up with them is -- one of the biggest tasks

16   of a maintenance department is just keeping up with

17   the everyday maintenance of plumbing utilities,

18   electrical, things like that.

19       Q.   Are there any specific improvements or

20   repairs that are needed to the plumbing facilities in

21   the housing units?

22       A.   I don't know what the specifics would be.  I

23   don't know.

24       Q.   Would the bathroom facilities in the housing

25   units also need to meet those housing codes we were

Page 42

1    talking earlier about in connection with Building 19?

2         A.    I believe that would be safe to assume, yes.

3         Q.    Do you know whether currently the bathroom

4    facilities in the housing units meet those codes?

5         A.    I do not know.

6         Q.    How would you check?

7         A.    I would contact the chief engineer, starting

8    with the chief engineer, and, if necessary, the

9    capital development, refer to the project itself.

10        Q.    Who is the chief engineer currently at

11   Vienna?

12        A.    Darren Baggott.  Darren Baggott.

13        Q.    Does Mr. Baggott report to you?

14        A.    No.  He would report to the warden.

15        Q.    Do you directly oversee or supervise anybody

16   specifically at Vienna?

17        A.    No.  When I answer the chief engineer, I

18   just tend to say go directly to the source who would

19   know, but I probably wouldn't call the chief engineer.

20   I would call warden, who would get that information

21   from the chief engineer.

22        Q.    Does the warden report to you?

23        A.    No.  Actually, no.  The deputy director and

24   the deputy chief actually report to me, but I've

25   learned I'm not adverse to contact -- when I want

Page 43

1  information, I just call.  Instead of going through

2  six people, I'll just say, "What's the deal?"

3       Q.   Are there any standards that the housing

4  units need to meet in terms of the drinkability of the

5  water?

6       A.   Are there standards?  I'm sure there are.

7       Q.   Do you know what those standards are?

8       A.   The same as it is for any drinking water

9  throughout the country.

10      Q.   Do you know whether the drinking water in

11 the housing units meets those standards?

12      A.   I would like to believe I was -- I would be

13 told if they did not.

14      Q.   Who would tell you that?

15      A.   The chief engineer.  I would say that

16 through a chain of -- if we had a dramatic issue with

17 water being drinkable or there being a boil order, it

18 would go from the chief engineer to the warden to the

19 deputy director and possibly even what we would call a

20 reportable incident that Vienna Correctional Center is

21 on some sort of a boil order or that there are -- it

22 would come to me in some form or fashion as a report

23 that we have.

24      Q.   If you wanted to check that, how would you

25 do that?

Page 44

1    A.    The drinkability of the water?

2    Q.    Correct.

3    A.    I don't know, sir.

4    Q.    Do you know whether there are complaints or

5    reports from inmates of brown drinking water?

6    A.    I have not heard any, no.  If we have a

7    complaint of foreign -- discolored drinking water or

8    foreign objects in the drinking water or unusual taste

9    or odor, there are processes by which the chief

10   engineer, starting with, will get Public Health

11   involved or whoever tests for the composition of the

12   drinking water.  I can only assume that that's been

13   done if there were complaints.  If they were

14   dispelled, then, okay, it was a complaint and never

15   was verified.  If it was verified, then it rises to a

16   whole different level.

17   Q.    So if there's -- if there's a complaint of

18   discoloration or some other complaint related to the

19   drinking water, you referred to a process.  What

20   specifically would that process be?

21   A.    I believe it is Public Health, that -- if

22   it's not Public Health, it's someone that they -- a

23   vendor that they can bring in to test water.  I can't

24   say much more specifically about the process than

25   that.  But -- and, again, depending on whether a

Page 45

1    facility's water is supplied by their own water

2    filtration system or by, say, city water or well water

3    or whatever, there is agency oversight on that sort of

4    thing.  Yeah.

5        Q.   Just so we're clear, when you refer to

6    Public Health, what are you referring to?

7        A.   The Illinois Department of Public Health.

8        Q.   And it's IDOC's intent that the drinking

9    water meets the applicable standards?

10       A.   Yes.

11       Q.   Other than the -- we just talked about the

12   bathroom facilities in the housing units.  Other than

13   the bathroom facilities, any other repairs or

14   improvements that need to be made to the housing

15   units, whether or not there's a capital project for

16   it?

17       A.   Not that I'm aware.

18       Q.   Let's -- let's talk about the dietary

19   facility.  Any current plans for any repairs or

20   improvements to the dietary building?

21       A.   Large scale, I'm not aware of, but small

22   scale, again, that's another area where you're

23   constantly replacing equipment and replacing material

24   and improving a building, the construction of a

25   building, but I don't know of anything specifically.

Page 46

1    Q.    What about the windows in the dietary

2    facility?  Any need to repair those?

3    A.    I'm assuming that they're probably somewhere

4    on the list of things to do, but I can't specifically

5    attest to that.

6    Q.    We've talked about the six housing units,

7    and we've talked about the six cells in the first

8    floor segregation unit, and we've talked about the

9    beds in the infirmary.  Other than those three general

10   areas, any other places at Vienna where inmates are

11   housed currently?

12   A.    No.

13   Q.    Does IDOC have any plans to house inmates in

14   any location at Vienna Correctional Center other than

15   the six housing units, the infirmary beds and those

16   six beds in the first floor segregation unit?

17   A.    No.

18   Q.    Any intent to do so?

19   A.    No.

20   Q.    Other than the six housing units and the

21   areas of Building 19 that we've talked about, meaning

22   first floor, second floor and the two segregation

23   units and infirmary, any other places at Vienna

24   Correctional Center that IDOC reserves the right to

25   house inmates?

Page 47

1      A.    Putting it into context, in an emergency, we

2   have housed inmates on gymnasium floors safely,

3   securely and sanitarily.  Having the right doesn't

4   mean we're going to doing it unless we have to do it,

5   so yes, we do reserve the right within that context.

6      Q.    But is it correct to say that IDOC's plan or

7   intent, would you only house inmates in other areas,

8   other than the ones we've talked about, for emergency

9   purposes only?

10     A.    Correct.

11     Q.    Other than -- other than the types of

12  repairs or capital projects we've already talked

13  about, are there other repairs or projects that IDOC

14  feels needs to be done at Vienna?

15     A.    Again, I'm sure that there are, but I'm not

16  sure of how many or where or what they are.

17          MR. COLLINS:  Why don't we just take a

18  five-minute break?

19          (Whereupon a break was taken.)

20     Q.    (By Mr. Collins) Just a couple of more

21  questions.  The first one, if you take a look at

22  Exhibit 2 again, do you see where it says in the

23  middle, "Building 19, first floor segregation equals

24  13"?

25     A.    Yes.

Page 48

1      Q.    Do you know why that number is 13 if there's

2    only six cells that holds two beds each?

3      A.    I'd say as recent as the date this was

4    provided to you, there was one offender in that one

5    big room.  As I said, this was just last week that it

6    came to my knowledge.  I put the "ixna" on it, if

7    that's a word we can use.

8      Q.    Pig Latin flies here.  I want to circle back

9    to the very beginning when you were talking about

10   operational capacity and how it relates to security

11   and the ability to keep the institution safe.  Does

12   that mean that Vienna can be at a hundred percent of

13   capacity, but have empty beds?

14     A.    The capacities I am familiar with, and

15   that's why I may be getting mixed up.  Operational

16   capacity may actually be filled to the -- every bed

17   filled.  I don't know.  There is a capacity term for

18   that, and I don't recall if it's operational.  There's

19   also ideal capacity, rating capacity, design capacity.

20   I've been flooded with different terms for capacity

21   that I can't recollect.  What -- I'd say in the basic

22   terms, you have a capacity that is, yes, that's what

23   we could hold.  Is that what we should hold?  No.  We

24   are -- we have never been at the -- we've never, in

25   the 31 years I've been around, we've never filled

Page 49

1    every single bed.  Even when we were forced, due to

2    population growth six, seven years ago or four or five

3    years ago and put offenders on gym floors, we still

4    had open beds in normal cells, but because we can't

5    put every offender with every other offender

6    necessarily, that some need to be single-celled, we

7    don't actually fill the beds.  We may leave a bed in

8    there, because that cell may be later utilized in some

9    other way.  There's no sense in taking that bed out if

10   we may re-purpose that cell.  So I have to plead -- I

11   have to punt on that, because I don't -- I don't know

12   that I could speak specifically to what "operational"

13   means, except, in my mind, it's like what's -- what's

14   the way to operate?  What's the best way to operate?

15   Because the other term is so foreign, in that we've

16   never done it, I don't really bring that into play.

17   Operational means every bed filled.

18        Q.    Putting the terms aside, the specific

19   defined terms, putting those aside, is it possible for

20   Vienna to have the number of inmates that you would

21   consider preferred or ideal and still have some extra

22   beds because of how you define preferred or ideal?

23        A.    Yes.

24        Q.    And that would -- would that relate to

25   security concerns or staffing concerns?

Page 50

```
 1        A.   It would.  It would relate to not so much
 2   the staffing, but the -- you want to have enough
 3   cushion, based on the population type, and that's
 4   where that difference between being completely filled
 5   up and every bed filled and what is -- it seems like I
 6   recollect a 95 percent being a number that for the --
 7   that one of our capacities is 95 percent.  That leaves
 8   us 5 percent wiggle room, and that's where that
 9   95 percent is really the realistic cap for us because
10   we know we really can't go above that.
11        Q.   Ninety-five percent of what?
12        A.   Of the entire -- the entire number of beds
13   that are in a facility.
14        Q.   All right.  So talking about Vienna
15   specifically and putting aside the areas you've closed
16   in Building 19, so just looking at the -- essentially
17   for general population, the six housing units, do you
18   know where Vienna is in terms of that ideal or
19   preferred number?
20        A.   I'd say even if we took all of the number of
21   beds that we reduced, that we took off of our capacity
22   from Building 19, that we are still lower to -- we are
23   still marginally lower than what our comfortable
24   capacity would be.  I'm believing that if we walked
25   again and did a cell-by-cell survey, we would find
```

Page 51

1   completely empty cells, or we would find several

2   single-person cells, even though there are two beds

3   and that there would be no harm in two guys being in

4   that cell together.  So I would say that that

5   95 percent, I don't know if it's scientific.  I just

6   know that you build in some padding into what you have

7   to do.  There's probably planners and researchers that

8   can tell you more about that than I.  I go more about

9   -- I operate based on mostly my experience, and so

10  yes.

11      Q.   If the total inmate population in Illinois

12  started to increase again, how would that affect

13  Vienna?

14      A.   I would say marginally, because it would

15  also be -- it would be dependent on how much it

16  increased.  I think it would take -- for instance, we

17  are 6,000 fewer offenders in our custody than we were

18  in 2012, 6,000 give or take, and it would take a

19  lot -- it would take us reversing course pretty

20  abruptly for Vienna to be affected adversely, by

21  anyone's terms, right away.

22      Q.   And in order to -- as we discussed earlier,

23  and if the inmate population generally were to

24  increase, such that IDOC needed to use the general

25  population areas of Building 19 again, that would be

Page 52

1    subject to the need for the repairs and improvements

2    we talked about earlier.

3         A.    Absolutely.

4         Q.    Are there any -- are there any prison

5    facilities in Illinois that are beyond where you would

6    have the ideal or preferred number of inmates, such

7    that Vienna would be at risk of transferring inmates

8    to Vienna?

9         A.    No.  I'm proud of that fact, by the way.

10              MR. COLLINS:  I don't have any more

11   questions.  I thank you very much for taking the time

12   to be here today, not only for the deposition, but for

13   the tour.

14              THE WITNESS:  You're welcome.

15                        EXAMINATION

16   QUESTIONS BY MR. GRADY:

17        Q.    In general, we talked about the maintenance

18   of facilities, and I just want to clear up a few

19   things.  So we mentioned that Vienna has a chief

20   engineer; is that correct?

21        A.    Correct.

22        Q.    He oversees the general maintenance of

23   Vienna Correctional Center?

24        A.    Yes.

25        Q.    Does he have a maintenance staff?

Page 53

1          A.    Yes.

2          Q.    On a day-to-day basis, do they conduct or

3    complete maintenance activities?

4          A.    Yes.

5          Q.    So that's a daily occurrence, maintenance

6    would be?

7          A.    Yes.

8          Q.    And those -- maintenance is distinct from

9    the capital projects?

10          A.    Yes.  The only role maintenance has in a

11    capital project is filing the appropriate

12    documentation of the need and providing it to the

13    warden, so an affidavit and all the forms that go with

14    it, yes.

15          Q.    So that kind of follows my next thought

16    here.  Just in general, you wouldn't necessarily be

17    informed of day-to-day maintenance?

18          A.    No.

19          Q.    And so I do want to talk about the role,

20    then, the chief engineer and maintenance play in

21    developing capital projects.  I guess how does a

22    capital project get started?  Where would it begin?

23          A.    With the chief engineer and his staff.  If

24    they identify whether it's a slow progression towards

25    the need or a roof caves in, the project will start

Page 54

1    with the chief engineer and the warden.  I've signed

2    affidavits myself attesting to what the need is, and

3    that's where it goes.

4         Q.   And that would go on to Springfield and

5    maybe the Capital Programs Unit?

6         A.   Yes.  They're involved, and they make an

7    assessment, and it's eventually to the Capital

8    Development Board.

9         Q.   And I do want to talk a little bit about the

10   Capital Development Board, CDB.  CDB oversees the

11   financing and the actual approval of plans for any

12   capital project in the State of Illinois; is that

13   right?

14        A.   Yes.

15        Q.   So any plan for any major capital

16   improvement would have to be approved by the CDB?

17        A.   Yes.

18        Q.   And is it true that the CDB actually

19   normally hires the architects, approves the plans or

20   designs?

21        A.   Yes.

22        Q.   They have their own engineers.

23        A.   Yes.

24        Q.   And architects at CDB as well?

25        A.   I believe they have engineers, and maybe

Page 55

1    architects, too.  I don't know, but they have some
2    professionals in their ranks, but they're not utilized
3    for the actual jobs.  They hire them out.
4         Q.    Right.  But I guess CDB approves all plans?
5         A.    Correct.
6         Q.    How much input does IDOC actually have into
7    some -- the design of a structure or of a capital
8    plan?
9         A.    Minimal, at best.  If you're talking
10   about -- well, for instance, if someone said, "Well,
11   we can't do this roofing project because it's
12   wintertime coming," I, as a representative of IDOC,
13   may say, "No, we're in Southern Illinois.  Don't put
14   us off.  You can do the roof in December or February
15   or whatever."
16        Q.    Would IDOC ever have any actual input into
17   the specifications?
18        A.    No.  Well, no.
19        Q.    I know interplay is sometimes --
20              MR. COLLINS:  Let him answer.
21        Q.    (By Mr. Grady) -- sometimes complicated.
22        A.    So if we have projects going on pursuant to
23   other cases that we do come in and say, "Wait a
24   second.  This is not a light enough color for the
25   need," the paint color may need to change.  Or we may

Page 56

1    say, "No, we don't want to put carpeting in here.  We

2    want to put epoxy or something."  So -- because CDB

3    are the technical experts, but we are the end users,

4    so there may be aspects where we say, "No.  I don't

5    think you understand what we really need these for."

6    So, yeah, there is -- there is some, but it's not

7    necessarily the technicality of it so much as what our

8    end use is.

9         Q.   So as far as like safety code goes, though,

10   does IDOC determine any of that?  That would all be

11   drawn by a CDB and the engineers and whatever

12   architect they hire?

13        A.   Correct.

14        Q.   Who solicits the bids?  CDB or IDOC?

15        A.   CDB.

16        Q.   And CDB determines, then, who is awarded

17   that bid?

18        A.   Yes, they procure it.

19             MR. GRADY:  I have no further questions.

20             MS. LALLY:  Do you want me to ask --

21             MR. COLLINS:  I have one or two.

22                          FURTHER EXAMINATION

23   QUESTIONS BY MR. COLLINS:

24        Q.   We discussed earlier applicable codes,

25   standards, and CDB is required to follow those

Page 57

1  standards and codes?

2       A.   Yes.

3       Q.   And is bound by those standards and codes?

4       A.   Yes.

5       Q.   And IDOC is bound by those standards and

6  codes?

7       A.   I'd say that we are bound insomuch that we

8  have to live within the limits of the code, that if we

9  only have enough toilets and showers for X amount of

10 offenders, then we make the decision how many

11 offenders to put in, and we are beholden to that.

12      Q.   With your counsel, you discussed the chief

13 engineer and the maintenance crew at Vienna.  Do you

14 recall that?

15      A.   Yes.

16      Q.   Do you know how many maintenance staff

17 members Vienna has?

18      A.   No, sir, I don't.

19      Q.   Do you know how many Vienna is intended to

20 have?

21      A.   I don't know.  I don't know.

22      Q.   Do you know whether the number of staff in

23 maintenance Vienna actually has is, in fact, the

24 number that it's intended or planned to have?

25      A.   I don't know.

Page 58

1          MS. LALLY:  I think we're good.

2          MR. COLLINS:  I think we're good.  Thank you

3     very much again.

4          MR. GRADY:  We'll waive.

5          MR. COLLINS:  Could we get a draft or

6     preliminary.  I'm forgetting the term.  A rough.  The

7     rough and then an electronic of the final.

8          MR. GRADY:  One copy and whatever is

9     cheapest.

10                              (Signature waived.)

11          (The deposition concluded at 1:00 p.m.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 59

1                    CERTIFICATE OF REPORTER

2          I, Brenda Orsborn, a Certified Court

3     Reporter (MO CCR No. 914) and Certified Shorthand

4     Reporter (IL CSR No. 084-003460), do hereby certify

5     that the witness whose testimony appears in the

6     foregoing deposition was duly sworn by me; that the

7     testimony of said witness was taken by me to the best

8     of my ability and thereafter reduced to typewriting

9     under my direction; that I am neither counsel for,

10    related to, nor employed by any of the parties to the

11    action in which this deposition was taken, and

12    further, that I am not a relative or employee of any

13    attorney or counsel employed by the parties thereto,

14    nor financially or otherwise interested in the outcome

15    of the action.

16                              _Brenda S. Orsborn_

17

                              Brenda Orsborn

18

19

20

21

22

23

24

25

[& - answer]

Page 1

| & |
| --- |
| **&**   4:4 5:17 |

| 0 |
| --- |
| **00704**   1:7 3:7 |
| **084-003460**   4:22 |
| 59:4 |

| 1 |
| --- |
| **1**   2:9 7:20,21,23 |
| 35:5,20,22 36:3,12 |
| 36:13,21 |
| **1,107**   35:13 |
| **100**   4:23 |
| **11:15**   1:18 |
| **12**   31:8 |
| **13**   6:14 47:24 48:1 |
| **146**   3:18 |
| **163**   35:24 36:12 |
| **16th**   6:1 |
| **19**   12:9,15,18,21 |
| 13:3,14,18 14:2,6 |
| 14:22 15:5,15 |
| 16:3,9,19,21,22 |
| 19:13,15,20 20:1 |
| 21:5 22:8,23 |
| 23:14 25:5,22 |
| 26:4,9 27:2,5,8 |
| 28:13 29:14 30:24 |
| 33:6,25 35:8,10 |
| 37:19 42:1 46:21 |
| 47:23 50:16,22 |
| 51:25 |
| **1:00**   58:11 |
| **1a**   36:1 |
| **1b**   36:1,22 |
| **1st**   6:14 |

| 2 |
| --- |
| **2**   2:9 34:23,24 |
| 47:22 |
| **2011**   6:14 |

| |
| --- |
| **2012**   11:21 51:18 |
| **2013**   6:9,11 |
| **2016**   1:17 3:15 6:2 |
| 35:13 |
| **203-2987**   4:24 |
| **217**   4:17 |
| **25**   8:22 14:15 |
| 22:20 35:13 |
| **26th**   6:9,11 |
| **2800**   4:5 |

| 3 |
| --- |
| **30**   8:3 |
| **31**   1:17 28:19 |
| 48:25 |
| **312**   4:6 |
| **314**   4:24 |
| **31st**   3:14 |
| **330**   4:5 |
| **34**   2:9 |
| **39**   36:5 |
| **3:12**   1:7 3:7 |

| 4 |
| --- |
| **4**   8:6 36:24 |
| **400**   24:2 |
| **41**   36:1,3,6 |
| **42**   36:2,5,22,22 |
| **4413**   4:9 |
| **47**   36:25 |
| **48**   37:3,3,11 |
| **4th**   4:23 |

| 5 |
| --- |
| **5**   2:4 50:8 |
| **500**   4:16 |
| **504**   30:7 |
| **52**   2:5 |
| **550**   4:23 |
| **56**   2:6 |

| 6 |
| --- |
| **6**   8:3 |
| **6,000**   51:17,18 |
| **60611**   4:5 |
| **60640**   4:10 |
| **62706**   4:16 |
| **62995**   3:19 |
| **63102**   4:23 |
| **6695**   3:18 |

| 7 |
| --- |
| **7**   2:9 |
| **769-1411**   4:10 |
| **773**   4:10 |
| **782-9056**   4:17 |

| 8 |
| --- |
| **876-7700**   4:6 |

| 9 |
| --- |
| **914**   4:21 59:3 |
| **95**   50:6,7,9 51:5 |

| a |
| --- |
| **a.m.**   1:18 |
| **ability**   12:2 24:12 |
| 30:20 48:11 59:8 |
| **able**   10:9,9 20:10 |
| 40:11 |
| **abruptly**   51:20 |
| **absolutely**   52:3 |
| **abstract**   9:19 |
| **accommodate** |
| 16:8 |
| **accurate**   35:15 |
| **act**   21:17 |
| **action**   59:11,15 |
| **activities**   53:3 |
| **actual**   33:11 35:3 |
| 54:11 55:3,16 |
| **add**   10:19 22:15 |
| 23:8 |

| |
| --- |
| **addition**   23:7 |
| **additional**   10:20 |
| **address**   28:13 |
| **adjusted**   10:20 |
| **adjustments**   14:16 |
| **administration** |
| 14:13 |
| **administrators** |
| 10:23 |
| **adverse**   42:25 |
| **adversely**   51:20 |
| **affect**   20:6 51:12 |
| **affidavit**   39:12 |
| 53:13 |
| **affidavits**   54:2 |
| **afraid**   18:25 |
| **age**   5:9 9:25 |
| **agencies**   18:19 |
| **agency**   10:8,23 |
| 13:6 18:13,15 |
| 21:22 28:18 30:9 |
| 45:3 |
| **ago**   13:5,6 49:2,3 |
| **agreed**   5:1 |
| **ahead**   23:5 |
| **air**   25:11,12 |
| **al**   3:23,24 |
| **alan**   4:8,11 |
| **alike**   9:3 13:9 |
| **allow**   16:18 |
| **altercation**   32:9 |
| **altered**   11:24 |
| **amending**   30:4 |
| **amendments**   30:8 |
| **amount**   33:12 |
| 57:9 |
| **ancillary**   30:5 |
| **answer**   7:8,17 |
| 24:18 25:25 34:3 |
| 41:11 42:17 55:20 |

**[anybody - buildings]**

anybody 42:15
anyone's 51:21
anyway 18:7
appealing 13:10
appears 35:2 59:5
applicable 21:19
  45:9 56:24
application 29:8
apply 21:24 36:8
appreciate 34:12
appropriate 16:14
  16:16 53:11
appropriately
  18:2
approval 54:11
approved 54:16
approves 54:19
  55:4
approximate 13:5
  24:2
architect 10:22
  56:12
architects 9:25
  10:16 18:16 21:15
  54:19,24 55:1
area 16:14 17:11
  17:24 29:23 31:9
  31:12,21 32:2,15
  33:14 34:3 38:6
  40:2,12,12 45:22
areas 13:10 20:8
  26:4,9 27:2,5
  33:25 38:24 39:21
  40:1 46:10,21
  47:7 50:15 51:25
aside 49:18,19
  50:15
asked 24:10
aspects 56:4
assessment 54:7

asset 18:8
assign 28:5
assigned 19:15
assistance 18:14
assume 7:8 12:24
  23:11 36:16,20,21
  40:8 42:2 44:12
assuming 46:3
atchison 1:15 3:14
  5:3,8,21
atg.state.il.us 4:17
attached 2:12
attest 46:5
attesting 54:2
attorney 4:15
  59:13
avenue 4:5
avoided 38:15
awarded 56:16
aware 15:9 26:6
  33:3 45:17,21

**b**

b 2:8 8:3 36:5
back 21:4 38:16
  48:8
backfill 16:15
baggott 42:12,12
  42:13
based 26:13 50:3
  51:9
basic 48:21
basically 27:4
basis 53:2
bathroom 20:5
  21:25 40:16 41:6
  41:8,24 42:3
  45:12,13
bathrooms 19:16
  20:24 21:2,3,6
  23:20,24

bed 12:25 32:24
  48:16 49:1,7,9,17
  50:5
beds 10:11 12:5
  13:2,20,25 16:4,17
  18:3 24:3 29:16
  30:17 31:8 32:21
  33:6,14,19,24
  36:15,17 37:11
  46:9,15,16 48:2,13
  49:4,7,22 50:12,21
  51:2
beginning 48:9
behalf 1:4,16 3:4
  5:10 8:13
beholden 19:8
  57:11
believe 8:10 11:22
  11:23 15:14 20:16
  21:7,14 22:10,13
  22:20 23:25 24:16
  25:10 28:16 29:23
  30:14 31:7 40:17
  40:18 42:2 43:12
  44:21 54:25
believing 50:24
benefit 14:17,18
benton 1:2 3:2,23
best 6:22,23,25
  13:8 14:18 24:23
  32:13 49:14 55:9
  59:7
bet 37:5,6
better 17:25
beyond 15:7 52:5
bible 26:16
bid 56:17
bids 56:14
big 24:22 30:3
  48:5

biggest 41:15
bird 28:21
bit 28:20 36:23
  39:8 54:9
board 18:15 27:22
  28:6,8 54:8,10
bob 15:4
boil 43:17,21
bound 57:3,5,7
bowen 15:4
boyd 1:3 3:3,23
break 7:14,15,17
  47:18,19
brenda 3:19 4:21
  5:4 59:2,17
bring 44:23 49:16
broken 28:21
brown 44:5
bucket 18:1
budget 18:23 40:9
budgetary 40:8,12
build 51:6
builders 10:1
building 12:9,15
  12:18,21 13:3,14
  13:18 14:2,6,21
  15:5,15 16:3,9,21
  16:22 18:7,13
  19:13,15,20 20:1
  21:5,9,12 22:8,23
  23:13 24:8 25:4
  25:22 26:4,9 27:2
  27:5,8 28:13,18,21
  29:14 30:24 33:6
  33:25 35:8,10
  37:19 42:1 45:20
  45:24,25 46:21
  47:23 50:16,22
  51:25
buildings 10:18,19
  10:21 12:3 29:4

[built - conversations]

Page 3

built 10:21
bunk 31:9,11,21
32:2,15 33:14
34:3
bunks 32:11

c

c 4:1,3 36:5
call 42:19,20 43:1
43:19
called 30:6
camp 16:11
camps 16:17
cap 50:9
capacities 1:11
3:11 11:23 48:14
50:7
capacity 8:2,12
9:17,22 10:4,7,9
10:13,14,20 11:1,5
11:5,8,19 12:21,25
13:5 21:7,8 31:5
31:19 33:11,18
34:20 36:22 48:10
48:13,16,17,19,19
48:19,20,22 50:21
50:24
capital 18:6,9,11
18:14,18 19:12,13
21:21 25:15,23
26:25 27:22 28:6
28:8 38:21 40:22
40:24 41:5 42:9
45:15 47:12 53:9
53:11,21,22 54:5,7
54:10,12,15 55:7
carpeting 56:1
case 1:7 3:7 10:11
17:9 23:6 24:14
24:15 25:25
cases 55:23

catastrophic 17:10
17:13
catch 18:1
cause 3:21
caves 53:25
ccr 4:21,21 59:3
cdb 18:22 22:1
54:10,10,16,18,24
55:4 56:2,11,14,15
56:16,25
cdb's 22:1
cell 31:8 36:19
49:8,10 50:25,25
51:4
celled 49:6
cells 12:14,18
13:24 31:7 39:17
46:7 48:2 49:4
51:1,2
center 1:10 3:10
3:18 4:9 6:12 8:1
8:20 9:15 11:20
35:7 43:20 46:14
46:24 52:23
center's 11:1
certain 3:21 12:3
20:8
certificate 59:1
certified 3:19 5:5
5:19 29:8 59:2,3
certify 59:4
cetera 21:11 36:2
chain 43:16
change 18:21
55:25
changed 11:20
32:14
characterize 17:15
cheapest 58:9
check 12:23 21:19
42:6 43:24

chicago 4:5,10
5:17
chief 5:22,22,24
6:5,8 7:22 8:19,21
9:14 14:23 15:3
27:20 28:4 34:24
42:7,8,10,17,19,21
42:24 43:15,18
44:9 52:19 53:20
53:23 54:1 57:12
circle 48:8
cite 28:1
cited 22:3
city 45:2
civil 8:3
class 5:18
classifications
32:24
classified 33:6,10
clear 6:25 7:3
29:13 45:5 52:18
closed 50:15
code 21:18,19
37:25 56:9 57:8
codes 21:9,9,12,13
21:14,24 22:4,8
24:8 41:25 42:4
56:24 57:1,3,6
collins 2:4,6,12 4:3
5:13,16 7:19,22
34:7,10,14 41:11
47:17,20 52:10
55:20 56:21,23
58:2,5
color 55:24,25
come 43:22 55:23
comfortable 50:23
coming 29:4 55:12
company 29:5
compares 10:14
11:5

comparing 13:4
complaint 44:7,14
44:17,18
complaints 44:4
44:13
complete 53:3
completed 39:1
completely 50:4
51:1
complicated 55:21
composition 8:25
44:11
computer 12:4
32:20
concept 26:20
concerns 49:25,25
concluded 58:11
concrete 27:1,4
conditions 28:19
conduct 53:2
confident 9:20
14:15
connection 42:1
consider 49:21
considered 26:15
consistent 25:13
constantly 45:23
construction
45:24
consulting 27:21
28:6
contact 21:21 42:7
42:25
context 47:1,5
contract 29:5,7
control 9:2 28:12
28:14,23
controls 29:9
conversations
38:22

[copy - dormitory]

| | | | |
|---|---|---|---|
| **copy** 7:23 58:8 | **cv** 1:7 3:7 | **deployment** 9:1 | **different** 16:21 |
| **correct** 9:7 12:11 | **d** | **depopulate** 14:5 | 28:20 44:16 48:20 |
| 12:13 13:19 14:3 | | 14:21 15:5 | **difficult** 31:16 |
| 17:2 20:2 23:16 | **d** 2:1,8 36:6 | **depopulated** 13:3 | **direction** 59:9 |
| 23:19 25:21 31:3 | **daily** 13:4 53:5 | 15:16 17:2 | **directly** 33:12 |
| 31:23,25 33:23 | **damaged** 17:11 | **depopulation** | 42:15,18 |
| 34:2,5 35:25 | **darn** 19:3 | 16:18 | **director** 1:8 3:8 |
| 39:23 40:14 44:2 | **darren** 42:12,12 | **deposed** 6:16 | 7:25 14:24,25,25 |
| 47:6,10 52:20,21 | **date** 35:16 48:3 | **deposes** 5:10 | 42:23 43:19 |
| 55:5 56:13 | **davis** 1:10 3:10 | **deposition** 1:15,18 | **disaster** 17:14 |
| **correctional** 1:10 | **day** 3:15,17 38:25 | 2:9 3:13 5:3 7:24 | **discipline** 30:6,11 |
| 3:10,17 6:12 8:1 | 39:21 40:2,11 | 7:24 9:11 52:12 | **discoloration** |
| 8:20,23 9:15 | 53:2,2,17,17 | 58:11 59:6,11 | 44:18 |
| 10:25 11:20 35:7 | **deal** 43:2 | **deputy** 5:21 6:5,7 | **discolored** 44:7 |
| 43:20 46:14,24 | **dealing** 32:10,11 | 42:23,24 43:19 | **discretion** 30:9 |
| 52:23 | **december** 6:14 | **deservedly** 19:5 | **discuss** 6:21 28:5 |
| **corrections** 1:9 | 55:14 | **design** 9:17,22 | **discussed** 51:22 |
| 3:9 5:23 8:1,13,14 | **decided** 31:15 | 10:14,18,19 11:5 | 56:24 57:12 |
| **counsel** 5:2,2 | 32:14 | 48:19 55:7 | **discussing** 18:20 |
| 57:12 59:9,13 | **deciding** 20:19 | **designation** 38:7 | 26:18 |
| **counter** 32:6 | **decision** 14:5,9,21 | **designed** 9:15 | **discussion** 14:23 |
| **country** 43:9 | 15:5 57:10 | 34:18 | **discussions** 15:8 |
| **couple** 30:1 36:24 | **decline** 14:11 | **designers** 10:1,16 | **dispelled** 44:14 |
| 47:20 | **decrease** 37:16 | **designs** 54:20 | **distinct** 53:8 |
| **course** 15:19 | **defendant** 5:10 | **desk** 38:25 | **distinguish** 31:17 |
| 30:23 51:19 | 7:25 | **determine** 28:2 | **distinguishing** |
| **court** 1:2 2:12 3:1 | **defendants** 1:12 | 56:10 | 12:21 |
| 3:22 4:20 5:5 6:20 | 3:12,25 4:14 5:3 | **determined** 11:8 | **district** 1:1,1 3:1,1 |
| 6:24 59:2 | **deferred** 39:7,9 | **determines** 56:16 | 3:22,22 |
| **crew** 57:13 | **define** 7:3 13:19 | **determining** 26:11 | **division** 1:2 3:2,23 |
| **crisis** 18:2 | 49:22 | **developing** 53:21 | **document** 15:11 |
| **csr** 4:21,22 59:4 | **defined** 49:19 | **development** | 15:14 34:25 35:2 |
| **current** 11:1,4 | **deliberate** 16:18 | 18:15 27:22 28:6 | **documentation** |
| 27:4 38:17 45:19 | **department** 1:9 | 28:8 42:9 54:8,10 | 53:12 |
| **currently** 26:12 | 3:9 5:23 7:25 8:12 | **dgrady** 4:17 | **documented** 40:20 |
| 33:7 34:21 35:6 | 8:13 26:18 30:7 | **diet** 40:11 | 41:1 |
| 37:3 42:3,10 | 41:16 45:7 | **dietary** 45:18,20 | **documents** 34:6 |
| 46:11 | **department's** | 46:1 | **doing** 47:4 |
| **cushion** 50:3 | 26:10 | **difference** 10:21 | **dormitory** 14:19 |
| **custody** 9:2 33:4 | **dependent** 51:15 | 24:22 50:4 | 32:7 |
| 51:17 | **depending** 44:25 | | |

[doubt - floor]

doubt 21:2
draft 58:5
dramatic 43:16
drawn 56:11
drinkability 43:4
  44:1
drinkable 43:17
drinking 43:8,10
  44:5,7,8,12,19
  45:8
dripping 18:1
driving 22:5
dubbed 9:22
due 18:4 40:12
  49:1
duly 59:6
dylan 4:15

**e**

e 2:1,1,8,8 3:18 4:1
  4:1 15:7
earlier 11:11
  32:20 42:1 51:22
  52:2 56:24
easiest 34:7
economically 37:8
educational 11:17
edwin 15:4
effect 15:10 16:13
  18:5 30:14
effective 26:12,14
efficient 15:25
  34:11
either 28:5 29:7
  32:4 39:21
elbow 13:7
elbows 13:7
electrical 39:3
  41:18
electronic 58:7
eliminating 13:10

emergencies 23:22
  30:21
emergency 17:9
  17:12,20,22,23
  20:20 23:6 24:14
  24:15 25:20 26:1
  26:5 27:10 28:10
  28:15 31:2,18,22
  47:1,8
emphatically
  18:25
employ 26:12
employed 59:10
  59:13
employee 59:12
empty 16:4 27:6
  48:13 51:1
engineer 27:20
  28:4 42:7,8,10,17
  42:19,21 43:15,18
  44:10 52:20 53:20
  53:23 54:1 57:13
engineers 18:17
  54:22,25 56:11
enjoyed 38:16
entire 25:11 50:12
  50:12
entirety 21:17
epoxy 56:2
equals 36:1,1
  37:21 38:9 47:23
equipment 45:23
especially 30:14
essentially 8:22
  50:16
et 3:23,24 21:11
  36:2
evaluation 18:17
evening 3:16
event 17:10,13

eventually 54:7
everyday 41:17
evidence 26:13
evolve 18:21
exact 24:5
exactly 19:22 20:4
  21:16 22:3 25:3
examination 5:12
  8:8 9:12 52:15
  56:22
examined 3:14 5:9
example 36:11
exhibit 2:9,9 7:20
  7:21,23 34:23,24
  37:19 47:22
exhibits 2:12
exist 24:16
existing 8:22 16:5
  27:21
exists 25:1
experience 51:9
experts 56:3
explains 6:5
expressly 5:7
extra 49:21

**f**

f 2:1,8
facilities 8:23,24
  9:5 10:19 16:7
  21:25 22:20 29:2
  40:16 41:6,8,20,24
  42:4 45:12,13
  52:5,18
facility 9:25 10:2,8
  10:16,23 11:12
  16:12 18:3 30:15
  39:6 45:19 46:2
  50:13
facility's 45:1
fact 52:9 57:23

factors 11:7,10
fair 7:9 17:15
  22:22 30:24
fall 9:6
familiar 10:3 33:2
  48:14
far 39:21 56:9
fashion 43:22
february 55:14
federal 8:2
feels 47:14
fences 29:4
fewer 51:17
filed 11:21
filing 53:11
fill 49:7
filled 16:17 48:16
  48:17,25 49:17
  50:4,5
filtration 45:2
final 40:23 58:7
financially 59:14
financing 54:11
find 50:25 51:1
finding 27:17
finished 40:6
first 12:12,14
  13:25 15:23 22:2
  31:4,11,21 32:15
  33:15 34:4 35:19
  38:17 39:16 46:7
  46:16,22 47:21,23
five 47:18 49:2
  50:11
fix 20:11
flies 48:8
flood 17:14
flooded 48:20
floor 12:12,14
  13:21,25 15:23,23
  16:24 17:5,19

[floor - illinois]                                                                                Page 6

22:16,19,24,24,25
23:2,3,8,10,13,24
24:11,11,13,18
29:11,14 30:19,23
31:1,4,11,21 32:15
33:15,19 34:4
35:9 46:8,16,22,22
47:23
**floors**   47:2 49:3
**flush**   41:14
**fly**   28:22
**follow**   56:25
**follows**   53:15
**force**   22:5
**forced**   49:1
**foregoing**   59:6
**foreign**   44:7,8
49:15
**forenoon**   3:16
**forgetting**   58:6
**form**   9:19 30:11
43:22
**formal**   15:7
**formalized**   15:6
**formerly**   33:5
**forms**   53:13
**formulated**   10:15
**four**   15:19 23:16
49:2
**frame**   15:21
**freedom**   36:19
**full**   37:7
**funding**   18:23,24
19:8 20:10 39:15
**further**   2:6 56:19
56:22 59:12

**g**

**general**   4:15 13:13
13:18,22 14:6
15:21 16:25 21:4
22:19 23:22 24:13

24:25 25:19 26:4
26:8 27:5 28:9,14
29:24 33:3,5,25
46:9 50:17 51:24
52:17,22 53:16
**generally**   51:23
**getting**   30:12
48:15
**give**   26:24 51:18
**glad**   38:14
**go**   6:18 11:7 16:3
18:18 22:2,12,25
23:5,13 27:17
38:4 42:18 43:18
50:10 51:8 53:13
54:4
**goals**   14:12
**godinez**   1:8 3:8,24
**goes**   28:22 54:3
56:9
**going**   7:11,19
15:12 18:5 22:3
34:24 43:1 47:4
55:22
**good**   5:14,15 58:1
58:2
**gosh**   19:3
**gotcha**   23:1
**govern**   30:5
**governor**   14:13
**governor's**   18:22
**grady**   2:5 4:15
34:9 41:10 52:16
55:21 56:19 58:4
58:8
**great**   7:13
**greater**   20:20
**grid**   39:3
**grievance**   30:6
**ground**   6:18 13:21

**growth**   49:2
**guess**   19:3 53:21
55:4
**guys**   51:3
**gym**   49:3
**gymnasium**   47:2

**h**

**h**   2:8
**h.u.**   35:20
**hand**   34:24
**handing**   7:22
**handlers**   25:11
**happen**   15:13
**hard**   24:20
**harm**   51:3
**hcu**   38:8,11
**head**   11:3 34:9
**health**   44:10,21,22
45:6,7
**healthcare**   38:12
**heard**   44:6
**held**   23:18
**help**   12:20
**high**   20:9,21
**hire**   55:3 56:12
**hires**   54:19
**hold**   6:7 34:18
36:13 37:3,6
48:23,23
**holder**   38:1
**holds**   48:2
**hours**   3:15
**house**   9:15 12:17
13:12,17 14:2
17:20 21:2,4,8
23:21 24:12,25
26:4 27:9 28:9,14
29:18,22 30:20,25
37:14 46:13,25
47:7

**housed**   25:19 35:6
46:11 47:2
**housing**   2:9 12:4
12:15 16:5 17:16
20:25 21:12 31:24
34:15,15,17,21
35:3,7,9,10,19,22
36:2,9,11,13,21,24
37:3,12 38:16,18
39:17 40:16 41:7
41:9,21,24,25 42:4
43:3,11 45:12,14
46:6,15,20 50:17
**huh**   23:15
**humans**   28:17
**hundred**   23:18
48:12
**hundreds**   16:10
18:3
**hvac**   25:4

**i**

**ideal**   48:19 49:21
49:22 50:18 52:6
**identify**   53:24
**idoc**   11:14 12:14
12:17,22 13:12,17
15:1 17:4,7 18:14
23:21 24:12,25
26:3 29:15 32:1
32:14 37:13 40:10
46:13,24 47:13
51:24 55:6,12,16
56:10,14 57:5
**idoc's**   14:1 30:19
30:25 31:20 33:24
45:8 47:6
**iii**   4:3
**il**   59:4
**illinois**   1:1,9 3:1,9
3:18,20,22 4:5,10
4:16,22 7:25 45:7

51:11 52:5 54:12
55:13
**immediately** 39:15
**importance** 19:1
**impress** 18:25
**improve** 26:19
**improvement**
54:16
**improvements**
22:12 23:23 24:1
32:16 38:18 40:15
41:8,19 45:14,20
52:1
**improving** 45:24
**incarceration**
14:14
**incident** 43:20
**include** 9:8 11:10
**includes** 8:24 13:9
**including** 35:7,8
**incorrectly** 10:7
**increase** 21:7
22:10 51:12,24
**increased** 24:2
51:16
**infirmary** 13:20
14:1,7 46:9,15,23
**information** 21:17
42:20 43:1
**informed** 39:23
53:17
**initial** 18:17
**initiative** 29:25
30:2
**inmate** 32:24
51:11,23
**inmates** 9:14
12:15,18 13:13,18
13:22 14:2 16:2
17:5,7,20 21:4
22:23,25 23:18,21

24:12,25 25:19
26:5 27:9 28:9,16
29:18,22 30:20,25
34:17 35:6,24
36:3,12,13 37:4,14
44:5 46:10,13,25
47:2,7 49:20 52:6
52:7
**input** 55:6,16
**insects** 29:6
**inside** 29:4
**insomuch** 57:7
**instance** 51:16
55:10
**instances** 36:18
**institution** 48:11
**intended** 57:19,24
**intends** 12:22
**intent** 13:6,12,17
14:1 30:25 31:20
37:13 45:8 46:18
47:7
**interested** 59:14
**interplay** 55:19
**introduce** 5:20
**involved** 16:1
44:11 54:6
**issue** 43:16
**issues** 40:13
**ixna** 48:6

| j |
| --- |

**j.b.** 1:3 3:3
**january** 6:9,11
**jobs** 55:3
**june** 14:8 15:20
**justice** 26:17,21

| k |
| --- |

**kathleen** 4:3
**kathleen.lally** 4:7

**keep** 48:11
**keeping** 41:15,16
**kendrick** 1:3 3:3
**kind** 53:15
**knees** 17:25
**knew** 16:16
**know** 7:1,15 9:14
9:17,19 10:13,25
11:2,4,7,19 12:1,2
12:6 15:8 18:12
20:4,7,12,12,13,13
21:8,12,15 22:3,7
22:17,18,22 23:8
23:11,21 24:4
25:9 26:17 27:14
27:17,20,23 28:1
29:21 31:5 33:5
33:16 34:17,20
35:15,17 36:11,15
36:25 37:2,24
39:2,6 40:4,4
41:22,23 42:3,5,19
43:7,10 44:3,4
45:25 48:1,17
49:11 50:10,18
51:5,6 55:1,19
57:16,19,21,21,22
57:25
**knowing** 14:12
36:14
**knowledge** 41:7
41:10 48:6

| l |
| --- |

**lack** 40:9
**lally** 4:3 56:20
58:1
**large** 25:14 30:16
30:16 45:21
**late** 15:20
**latham** 4:4 5:17

**latin** 48:8
**law** 4:9
**lawful** 5:9
**lawsuit** 11:21
**lawyer** 5:17
**layman's** 18:11
**leaking** 20:8
**learned** 42:25
**leave** 27:5 49:7
**leaves** 50:7
**lee** 1:3 3:3
**left** 6:15
**legal** 4:22
**legged** 28:17
**legislative** 18:24
**level** 11:12 30:15
44:16
**life** 21:14 26:19
**light** 55:24
**liked** 32:4
**limbo** 38:6
**limits** 30:10 57:8
**line** 35:19 37:21
**list** 18:18 19:4
20:9,21 38:21
46:4
**listed** 33:22 34:1
**lists** 18:21 35:12
36:1
**little** 28:20 36:23
54:9
**live** 14:19 57:8
**living** 14:19 38:24
**llp** 4:4
**location** 13:23
46:14
**long** 5:24 6:7,13
18:4 32:18
**longer** 12:3,5
33:10,11 34:1
37:1

[look - offenders]                                                                     Page 8

**look**  35:5 37:18
   47:21
**looked**  33:9
**looking**  36:11 37:6
   50:16
**loop**  39:4
**lose**  18:3
**loss**  25:13
**lot**  16:8 51:19
**lots**  37:8
**louis**  4:23
**lower**  30:15 50:22
   50:23
**lw.com**  4:6,7,7

**m**

**m**  2:1
**mail**  15:7
**main**  22:13
**maintenance**  9:5,8
   17:19 32:16 39:7
   39:10 41:16,17
   52:17,22,25 53:3,5
   53:8,10,17,20
   57:13,16,23
**major**  18:12,13
   54:15
**making**  13:9 26:16
**manage**  18:2 32:9
**managed**  12:2
**management**
   18:22 29:3
**march**  6:1
**marginally**  50:23
   51:14
**mark**  7:19,20
**marked**  7:21,23
   34:23
**material**  20:16,17
   45:23
**matter**  19:1

**mean**  10:6 14:18
   14:25 17:12 24:20
   28:25 33:22 35:22
   36:2 39:9 47:4
   48:12
**meaning**  13:1 40:2
   46:21
**means**  9:18 37:25
   49:13,17
**medium**  16:7
**meet**  22:8 24:5
   27:24 28:7 41:25
   42:4 43:4
**meetings**  15:8
**meets**  43:11 45:9
**members**  57:17
**menard**  6:12,13
**mentality**  30:13
**mentioned**  15:9
   18:9 19:11 20:23
   32:20 52:19
**michael**  1:3,15 3:3
   3:13,23 5:3,8,21
**mid**  11:21
**middle**  30:3 47:23
**midstream**  40:5,7
**mills**  4:8
**mind**  10:1,22,22
   10:23 49:13
**minimal**  55:9
**minimum**  16:7,7
   16:12 36:17
**minute**  47:18
**mission**  11:11
**missouri**  4:21,23
**mistake**  13:16
**mixed**  48:15
**mo**  59:3
**months**  6:14 13:5
   13:6

**morning**  5:14,15
**move**  10:11 15:11
   15:13 16:14 17:10
   19:4 38:3,4
**moved**  20:17 38:5
**movement**  9:2
   36:20
**moves**  15:10,24
   16:18 22:5
**moving**  15:13,13
   27:21 38:2,2
**mrj**  1:7 3:7
**multiple**  18:19
   38:5

**n**

**n**  2:1,1,1,8 4:1
**name**  5:21
**natural**  17:14
**necessarily**  26:14
   49:6 53:16 56:7
**necessary**  32:13
   42:8
**need**  7:14 14:1
   17:18 18:18 20:6
   21:5 22:7,15 23:1
   23:3,23 25:18
   26:3,24,24 27:9,10
   28:7,13 30:16
   32:17 36:18 39:1
   39:14 41:25 43:4
   45:14 46:2 49:6
   52:1 53:12,25
   54:2 55:25,25
   56:5
**needed**  18:18 41:8
   41:20 51:24
**needs**  27:12 47:14
**neither**  59:9
**never**  28:17,20
   32:3 44:14 48:24
   48:24,25 49:16

**new**  39:18
**nine**  3:15
**ninety**  50:11
**nodding**  34:9
**normal**  49:4
**normally**  54:19
**north**  4:5,9
**notice**  2:9 7:24
**number**  13:2 19:4
   21:25 22:11,14
   23:9 24:2,4 30:16
   35:6,12,15 36:12
   36:15 37:13 48:1
   49:20 50:6,12,19
   50:20 52:6 57:22
   57:24
**numbers**  29:25
   31:14,19 37:6

**o**

**o**  2:1,1,8 37:24
**o'clock**  3:16,16
**oath**  7:5
**objection**  41:10
**objective**  14:12
**objects**  44:8
**obviously**  6:20
**occupy**  24:6
**occurrence**  53:5
**october**  1:17 3:15
   35:13
**odor**  44:9
**offender**  8:24 9:1
   38:2,3,4,4 48:4
   49:5,5
**offenders**  9:3
   11:14 14:18 16:9
   16:14,16 17:10
   21:1,2,10 24:3
   26:19 32:10,12
   35:13 38:24 49:3
   51:17 57:10,11

[offhand - professionals]

| | | | |
|---|---|---|---|
| **offhand** 9:16 | **ou** 37:21,23 38:4 | **persons** 15:9 | 28:9,15 29:24 |
| **office** 4:15 18:22 | 38:14 | **pest** 28:12,14,23 | 33:4,6,25 35:3 |
| **officer** 40:2,12 | **outcome** 59:14 | 29:9 | 37:16 49:2 50:3 |
| **officer's** 38:25 | **overall** 11:14,14 | **physically** 40:3 | 50:17 51:11,23,25 |
| **officers** 39:22 | 14:11 37:15 | **pig** 48:8 | **position** 6:4,7,10 |
| **offices** 3:17 | **oversee** 8:21,25 | **place** 10:12 26:13 | **possible** 49:19 |
| **official** 1:11 3:11 | 9:1 42:15 | 38:1,7,13 | **possibly** 15:21 |
| 8:2,12 | **oversees** 52:22 | **placement** 16:12 | 16:11 43:19 |
| **offline** 31:10,12,16 | 54:10 | 16:12 | **potential** 26:15,21 |
| **okay** 7:14 13:24 | **oversight** 45:3 | **places** 46:10,23 | **practice** 32:13 |
| 16:23 31:4,20 | **p** | **plaintiff's** 7:24 | **preferred** 49:21 |
| 35:5 38:8,13 | **p** 1:15 3:13 4:1,1,3 | **plaintiffs** 1:6,16 | 49:22 50:19 52:6 |
| 41:12 44:14 | 4:15 5:3,8,21 | 3:6,24 4:2 5:2,18 | **preliminary** 58:6 |
| **one's** 17:2 | **p.m.** 58:11 | **plan** 15:10 25:23 | **premise** 32:6 |
| **ones** 33:2 36:23 | **packing** 37:7 | 27:4 30:25 31:20 | **prepare** 9:11 |
| 39:2,5 47:8 | **padding** 51:6 | 32:14 33:24 47:6 | **prepared** 8:16 |
| **ongoing** 30:1 | **page** 2:3 6:19 8:6 | 54:15 55:8 | **preserve** 18:8 |
| 41:13 | **paint** 55:25 | **planned** 19:18,22 | **pretty** 51:19 |
| **open** 10:11 49:4 | **part** 21:15 23:12 | 20:21 40:15 57:24 | **previously** 35:2 |
| **operate** 10:10 | 25:24 28:16 37:18 | **planners** 51:7 | **primarily** 20:3 |
| 49:14,14 51:9 | 40:4,19 | **plans** 12:17 17:4 | **principals** 19:1 |
| **operating** 28:24 | **particular** 10:1 | 25:4 26:8 27:1 | **prior** 30:7 |
| 28:25 | 18:3 35:2 37:7 | 29:15,18 37:13 | **priority** 18:21 |
| **operational** 10:4,7 | **parties** 59:10,13 | 38:17 45:19 46:13 | 19:3 20:9 |
| 10:13 11:1,4,8,19 | **parts** 15:13 30:5 | 54:11,19 55:4 | **prison** 52:4 |
| 12:21 13:1,4 | 41:13 | **play** 49:16 53:20 | **probably** 15:10 |
| 34:20 48:10,15,18 | **paul** 1:3 3:3 | **plead** 49:10 | 16:7 22:1,2,3 |
| 49:12,17 | **pearson** 1:3 3:3 | **please** 7:1 8:6 | 24:25 25:10 27:19 |
| **operations** 5:22,25 | **pending** 3:21 7:17 | **plumbing** 21:9 | 31:13 39:5,5 |
| 6:5 8:19,21,22 | **people** 16:10 | 27:11,12,15,24,25 | 42:19 46:3 51:7 |
| **opinion** 10:15 | 17:24 22:14 35:18 | 28:2,7 41:13,17,20 | **procedure** 8:3 |
| **opportunities** | 43:2 | **point** 19:6 20:18 | 28:24 29:1 |
| 11:13,16 26:18 | **people's** 4:9 | 27:1 | **procedures** 30:6 |
| **order** 23:21 28:9 | **percent** 14:15 | **population** 2:9 | **process** 26:10 30:4 |
| 28:14 43:17,21 | 48:12 50:6,7,8,9 | 8:25 10:11,24 | 38:2 44:19,20,24 |
| 51:22 | 50:11 51:5 | 11:13,14,22 13:8 | **processes** 44:9 |
| **original** 2:12 9:21 | **perfect** 39:11 | 13:13,18,22 14:6 | **procure** 56:18 |
| 10:18 | **period** 14:20 | 14:10,11,14 16:25 | **produce** 34:5 |
| **originally** 34:18 | **permanently** 24:6 | 21:5 22:19 23:22 | **produced** 3:14 5:9 |
| **orsborn** 3:19 4:21 | **person** 14:20 | 24:13 25:1,19 | **professionals** 55:2 |
| 5:4 59:2,17 | 36:19 51:2 | 26:4,9,20 27:5 | |

[programmatic - reviewing]                                                    Page 10

**programmatic**
  11:12,16
**programming**
  26:16
**programs** 21:21
  26:11,12,13,23
  27:2 54:5
**progression** 53:24
**project** 19:2,2,14
  20:4,15 23:12
  25:6,8,23 26:25
  27:21 39:12 40:5
  40:22,24 41:5
  42:9 45:15 53:11
  53:22,25 54:12
  55:11
**projects** 18:6,9,11
  18:13,18 19:12,13
  19:17,23 22:4
  25:15 26:22 38:23
  39:1 40:19,20,25
  47:12,13 53:9,21
  55:22
**proper** 16:6 24:3
**properly** 37:9
**protective** 33:4
**proud** 52:9
**provided** 48:4
**providing** 53:12
**public** 44:10,21,22
  45:6,7
**punt** 49:11
**purpose** 49:10
**purposes** 5:19
  17:21 30:21 31:1
  31:22 47:9
**pursuant** 8:2
  55:22
**put** 17:4,7 18:1,5
  38:14 48:6 49:3,5
  55:13 56:1,2

57:11
**putting** 26:13 47:1
  49:18,19 50:15

**q**

**qualify** 11:24
**quality** 26:19
**question** 7:8,9,16
  24:10 28:12 30:3
  30:18 37:10
**questions** 2:4,5,6
  5:13 6:25 7:2,7,11
  12:7 27:8 47:21
  52:11,16 56:19,23
**quite** 39:5,8

**r**

**r** 4:1
**randy** 1:9 3:9
**ranks** 55:2
**rare** 36:18
**rate** 14:14
**rating** 48:19
**ratios** 24:5
**real** 38:7,13
**realistic** 50:9
**really** 16:8 18:12
  20:6 49:16 50:9
  50:10 56:5
**reason** 32:1 40:10
**recall** 15:22 20:18
  20:18,25 22:17
  25:6,8,9 27:12,13
  40:17 48:18 57:14
**recidivism** 37:16
**recognize** 34:25
  35:1
**recognizing** 32:3
**recollect** 48:21
  50:6
**recollecting** 9:13
  10:8

**record** 5:16,20
  21:22
**reduce** 14:13,14
  29:25 37:16
**reduced** 11:23
  12:25 13:1 31:14
  33:12 50:21 59:8
**reducing** 30:10
**refer** 21:15 42:9
  45:5
**referred** 19:17
  44:19
**referring** 18:10
  19:12 21:13 22:9
  24:7 45:6
**regardless** 9:24
  10:17,17 41:5
**relate** 49:24 50:1
**related** 44:18
  59:10
**relates** 48:10
**relative** 59:12
**reliance** 30:10
**reliant** 35:17
**removed** 16:2
**renovate** 21:1,3
**renovation** 9:9
**renovations** 18:12
  20:5
**repair** 17:19 46:2
**repairs** 9:8 32:16
  38:18 40:15 41:7
  41:20 45:13,19
  47:12,13 52:1
**repeat** 30:22
**repeating** 11:11
**rephrase** 7:2
**replace** 20:11 26:1
  26:14 40:1,11
**replaced** 39:18,21

**replacement** 39:4
**replacing** 41:13,14
  41:14 45:23,23
**report** 13:4 42:13
  42:14,22,24 43:22
**reportable** 43:20
**reporter** 2:12 3:20
  4:20 5:5 6:20,24
  59:1,3,4
**reports** 44:5
**represent** 5:18
**representative**
  55:12
**request** 40:23
**requested** 40:25
  41:6
**require** 18:13
**required** 26:1
  56:25
**requirements**
  27:14,18
**requires** 18:23,23
**researchers** 51:7
**reservation** 17:16
  30:20
**reserve** 17:7 24:12
  47:5
**reserves** 46:24
**resolve** 14:16
  37:15
**responsibilities**
  8:20
**responsibility** 9:4
**restorative** 26:17
  26:21
**retained** 2:12
**reversing** 51:19
**review** 13:3 38:20
**reviewing** 9:12
  26:11

[rid - staffing]                                                                Page 11

**rid**  29:5
**right**  12:10 17:7
  20:10 24:12,16,20
  25:1 30:13 32:21
  37:11 39:16 46:24
  47:3,5 50:14
  51:21 54:13 55:4
**right's**  24:21
**rises**  44:15
**risk**  52:7
**rjd**  1:7 3:7
**rob**  15:4
**robert**  4:3 5:16
**robert.collins**  4:6
**role**  53:10,19
**roof**  18:1 20:3,3,5
  20:8,11,11,15,19
  53:25 55:14
**roofing**  19:15
  55:11
**room**  10:10 13:8,9
  14:20 32:8 36:16
  37:8,8 38:3 39:21
  40:12 48:5 50:8
**rooms**  25:14 36:17
  37:1 38:6,25 40:2
**rough**  58:6,7
**route**  3:18
**routine**  29:3,3
**rpr**  4:21
**rubbing**  13:7
**rule**  30:7,8,9,10
**rules**  6:18 8:3 30:4

**s**

**s**  2:8 4:1,16
**s.a.**  1:8 3:8,24
**safe**  15:25 17:11
  17:24 18:20 42:2
  48:11
**safely**  10:10 47:2

**safety**  21:14 56:9
**sajid**  4:4
**sajid.saleem**  4:7
**saleem**  4:4
**sanitarily**  47:3
**satellite**  8:23
**save**  34:11
**saying**  12:1,6,8,23
  31:14 39:13
**says**  5:10 12:5
  35:6,19,20,24
  37:19 47:22
**scale**  45:21,22
**scheduled**  20:14
  20:16
**scientific**  51:5
**screened**  16:10
**second**  4:16 15:23
  16:24 17:5,19
  22:15,19,23,24
  23:3,8,10 24:11,18
  37:18 46:22 55:24
**section**  16:20 35:9
**sections**  14:6
  15:15 16:22
**securely**  10:10
  47:3
**security**  9:2 11:12
  36:18 48:10 49:25
**see**  21:16 35:5,19
  37:19 38:8 47:22
**seeing**  36:14 40:17
**seen**  8:4,8 28:17
  28:19,20 35:2
**segregation**  12:12
  12:14 13:25 29:10
  29:14,19,25 30:5
  30:11,17,19,24
  31:1,5,11,21 32:8
  32:15,18 33:4,15
  33:20 34:4 35:9

  46:8,16,22 47:23
**sense**  19:10 49:9
**separate**  15:11,14
  20:4
**seriously**  19:7
**set**  28:8 30:10
**settlement**  5:19
**seven**  49:2
**sheridan**  4:9
**shorthand**  3:19
  5:4 59:3
**show**  34:6
**shower**  21:10
**showers**  22:11,15
  22:18,24 23:1,3,8
  24:4 41:14 57:9
**side**  30:14
**signature**  5:6
  58:10 59:17
**signed**  54:1
**signs**  26:17
**similar**  30:18
**similarly**  1:5 3:5
**single**  36:19 49:1,6
  51:2
**sinks**  21:25 23:9
**sir**  5:14 7:10 27:16
  44:3 57:18
**sit**  39:22
**situated**  1:5 3:5
**six**  3:16 12:14,18
  13:5,5,24 15:20
  31:7 32:11,11
  34:15 36:8 43:2
  46:6,7,15,16,20
  48:2 49:2 50:17
**slip**  6:6
**slow**  53:24
**small**  45:21
**snippets**  21:17

**solicit**  18:14
**solicits**  56:14
**solutions**  4:22
**somewhat**  9:19
**sorry**  5:22 11:2
  13:15 34:10,19
  35:20
**sort**  26:17 32:7
  38:1,6 43:21 45:3
**source**  42:18
**south**  4:23
**southern**  1:1 3:1
  3:22 55:13
**space**  12:25 26:15
**speak**  16:6 33:8
  37:15 49:12
**speaking**  18:24
  28:4
**specific**  19:12
  29:13 37:12 41:19
  49:18
**specifically**  22:7
  30:8 38:21 42:16
  44:20,24 45:25
  46:4 49:12 50:15
**specifications**
  55:17
**specifics**  41:22
**spraying**  29:6
**sprays**  29:3
**spread**  37:8
**springfield**  4:16
  54:4
**st**  4:23
**staff**  9:3 13:9
  14:24 15:3 29:7
  52:25 53:23 57:16
  57:22
**staffing**  8:25 49:25
  50:2

[standard - understanding]

| | | | |
|---|---|---|---|
| standard 28:24,25 | survey 40:23,23 | tend 42:18 | told 26:7 43:13 |
| standards 27:23 | 41:1 50:25 | term 9:17 10:3,6 | tongue 6:6 |
| 27:25 28:3,8 43:3 | swing 11:3 | 18:4 37:25 48:17 | top 11:2 |
| 43:6,7,11 45:9 | sworn 3:14 5:9 | 49:15 58:6 | topics 8:8 9:12 |
| 56:25 57:1,3,5 | 59:6 | terms 17:18 18:11 | tornado 17:14 |
| stands 37:24 | system 12:5 25:4 | 43:4 48:20,22 | 18:4 |
| start 8:18 12:12 | 25:10 27:15 32:20 | 49:18,19 50:18 | total 35:12 36:12 |
| 16:24 23:20 53:25 | 33:7 45:2 | 51:21 | 51:11 |
| started 51:12 | | test 44:23 | tour 52:13 |
| 53:22 | **t** | testify 8:13 13:6 | tracks 32:21 |
| starting 1:18 | t 2:1,8 | 33:12 | transcribed 5:5 |
| 27:19 42:7 44:10 | take 7:15,17 11:3 | testimony 59:5,7 | transcript 2:13 |
| state 3:18,20 16:8 | 12:8 16:13 19:6 | tests 44:11 | transferring 52:7 |
| 18:13,15 54:12 | 35:5 47:17,21 | thank 5:15 52:11 | translated 12:4 |
| states 1:1 3:1,21 | 51:16,18,18,19 | 58:2 | trickle 16:13 |
| statewide 18:19 | taken 1:16 5:4 | thereto 59:13 | true 54:18 |
| statute 21:16 | 31:10,12 33:17 | thing 7:13,16 9:9 | trust 26:25 |
| stipulated 5:1 | 47:19 59:7,11 | 22:13 45:4 | try 7:2 13:15 |
| stopped 32:1 40:5 | talk 6:22,23 16:20 | things 19:16 41:18 | trying 19:10 34:10 |
| 40:7 | 29:10 31:4 34:14 | 46:4 52:19 | turn 8:6 |
| strategy 15:24 | 38:17 45:18 53:19 | think 17:23,23 | turned 18:4 |
| street 4:16,23 | 54:9 | 20:13,23 33:9 | two 27:8 28:17 |
| structural 22:12 | talked 45:11 46:6 | 51:16 56:5 58:1,2 | 31:8,17 32:9,12 |
| structure 18:8 | 46:7,8,21 47:8,12 | third 15:23 22:25 | 36:17 46:22 48:2 |
| 55:7 | 52:2,17 | 23:13,24 24:11,13 | 51:2,3 56:21 |
| students 11:17 | talking 24:8 25:16 | 29:11,14 30:19,23 | type 9:9 10:24 |
| study 26:16 | 39:6 42:1 48:9 | 31:1 33:19 37:21 | 11:17 50:3 |
| style 32:7 | 50:14 55:9 | thought 53:15 | types 47:11 |
| subject 52:1 | tasks 41:15 | three 46:9 | typewriting 5:6 |
| submit 39:12,13 | taste 44:8 | time 1:18 7:15 | 59:8 |
| sufficient 23:10 | technical 56:3 | 11:15 15:16,21 | |
| suit 28:16 | technicality 56:7 | 29:21 34:11 52:11 | **u** |
| suite 4:5,23 | technically 13:21 | today 9:11 12:24 | u 37:24 |
| supervise 42:15 | tell 19:22 22:22 | 33:9 38:22,22 | uh 23:15 |
| supplied 45:1 | 35:18 43:14 51:8 | 52:12 | umbrella 9:6 |
| sure 7:13 11:25 | temperature | today's 13:4 | understand 7:1,2 |
| 12:7 19:11 24:24 | 25:12 | toilet 21:10 | 7:5 8:11 9:20 12:8 |
| 27:25 28:22 34:5 | temporary 13:22 | toilets 21:9,25 | 12:20 14:4 19:11 |
| 36:16 39:8 43:6 | 17:16 18:4,5 | 22:11 23:9 24:4 | 24:24 56:5 |
| 47:15,16 | 31:24 38:6 | 57:9 | understanding |
| | ten 14:15 39:6,9 | | 9:21,21,23,24 |
| | | | 39:25 |

[understood - zero]                                                                  Page 13

understood  7:4,8
  7:18 23:7
unfinished  38:23
unit  2:9 13:25
  21:21,22,24 29:10
  29:14,15,21 30:19
  30:24 31:1,5,6,22
  34:18 35:3,8,10,20
  35:22 36:3,12,13
  36:21,24 37:3,12
  38:12 46:8,16
  54:5
united  1:1 3:1,21
units  8:23 16:5
  34:15,15,21 36:9
  38:16,19,24 39:17
  40:16 41:7,9,21,25
  42:4 43:4,11
  45:12,15 46:6,15
  46:20,23 50:17
unsafe  17:25
unusual  44:8
upkeep  9:9
uplcchicago.org
  4:11
uptown  4:9
urinals  23:10 24:4
use  10:24 12:3
  27:1 31:15,16,21
  32:15,18 48:7
  51:24 56:8
users  56:3
usually  21:16 29:6
utilities  41:17
utilization  10:24
  29:8
utilized  49:8 55:2

v

vacated  29:23,24
valves  41:14

various  32:23
varmints  29:4
vcc  35:6
vendor  44:23
ventilation  25:10
verified  44:15,15
veritext  4:22
versus  12:22
videotaped  3:13
vienna  1:10 3:10
  3:17,18 8:1,20
  9:14 10:25 11:5,9
  11:20 13:13 16:5
  16:6,11 30:15
  35:4,7 38:21
  39:25 41:3 42:11
  42:16 43:20 46:10
  46:14,23 47:14
  48:12 49:20 50:14
  50:18 51:13,20
  52:7,8,19,23 57:13
  57:17,19,23
vigorously  19:9
vocational  11:17
vs  1:7 3:7

w

wabash  4:5
wait  55:23
waive  58:4
waived  5:7 58:10
walked  12:9 22:21
  39:24 50:24
walls  13:11
want  13:7,7,8 14:4
  15:19 16:10,20
  18:8 19:11 20:7
  39:3 42:25 48:8
  50:2 52:18 53:19
  54:9 56:1,2,20
wanted  21:19
  43:24

warden  1:10 3:10
  6:12,13 8:1 39:13
  42:14,20,22 43:18
  53:13 54:1
washup  1:4 3:4
watched  14:10
water  17:25 20:8
  43:5,8,10,17 44:1
  44:5,7,8,12,19,23
  45:1,1,2,2,9
watkins  4:4 5:17
way  15:6 25:1
  30:13 34:8 37:10
  49:9,14,14 52:9
we've  17:23 30:12
  46:6,7,8,21 47:8
  47:12 48:24,25
  49:15
week  15:11 19:5
  48:5
weekly  18:20
weeks  15:20 31:13
welcome  52:14
went  15:23 16:4,6
wiggle  50:8
window  38:23
windows  19:15
  25:22 26:2 28:21
  39:16,17,18,20
  40:1,11 46:1
wing  16:25 17:5,8
  17:19 23:18 30:16
  35:4,8 36:2,5,5,6
  36:22 37:7
wings  23:16 29:24
  36:25 37:1,3,12,14
wintertime  55:12
wish  33:8
witness  3:13 5:6
  34:12 52:14 59:5
  59:7

word  48:7
words  25:13
work  16:11,17
  19:8 20:22 22:6
workforce  9:1
working  30:7,9
works  33:17
world  39:11

x

x  2:1,1,8,8 57:9

y

yeah  26:21 30:23
  32:3 37:2 39:7
  45:4 56:6
year  6:1 10:17
  14:8
years  14:11,15
  28:19 30:1 39:7,9
  48:25 49:2,3
yep  17:17

z

zero  37:21 38:9

# EXHIBIT E

DRAFT

United States District Court for the Southern District of Illinois

**Notice of Dismissal of Class Action Lawsuit**

**A federal court directed this notice.  This is not a solicitation from a lawyer.**

In June 2012, several inmates filed a lawsuit, *Michael Boyd, et al. v. S. A. Godinez, et al.*, Case No. 3:12-cv-00704 (S.D. Ill.), relating to the living conditions at Vienna Correctional Center ("Vienna").  This lawsuit did not seek any money for any inmates.  It also did not bring any claims related to medical or psychological treatment.  Instead, it sought an order requiring improvements to Vienna.  Due to changed conditions at Vienna, however, Plaintiffs now seek to voluntarily dismiss this lawsuit.  This notice explains the reasons for dismissal and the rights of the Class.

**What Was This Case Trying To Achieve?**  The inmates who brought this case were seeking an order from the Court requiring IDOC to make repairs to and improvements in the living conditions at Vienna. They were not seeking any money damages and were not seeking any changes to medical or psychological services at Vienna.

**What Is A Class Action?**  In a class action, one or more people called "Class Representatives" (in this case, J.B. Washup) sue on behalf of themselves and other similarly-situated people.  Together, all the people with similar claims are members of the "Class."

**Why Is This Case Being Dismissed?** The primary goal in this case was to improve the living conditions at Vienna, primarily in "Building 19."  Since the case was filed, however, IDOC has ceased using Building 19 to house inmates in the general population, has made improvements to the various housing units and has overall reduced the prison population that caused many of the substandard living conditions. IDOC has agreed to inform Class Counsel in writing if it intends to re-open Building 19 within two years of dismissal so that Class Counsel can evaluate the rights of the Class and whether further legal action would be appropriate.

**Am I Entitled To Monetary Relief As A Result Of This Lawsuit?**  No.  Plaintiffs brought this case to improve conditions at Vienna and were not asking for any money damages.

**Does The Dismissal Prevent Me From Seeking Money Damages?**  No.  Nothing in this dismissal would prevent you from filing a separate lawsuit.

**When And Where Will The Court Decide Whether To Approve The Dismissal?**  The Court has scheduled a Fairness Hearing on [date] at [location].

**If I Do Not Agree With The Dismissal, How Can I Tell The Court?**  If you do not agree with the dismissal or have other information that you want to provide the Court, you may submit a letter or other written document that includes the following:

1)  A heading that includes the case name and case number -- *Michael Boyd, et al. v. S. A. Godinez, et al.*, Case No. 3:12-cv-00704.

2)  Your name and inmate number.

3)  A statement of all your objections to dismissal or other information that you would like to bring to the Court's attention.

You must mail your objection no later than [date] to the following address:

[COURT ADDRESS]